# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

LASHEENA SIPP-LIPSCOMB AND ANDRES GARDIN, SR., Individually and in their own right and as Parents and Natural Guardians of ANDRES GARDIN, JR., a Minor

**(b)** County of Residence of First Listed Plaintiff    Philadelphia

*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

David E. Jokelson, Esquire, Derek E. Jokelson, Esquire, 230 S. Broad Street, 10th Floor, Philadelphia, PA, 215-735-7556

## DEFENDANTS

EINSTEIN PHYSICIANS PENNYPACK PEDIATRICS, et al.

County of Residence of First Listed Defendant    Philadelphia

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation - Transfer
- ☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. Section 1395dd (EMTALA)

Brief description of cause:
Failure to appropriately screen for and stabilize emergency medical condition under EMTALA, and pendent state law malpractice claims.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
In excess of $150,000

CHECK YES only if demanded in complaint:

JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE
April 16, 2020

SIGNATURE OF ATTORNEY OF RECORD
s/David E. Jokelson

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

### DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: **2555 Welsh Road, Apartment 321, Philadelphia, PA 19114-3212**

8556 Bustleton Avenue, Philadelphia, PA 19152, 5501 Old York Road, Philadelphia, PA 19141, 160 E. Erie Street, Philadelphia, PA 19134
Address of Defendant: 1209 Orange Sreet, Wilmington, DE 19801, 200 Bowman Drive, Suite E-360, Voorhees, NJ 08043

Place of Accident, Incident or Transaction: _____ **Philadelphia, Pennsylvania** _____

---

*RELATED CASE, IF ANY:*

Case Number: _____     Judge: _____     Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?     Yes ☐     No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?     Yes ☐     No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?     Yes ☐     No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?     Yes ☐     No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: __April 16, 2020__     __s/David E. Jokelson__     __73734__
                                              Must sign here
                            *Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☑ 11. All other Federal Question Cases
*(Please specify):* __42 U.S.C. Section 1395dd (EMTALA)__

**B.** *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☐ 9. All other Diversity Cases
*(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, __David E. Jokelson__, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐ Relief other than monetary damages is sought.

DATE: __April 16, 2020__     __s/David E. Jokelson__     __73734__
                                              Sign here if applicable
                            *Attorney-at-Law / Pro Se Plaintiff*          *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

|  |  |  |
|---|---|---|
| LASHEENA SIPP-LIPSCOMB AND ANDRES GARDIN, SR., Individually and in their own right and as Parents and Natural Guardians of ANDRES GARDIN, JR., a Minor | : | CIVIL ACTION |
| v. | : | |
| | : | |
| EINSTEIN PHYSICIANS PENNYPACK PEDIATRICS,et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
commonly referred to as complex and that need special or intense management by
the court. (See reverse side of this form for a detailed explanation of special
management cases.)          ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.     (x x)


| April 16, 2020 | s/David E. Jokelson | David E. Jokelson/Derek E. Jokelson |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for**  Plaintiffs |
| 215-735-7556 | 215-985-0476 | david@jokelson.com/dej@jokelson.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LASHEENA SIPP-LIPSCOMB AND ANDRES GARDIN, SR., Individually and in their own right and as Parents and Natural Guardians of ANDRES GARDIN, JR., a Minor** 2555 Welsh Road, Apt. 321 Philadelphia, PA 19114-3212 | CIVIL ACTION |
| v. | NO. |
| **EINSTEIN PHYSICIANS PENNYPACK PEDIATRICS** 8556 Bustleton Avenue Philadelphia, PA 19152 | *JURY TRIAL DEMANDED* |
| and | |
| **ALBERT EINSTEIN HEALTHCARE NETWORK** 5501 Old York Road Philadelphia, Pennsylvania 19141 | |
| and | |
| **AGENT DOE** c/o Einstein Physicians Pennypack Pediatrics (see above) and/or Albert Einstein Health Care Network (see above) | |
| and | |
| **ST. CHRISTOPHER'S HEALTHCARE, LLC** f/k/a/ and/or f/d/b/a St. Christopher's Hospital for Children c/o St. Christopher's Hospital for Children 160 East Erie Avenue Philadelphia, PA 19134 and/or 1209 Orange Street | |

Wilmington DE 19801
and/or
Cogency Global Inc.
600 North 2nd Street
Harrisburg, PA 17101

     and

**AMERICAN ACADEMIC HEALTH
SYSTEM, LLC**
f/k/a/ and/or f/d/b/a St. Christopher's Hospital
for Children
c/o St. Christopher's Hospital for Children
160 East Erie Avenue
Philadelphia, PA 19134
and/or
Cogency Global Inc.
850 New Burton Rd., Ste 201
Dover, DE 19904

     and

**PHILADELPHIA ACADEMIC HEALTH
HOLDINGS, LLC**
f/k/a/ and/or f/d/b/a St. Christopher's Hospital
for Children
c/o St. Christopher's Hospital for Children
160 East Erie Avenue
Philadelphia, PA 19134
and/or
Cogency Global Inc.
850 New Burton Rd., Ste 201
Dover, DE 19904

     and

**PHILADELPHIA ACADEMIC HEALTH
SYSTEM, LLC**
f/k/a/ and/or f/d/b/a St. Christopher's Hospital
for Children
c/o St. Christopher's Hospital for Children
160 East Erie Avenue
Philadelphia, PA 19134
and/or
1209 Orange Street
Wilmington DE 19801

and/or
Cogency Global Inc.
600 North 2nd Street
Harrisburg, PA 17101

          and

**ULTRASOUND TECHNICIAN DOE**
c/o St. Christopher's Hospital for Children
160 East Erie Avenue
Philadelphia, PA 19134
and/or
St. Christopher's Healthcare, LLC (see
above)
and/or
American Academic Health System, LLC
(see above)
and/or
Philadelphia Academic Health Holdings,
LLC (see above)

          and

**ERIN E. HASSEL, MD**
c/o St. Christopher's Hospital for Children
160 East Erie Avenue
Philadelphia, PA 19134
and/or
St. Christopher's Healthcare, LLC (see
above)
and/or
American Academic Health System, LLC
(see above)
and/or
Philadelphia Academic Health Holdings,
LLC (see above)
and/or
Philadelphia Academic Health System, LLC
(see above)

          and

**PRAMATH NATH, MD**
c/o St. Christopher's Hospital for Children
160 East Erie Avenue
Philadelphia, PA 19134

and/or
St. Christopher's Healthcare, LLC (see above)
and/or
American Academic Health System, LLC (see above)
and/or
Philadelphia Academic Health Holdings, LLC (see above)
and/or
Philadelphia Academic Health System, LLC (see above)

     and

**UROLOGY FOR CHILDREN, LLC**
200 Bowman Drive, Ste. E-360
Voorhees, NJ 08043

     and

**CHARLES W. CONCODORA, MD**
c/o Urology for Children, LLC (see above)
and/or
St. Christopher's Hospital for Children
160 East Erie Avenue
Philadelphia, PA 19134
and/or
St. Christopher's Healthcare, LLC (see above)
and/or
American Academic Health System, LLC (see above)
and/or
Philadelphia Academic Health Holdings, LLC (see above)
and/or
Philadelphia Academic Health System, LLC (see above)

     and

**UROLOGIST DOE**
c/o Urology for Children, LLC (see above)
and/or
St. Christopher's Hospital for Children

160 East Erie Avenue
Philadelphia, PA 19134
and/or
St. Christopher's Healthcare, LLC (see
above)
and/or
American Academic Health System, LLC
(see above)
and/or
Philadelphia Academic Health Holdings,
LLC (see above)
and/or
Philadelphia Academic Health System, LLC
(see above)

       and

**TELERADIOLOGIST DOE**
c/o St. Christopher's Hospital for Children
160 East Erie Avenue
Philadelphia, PA 19134
and/or
St. Christopher's Healthcare, LLC (see
above)
and/or
American Academic Health System, LLC
(see above)
and/or
Philadelphia Academic Health Holdings,
LLC (see above)
and/or
Philadelphia Academic Health System, LLC
(see above)

## COMPLAINT

## PARTIES

1.      Plaintiffs, Lasheena Sipp-Lipscomb and Andres Gardin, Sr., are the parents and natural

guardians of Andres Gardin, Jr. ("**Baby Gardin**"), a minor child born on April 18, 2017.

At the time of the events described below, Baby Gardin was two (2) years old. Plaintiffs

bring this action individually and on behalf of Baby Gardin as his parents and natural guardians. At all relevant times, Baby Gardin and his parents were indigent and receiving medical assistance (Medicaid).

2.    Defendant Einstein Physicians Pennypack Pediatrics ("**Pennypack**") at all relevant times was an entity engaged in the provision of medical care and services to patients through its physicians, physician assistants, nurses, nurse practitioners, and other staff, including Agent Doe, who participated in the care of Baby Gardin on July 23, 2019, as more specifically described herein. The claims asserted against Pennypack are for corporate negligence and the negligence and/or professional negligence of its actual, apparent and/or ostensible agents, servants and employees, including Agent Doe, who participated in the care, treatment and management of Baby Gardin, as described more fully herein, and whose acts and failures to act increased the risk of harm and were substantial factors contributing to the harm suffered by Baby Gardin.

3.    Defendant Agent Doe was a non-physician agent, servant, and/or employee of Pennypack engaged in the authorized and/or unauthorized provision of medical care and services to patients, including Baby Gardin. Agent Doe was the non-physician Pennypack staff member who consulted with Plaintiff Lasheena Lipscomb in connection with the care and treatment of her minor child on July 23, 2019. Plaintiffs are asserting a negligence and/or professional liability claim against Agent Doe whose acts and failures to act increased the risk of harm and were substantial factors contributing to the harm suffered by Baby Gardin.

4.    Defendant Albert Einstein Healthcare Network ("**AEHN**") is a partnership, corporation or other legal entity organized and existing under the laws of the Commonwealth of

Pennsylvania. At all relevant times, AEHN owned, maintained, operated, managed and/or controlled a network of hospitals and medical practices, including Pennypack, and employed physicians, interns, residents, fellows, nurses, physician assistants, nurse practitioners, technicians and other agents, servants, and employees who purportedly possessed skill and training for the purposes of providing medical care and services to the general public, and Baby Gardin in particular. The claims asserted against AEHN are for corporate negligence and the negligence and professional negligence of its actual, apparent, and/or ostensible agents, employees, and servants, including Agent Doe, who participated in the care of Baby Gardin on July 23, 2019, as more specifically described herein, and whose acts and failures to act increased the risk of harm and were substantial factors contributing to the harm suffered by Baby Gardin.

5.      Defendant St. Christopher's Healthcare, LLC ("**STCH LLC**"), f/k/a/ and/or f/d/b/a St. Christopher's Hospital for Children, at all relevant times was the owner and engaged in the business of the operation of the hospital known as St. Christopher's Hospital for Children ("**St. Christopher's Hospital**") including the hospital inpatient, outpatient, clinics, pharmacy, laboratory, and emergency department services. STCH LLC provided medical care and services to patients through its physicians, physician assistants, nurses, nurse practitioners, ultrasound technicians, and other staff, including Drs. Hassel, Nath, and Concodora, Urologist Doe, Teleradiologist Doe, and Ultrasound Technician Doe, who all participated in the care of Baby Gardin on July 24, 2019, as more specifically described herein. The claims asserted against STCH LLC are for violations of federal law under the Emergency Medical Treatment and Active Labor Act, ("**EMTALA**"), commonly known as the "Patient anti Dumping Act," 42 U.S.C. § 1395dd, corporate

negligence, and the negligence and professional negligence of its actual, apparent and/or ostensible agents, servants and employees, including Drs. Hassel, Nath, and Concodora, Urologist Doe, Teleradiologist Doe, and Ultrasound Technician Doe, who participated in the care, treatment and management of Baby Gardin, as described more fully herein, and whose acts and failures to act increased the risk of harm and were substantial factors contributing to the harm suffered by Baby Gardin.

6.       Defendant American Academic Health System, LLC ("**AAHS LLC**"), f/k/a/ and/or f/d/b/a St. Christopher's Hospital for Children, at all relevant times was the owner and engaged in the business of the operation of the hospital known as St. Christopher's Hospital including the hospital inpatient, outpatient, clinics, pharmacy, laboratory, and emergency department services. AAHS LLC provided medical care and services to patients through its physicians, physician assistants, nurses, nurse practitioners, ultrasound technicians, and other staff, including Drs. Hassel, Nath, and Concodora, Urologist Doe, Teleradiologist Doe, and Ultrasound Technician Doe, who all participated in the care of Baby Gardin on July 24, 2019, as more specifically described herein. The claims asserted against AAHS LLC are for violations of federal law under EMTALA, corporate negligence, and the negligence and professional negligence of its actual, apparent and/or ostensible agents, servants and employees, including Drs. Hassel, Nath, and Concodora, Urologist Doe, Teleradiologist Doe, and Ultrasound Technician Doe, who participated in the care, treatment and management of Baby Gardin, as described more fully herein, and whose acts and failures to act increased the risk of harm and were substantial factors contributing to the harm suffered by Baby Gardin.

7.       Defendant Philadelphia Academic Health System, LLC ("**PAHS LLC**") f/k/a/ and/or

f/d/b/a St. Christopher's Hospital for Children, at all relevant times was the owner and engaged in the business of the operation of the hospital known as St. Christopher's Hospital including the hospital inpatient, outpatient, clinics, pharmacy, laboratory, and emergency department services. PAHS LLC provided medical care and services to patients through its physicians, physician assistants, nurses, nurse practitioners, ultrasound technicians, and other staff, including Drs. Hassel, Nath, and Concodora, Urologist Doe, Teleradiologist Doe, and Ultrasound Technician Doe, who all participated in the care of Baby Gardin on July 24, 2019, as more specifically described herein. The claims asserted against PAHS LLC are for violations of federal law under EMTALA, corporate negligence, and the negligence and professional negligence of its actual, apparent and/or ostensible agents, servants and employees, including Drs. Hassel, Nath, and Concodora, Urologist Doe, Teleradiologist Doe and Ultrasound Technician Doe, who participated in the care, treatment and management of Baby Gardin, as described more fully herein, and whose acts and failures to act increased the risk of harm and were substantial factors contributing to the harm suffered by Baby Gardin.

8.     Defendant Philadelphia Academic Health Holdings, LLC ("**PAHH LLC**," and collectively with STCH LLC, AAHS LLC and PAHS LLC, the "**St. Chris Entities**"), f/k/a/ and/or f/d/b/a St. Christopher's Hospital for Children, at all relevant times was the owner and engaged in the business of the operation of the hospital known as St. Christopher's Hospital including the hospital inpatient, outpatient, clinics, pharmacy, laboratory, and emergency department services. PAHH LLC provided medical care and services to patients through its physicians, physician assistants, nurses, nurse practitioners, ultrasound technicians, and other staff, including Drs. Hassel, Nath, and

Concodora, Urologist Doe, Teleradiologist Doe, and Ultrasound Technician Doe, who all participated in the care of Baby Gardin on July 24, 2019, as more specifically described herein. The claims asserted against PAHH LLC are for violations of federal law under EMTALA, corporate negligence, and the negligence and professional negligence of its actual, apparent and/or ostensible agents, servants and employees, including Drs. Hassel, Nath, and Concodora, Urologist Doe, Teleradiologist Doe, and Ultrasound Technician Doe, who participated in the care, treatment and management of Baby Gardin, as described more fully herein, and whose acts and failures to act increased the risk of harm and were substantial factors contributing to the harm suffered by Baby Gardin.

9.   Upon information and belief, at all relevant times the St. Chris Entities in their capacity as the owner and operator of St. Christopher's Hospital were a "participating hospital" as that term is defined under EMTALA.

10.   Defendant Ultrasound Technician Doe, upon information and belief, is a non-physician ultrasound technician at St. Christopher's Hospital. At all relevant times, Ultrasound Technician Doe was engaged in the provision of services to patients, including Baby Gardin. Ultrasound Technician Doe was the unnamed ultrasound technician referenced in the medical records who purported to interpret and report the results of Baby Gardin's scrotal ultrasound performed at St. Christopher's Hospital on July 24, 2019. Plaintiffs are asserting a negligence and/or professional liability claim against Ultrasound Technician Doe for his or her negligence and the negligence of his or her actual, apparent, and/or ostensible agents, servants and/or employees who were acting at Ultrasound Technician Doe's direction and/or under his or her supervision, control and/or right of control, and whose acts and failures to act increased the risk of harm and were substantial factors

contributing to the harm suffered by Baby Gardin.

11.     Although the records of Baby Gardin's first emergency room encounter on July 24, 2019,

do not identify or reference the participation of a radiologist in the care and treatment of

Baby Gardin and in fact state that Baby Gardin's ultrasound was interpreted by

Ultrasound Technician Doe, records from a subsequent encounter imply that Baby

Gardin's ultrasound may have been interpreted by a radiologist during the first encounter

on July 24, 2019. To the extent Baby Gardin's ultrasound were interpreted by a

radiologist during that first encounter, Defendant Teleradiologist Doe was that

interpreting radiologist. Teleradiologist Doe, upon information and belief, is a duly

licensed and practicing physician specializing in the field of radiology. At all relevant

times, Teleradiologist Doe was engaged at St. Christopher's Hospital in the provision of

medical care and services to patients, including Baby Gardin. Plaintiffs are asserting a

professional liability claim against Teleradiologist Doe for his negligence and the

negligence of his actual, apparent, and/or ostensible agents, servants and/or employees

who were acting at Teleradiologist Doe's direction and/or under his or her supervision,

control and/or right of control, and whose acts and failures to act increased the risk of

harm and were substantial factors contributing to the harm suffered by Baby Gardin.

12.     Defendant Erin E. Hassel, MD, upon information and belief, is a licensed graduate

medical trainee specializing in the field of emergency medicine. At all relevant times, Dr.

Hassel was engaged at St. Christopher's Hospital in the provision of medical care and

services to patients, including Baby Gardin. Plaintiffs are asserting a professional liability

claim against Dr. Hassel for her negligence and the negligence of her actual, apparent,

and/or ostensible agents, servants and/or employees who were acting at Dr. Hassel's

direction and/or under her supervision, control and/or right of control, and whose acts and failures to act increased the risk of harm and were substantial factors contributing to the harm suffered by Baby Gardin.

13.   Defendant Pramath Nath, MD, upon information and belief, is a duly licensed and practicing physician specializing in the field of emergency medicine. At all relevant times, Dr. Nath was engaged at St. Christopher's Hospital in the provision of medical care and services to patients, including Baby Gardin. Plaintiffs are asserting a professional liability claim against Dr. Nath for his negligence and the negligence of his actual, apparent, and/or ostensible agents, servants and/or employees who were acting at Dr. Nath's direction and/or under his supervision, control and/or right of control, and whose acts and failures to act increased the risk of harm and were substantial factors contributing to the harm suffered by Baby Gardin.

14.   Defendant Urology for Children, LLC, ("**UFC LLC**"), at all relevant times was engaged in the business of providing pediatric urology services. Upon information and belief, pursuant to an Emergency Room On-Call Services Agreement and other ancillary agreements with one or more of the St. Chris Entities, UFC LLC contracted to provide 24/7 emergency room coverage for St. Christopher's Hospital through its physician employees including Defendant Charles W. Concodora, MD and possibly Defendant Urologist Doe. The claims asserted against UFC LLC are for the professional negligence of its actual, apparent and/or ostensible agents, servants and employees, including Dr. Concodora and possibly Urologist Doe, who participated in the care, treatment and management of Baby Gardin, as described more fully herein, and whose acts and failures to act increased the risk of harm and were substantial factors contributing to the harm

suffered by Baby Gardin.

15.    Defendant Charles W. Concodora, MD, upon information and belief, is a duly licensed

and practicing physician specializing in the field of urology. Upon information and

belief, Dr. Concodora was at all relevant times the pediatric urologist responsible for on-

call coverage of the emergency room at St. Christopher's Hospital from 12:00AM to

7:59AM on July 24, 2019, and engaged in the provision of medical care and services to

patients, including Baby Gardin during this time. Upon information and belief, Dr.

Concodora was the unnamed urologist referenced in the medical records who purported

to render medical care and treatment to Baby Gardin on July 24, 2019, at St.

Christopher's Hospital. Plaintiffs are asserting a professional liability claim against Dr.

Concodora for his negligence and the negligence of his actual, apparent, and/or ostensible

agents, servants and/or employees who were acting at Dr. Concodora's direction and/or

under his supervision, control and/or right of control, and whose acts and failures to act

increased the risk of harm and were substantial factors contributing to the harm suffered

by Baby Gardin.

16.    Defendant Urologist Doe, upon information and belief, is a duly licensed and practicing

physician specializing in the field of urology. To the extent Dr. Concodora was not

involved in the care and treatment of Baby Gardin, Urologist Doe was the unnamed

urologist referenced in the medical records who purported to render medical care and

treatment to Baby Gardin on July 24, 2019, at St. Christopher's Hospital. Plaintiffs are

asserting a professional liability claim against Urologist Doe for his negligence and the

negligence of his actual, apparent, and/or ostensible agents, servants and/or employees

who were acting at Urologist Doe's direction and/or under his supervision, control and/or

right of control, and whose acts and failures to act increased the risk of harm and were

substantial factors contributing to the harm suffered by Baby Gardin.

**JURISDICTION AND VENUE**

17.  Jurisdiction is founded upon a federal question arising under EMTALA against the St.

Chris Entities pursuant to 28 U.S.C. § 1331. Plaintiffs also invoke this Court's

supplemental jurisdiction over both the remaining pendent parties and pendent state law

claims pursuant to 28 U.S.C. 1367(a).

18.  Venue under 28 U.S.C. 1391 is appropriate in this judicial district in so far as the events

and omissions giving rise to the claims occurred within the Eastern District of

Pennsylvania and one or more of the Defendants reside in the Commonwealth of

Pennsylvania.

**FACTS**

19.  In July 2019, Baby Gardin was an established patient of Pennypack.

20.  On July 23, 2019, and promptly upon discovery of Baby Gardin with a swollen and

tender/painful left testicle, Plaintiff Lasheena Sipp Lipscomb ("**Plaintiff Lipscomb**")

initiated telephone communication with Pennypack to report these symptoms and her

concerns about Baby Gardin's health and welfare.

21.  Unbeknownst to Plaintiff Lipscomb, the symptoms, including acute scrotal pain,

exhibited by Baby Gardin were consistent with a testicular torsion and constituted a

medical emergency requiring urgent medical evaluation and treatment.

22.  Acute scrotal pain, such as the pain experienced by Baby Gardin, is a urological

emergency requiring prompt assessment. Differential diagnoses include torsion of the

testis, torsion of testicular appendages, epididymoorchitis, idiopathic scrotal oedema,

hydrocele, trauma, testicular tumors, epididymal cysts and strangulated inguinal hernia. Torsion of the spermatic cord is of major concern because it requires immediate surgical intervention. Testicular torsion is a twisting of the spermatic cord and its contents and is a surgical emergency. It accounts for 10% to 15% of acute scrotal disease in children, and results in an orchiectomy (the surgical removal of one or both testicles) rate of 42% in boys undergoing surgery for testicular torsion. Because spermatic cord torsion is a potentially reversible condition when diagnosed and treated early, the emphasis should be on prompt evaluation of children who present with acute scrotum or acute inguinal or abdominal pain. Prompt recognition and treatment are necessary for testicular salvage, and torsion must be excluded in all patients who present with acute scrotum. Delay in treatment may be associated with decreased fertility, or may necessitate orchiectomy. In a patient presenting with acute scrotum, it is imperative to rule out testicular torsion, which is a true surgical emergency. A high index of suspicion on the part of the physician is required. Prompt identification and institution of therapy are crucial to avoid limiting the therapeutic window for testicular salvage. Spermatic cord torsion is a true urologic emergency and must be differentiated from other complaints of testicular pain because a delay in diagnosis and management can lead to loss of the testicle. Time becomes an important factor when evaluating these patients; a prompt and accurate diagnosis can be essential to the preservation of testicular viability. The rate of testicular loss can approach 100% in cases where the diagnosis is missed, emphasizing the necessity of maintaining a high index of suspicion for torsion in males presenting with scrotal pain. If the affected testicle is deemed viable, orchiopexy with permanent suture should be performed to permanently fix the testicle within the scrotum.

23.     Plaintiff Lipscomb reported the symptoms, including *inter alia*, acute scrotal pain exhibited by and the condition of Baby Gardin to Pennypack and its agent, Agent Doe.

24.     Although the symptoms reported were consistent with a testicular torsion requiring urgent medical attention to salvage Baby Gardin's testicle, Agent Doe negligently failed to direct Plaintiff Lipscomb to seek emergency medical care and instead advised her that the swelling could be secondary to fluid accumulation and that she should simply observe Baby Gardin to see if the swelling resolved with time.

25.     Upon information and belief, Pennypack and Agent Doe knew and understood and/or should have known and understood, and it is recognized in the medical literature and under the standard of care, that "Acute scrotal pain is a urological emergency requiring prompt assessment," and that the failure to seek emergency medical care could result in grievous body injury including the loss of one or both testicles, decreased fertility, and the loss of the ability to procreate.

26.     Upon information and belief, Pennypack failed to formulate, adopt and enforce rules and policies to ensure quality patient care including rules and policies related to receiving, acting upon, and documenting telephone reports from and encounters with patients and their care takers.

27.     Upon information and belief, Pennypack failed to properly oversee all persons who practiced medicine at its facility and participated in rendering substandard care to Baby Gardin, including Agent Doe.

28.     Upon information and belief, Pennypack failed to select and retain only competent staff to dispense medical advice to patients and their care takers.

29.     By failing and otherwise refusing to direct Baby Gardin to seek emergency medical care,

and by failing to formulate, adopt and enforce rules and policies to ensure quality patient care, to oversee all persons who practiced medicine at its facility, and to retain only competent staff to dispense medical advice, Pennypack and Agent Doe acted in, and otherwise exhibited, reckless disregard of the health, welfare and safety of Baby Gardin.

30. Agent Doe's and Pennypack's acts and omissions constituted an abandonment of Baby Gardin and his parents.

31. As a result of Agent Doe's and Pennypack's acts and omissions, Baby Gardin did not receive the immediate medical attention that was otherwise required under the circumstances.

32. Despite due diligence, Plaintiffs have been unable to discover the identity of Agent Doe. Plaintiffs requested from Pennypack all of Baby Gardin's medical records, but the records produced do not identify Agent Doe or include any reference to the telephone encounter on July 23, 2019. After further demand upon Pennypack to produce all records of telephone communications, including any and all notes relating to the telephone encounter on July 23, 2019, regarding the care and treatment of Baby Gardin, Pennypack advised that it has no records of any telephone communication on that date. Upon information and belief, Agent Doe and/or Pennypack failed to maintain records of this telephone encounter and/or spoliated the records associated with this encounter.

33. At approximately 3:02 AM on July 24, 2019, Baby Gardin presented to the emergency department of St. Christopher's Hospital with acute scrotal pain, and was seen for treatment of acute scrotal pain under the attending care of Drs. Hassel and Nath.

34. At all relevant times, upon information and belief, St. Christopher's Hospital and its staff, including Dr. Hassel and Dr. Nath, knew and understood, and it is recognized in the

medical literature and under the standard of care, that "Acute scrotal pain is a urological

emergency requiring prompt assessment" and is otherwise an emergency medical

condition requiring stabilization under EMTALA.

35.   Dr. Hassel noted in Baby Gardin's medical chart the following History of Present Illness:

> The patient presents with testicular pain and scrotal swelling. The onset was 12 hours ago. The course/duration of symptoms is fluctuating in intensity. Type of injury: none. Location: Left testicle. Radiating pain: none. The character of symptoms is sharp. The exacerbating factor is palpation. The relieving factor is lying down. Risk factors consist of none. Prior episodes: none. Therapy today: none. Associated symptoms: none.
>
> Previously healthy 2 y/o M presents with left testicular pain/swelling that began - 1500 yesterday. Mom reports that after the pt woke up from a nap he was walking with his legs farther apart than usual while leaning forward. She examined him and noted that his left testicle was swollen and tender to the touch. She reports that she called the pediatrician's office and was advised that the swelling could be 2/2 to fluid accumulation and that she should observe the pt to see if the swelling resolved with time. The swelling improved during the evening and then worsened at night. Mom reports the swelling is currently at its worst. Also endorses redness and tenderness of the left testicle. Mom denies f/c, n/v, dysuria, hematuria. Denies trauma to testicles. Denies any therapy today. Denies h/o similar symptoms.

36.   Dr. Hassel further noted that "Skin over left testicle is erythematous, swollen. Left

testicle warmer than right, cremaster reflex absent b/l."

37.   Based upon the history and symptoms presented by Baby Gardin, Dr. Hassel and Dr.

Nath formed a differential diagnosis of "Testicular torsion, epididymitis, inguinal hernia,

orchitis."

38.   Upon information and belief, the regular screening procedure for patients with suspected

testicular torsions at hospitals including St. Christopher's Hospital included a scrotal

ultrasound to be interpreted by a licensed and qualified physician and/or a scrotal

exploration.

39.   Upon information and belief, and in conscious, reckless, willful, wanton and/or

intentional disregard of the substantial risk of serious harm, neither screening procedure were followed or adhered for Baby Gardin.

40. At or around 3:33AM, a scrotal ultrasound was ordered to screen for and otherwise rule out "Scrotal Torsion."

41. Pursuant to this order, a scrotal ultrasound was performed on Baby Gardin by Ultrasound Technician Doe.

42. Upon information and belief, after the scrotal ultrasound was performed and before Baby Gardin was discharged at or around 6:48AM, St. Christopher's Hospital and the attending physicians did not have a radiologist interpret the sonograms and/or generate diagnostic reports (preliminary or final) therefrom.

43. Instead, upon information and belief and in violation of Pennsylvania law, the standard of care, and the regular screening procedures, St. Christopher's Hospital and its staff including Dr. Hassel, Dr. Nath, Dr. Concodora and Urologist Doe refused to follow the regular screening procedures and otherwise failed to adhere to the standard of care by relying upon and delegating the responsibility to Ultrasound Technician Doe to interpret Baby Gardin's sonogram and generate a verbal diagnostic report.

44. As a non-physician, Ultrasound Technician Doe was unauthorized to practice medicine such as by interpreting sonograms or rendering diagnostic reports thereon, and was not qualified, licensed or credentialed to interpret sonograms and generate verbal diagnostic reports as a matter of law and pursuant to the standard of care. By allowing Ultrasound Technician Doe to practice medicine without a license and otherwise in violation of Pennsylvania law, the St. Chris Entities and Drs. Hassel, Nath, and Concodora, and Urologist Doe, as well as Ultrasound Technician Doe negligently, recklessly, willfully,

wantonly, and intentionally placed Baby Gardin in unnecessary danger.

45.     Defendants never explained to Plaintiffs that a non-physician was delegated the

responsibility to interpret Baby Gardin's sonogram, and the delegation to Ultrasound

Technician Doe violated the Medical Practice Act of 1985 and the Osteopathic Medical

Practice Act, and the regulations promulgated thereunder.

46.     Despite due diligence, Plaintiffs have been unable to discover the identity of Ultrasound

Technician Doe. Plaintiffs requested from St. Christopher's Hospital all of Baby Gardin's

medical records on August 6, 2019, but the records produced do not identify Ultrasound

Technician Doe. Thereafter on August 15 and 26, September 6, September 10, September

17, and December 7, 2019, Plaintiff's counsel requested, *inter alia*, records sufficient to

identify Ultrasound Technician Doe. St. Christopher's Hospital and the St. Chris Entities

have failed and otherwise refused to provide this information.

47.     In violation of Pennsylvania law prohibiting the unauthorized practice of medicine and

unauthorized delegation of medical services to non-physicians, the applicable standard of

care, and the regular screening procedures, at or around 4:25AM, upon information and

belief, Ultrasound Technician Doe interpreted Baby Gardin's scrotal ultrasound and

reported that interpretation to Dr. Hassel. In her note to Baby Gardin's medical chart, Dr.

Hassel describes Ultrasound Technician Doe's interpretation and verbal diagnostic report

as follows:

> 07/24/2019 04:25 Spoke to US tech re pt. She said that while it was difficult to
> examine the pt 2/2 to the pt moving during US she is confident there is good
> blood flow in both testicles. She reports she saw evidence of epidymitis on the
> left side.

48.     Upon information and belief, at no time was Ultrasound Technician Doe authorized,

licensed or otherwise qualified or permitted under law to interpret sonograms, and by doing so engaged in the unauthorized and illegal practice of medicine.

49.     Contrary to the interpretation reported by Ultrasound Technician Doe, the scrotal ultrasound did not establish "good blood flow in both testicles" and could not support a diagnosis ruling out testicular torsion.

50.     Neither Ultrasound Technician Doe nor Teleradiologist Doe properly interpreted or acted upon the scrotal ultrasound, and they misinterpreted the sonogram to show "good blood flow in both testicles."

51.     At or around 4:34AM, Dr. Hassel wrote that she consulted with an unnamed urologist believed to be Dr. Concodora and/or Urologist Doe to relay that "US tech was NOT concerned for torsion, saw signs of epididymitis (LEFT). Informed urology of plan to treat pt with motrin 08 for 5 days and have f/u with pediatrics. Urologist [Dr. Concodora and/or Urologist Doe] reported that he would view images and call back."

52.     At or around 5:32AM, Dr. Hassel wrote "Spoke to urology. Urologist [Dr. Concodora and/or Urologist Doe] reported that he was not confident in the results of the US. He is coming in to evaluate the pt."

53.     At or around 5:57AM, Dr. Hassel wrote that "Re-evaluation [of the patient was] performed by urology [Dr. Concodora and/or Urologist Doe]. Exam unchanged from previous."

54.     Upon information and belief, no proper, adequate and/or reasonable evaluation was performed by Dr. Concodora or Urologist Doe.

55.     Despite due diligence, Plaintiffs have been unable to discover from Defendants the identity of Urologist Doe. Through documents filed in the United States Bankruptcy

Court for the District of Delaware, Dr. Concodora has affirmed and attested that he was the pediatric urologist on-call to the emergency room at St. Christopher's Hospital from 12:00AM through 7:59AM on July 24, 2019. On August 6, 2019, Plaintiffs also requested from St. Christopher's Hospital all of Baby Gardin's medical records. However, the records produced do not identify the consulting urologist and do not include any medical records created by the consulting urologist. Thereafter, on August 15 and 26, September 6, September 10, September 17, and December 7, 2019, Plaintiff's counsel requested, *inter alia*, records sufficient to identify the consulting urologist as well as all medical records created by the consulting urologist or otherwise documenting his encounter with Baby Gardin. St. Christopher's Hospital and the St. Chris Entities have failed and otherwise refused to provide this information.

56. Similarly, despite due diligence, Plaintiffs have also been unable to discover from Defendants the identity of Teleradiologist Doe. On August 6, 2019, Plaintiffs requested from St. Christopher's Hospital all of Baby Gardin's medical records. Thereafter on August 15 and 26, September 6, September 10, September 17, and December 7, 2019, Plaintiff's counsel requested, *inter alia*, records sufficient to identify Teleradiologist Doe. St. Christopher's Hospital and the St. Chris Entities have failed and otherwise refused to provide this information.

57. Although 1) the scrotal ultrasound did not establish good blood flow in both testicles and could not rule out a testicular torsion, 2) Dr. Concodora and/or Urologist Doe, according to Dr. Hassel, "reported that he was not confident in the results of the US," and 3) Ultrasound Technician Doe was not authorized, licensed, credentialed or otherwise qualified or permitted under law to interpret sonograms, Drs. Concodora, Hassel, and

Nath, Teleradiologist Doe, Urologist Doe, and Ultrasound Technician Doe, upon information and belief, elected not to order and St. Christopher's hospital failed to obtain a repeat scrotal ultrasound or demand that the sonogram be interpreted by a radiologist prior to discharge.

58.     Instead, upon information and belief, Drs. Hassel and Nath, in consultation with Dr. Concodora and/or Urologist Doe, chose to rely upon the unauthorized and illegal ultrasound interpretation and diagnosis rendered by Ultrasound Technician Doe and based thereon elected to discharge Baby Gardin notwithstanding the absence of a preliminary or final imaging report, their knowledge that Ultrasound Technician Doe was not authorized to practice medicine including by interpreting sonograms and generating verbal diagnostic reports thereon, and Dr. Concodora's and/or Urologist Doe's belief that "he was not confident in the results of the US."

59.     Upon this record, Drs. Hassel and Nath, in consultation with Dr. Concodora and/or Urologist Doe, discharged Baby Gardin from St. Christopher's Hospital with an incomplete and therefore false diagnosis of "Left testicular pain" upon the "Rationale" that "Left testicle erythematous, warm, swollen. No h/o of fever, parotitis, n/v, dysuria, hematuria. U/S of poor quality, however, U/S tech reported good flow to both testicles during exam. Imaging did reveal swelling consistent with epididymitis."

60.     The unlawful reliance upon Ultrasound Technician Doe and the premature and unjustified discharge constituted an abandonment of Baby Gardin as well as an outrageous and reckless disregard of Baby Gardin's health, safety and welfare.

61.     At and prior to the time of discharge, St. Christopher's Hospital refused and otherwise failed to follow its regular screening procedure and failed to stabilize Baby Gardin's

known emergency medical condition prior to discharge, all in violation of EMTALA.

62.     Instead, on discharge at or around 6:48AM, the staff of St. Christopher's Hospital

instructed that Baby Gardin "Follow up with: KRISSA GEORGE MD Within 3-5 days;

Follow up with Specialist Within 10-14 days Call Urology at 856-751-7880 to set up

appointment in 2 weeks for follow up."

63.     In truth and in fact, at no time did the sonogram unlawfully interpreted by Ultrasound

Technician Doe evidence good blood flow to both of Baby Gardin's testicles.

64.     Instead, hours after Defendants unlawfully discharged Baby Gardin without following or

adhering to the regular medical screening procedure or stabilizing Baby Gardin's known

emergency medical condition and otherwise in violation of the standard of care and

EMTALA, the scrotal sonogram was reviewed, upon information and belief for the first

time, by a radiologist at St. Christopher's Hospital, Timothy Higgins, MD, who formed

the following impression in an ultrasound report he authored over six (6) hours after

discharge at 1:35PM:

1.     Definitive blood flow with normal-appearing waveforms is not
documented in either testis, which may be technical or secondary to
motion.

2.     There is hyperemia surrounding the left testicle and involving the
epididymis, and the left testicle demonstrates a heterogeneous
echogenicity. Although a preliminary report was provided by
teleradiology indicating no evidence of testicular torsion on this limited
evaluation, repeat ultrasound with color and spectral Doppler imaging is
recommended to exclude testicular torsion and document normal blood
flow in the testes.

3.     Revised findings were called to the nurse practitioner Stephanie in the
emergency room at the time of over read by Dr. Higgins at 10:00 AM.

65.     Upon information and belief, notwithstanding Dr. Higgins' above statement, no

"preliminary report was [ever] provided by teleradiology." The only report was a verbal

report by Ultrasound Technician Doe.

66.  Upon information and belief, no teleradiology services were utilized at St. Christopher's

Hospital in connection with the care and treatment of Baby Gardin.

67.  Following Dr. Higgins' interpretation of the scrotal ultrasound hours after Baby Gardin

was wrongly discharged from St. Christopher's Hospital in violation of EMTALA and

the standard of care, Plaintiff Lipscomb returned with Baby Gardin to the emergency

room at St. Christopher's Hospital.

68.  On Baby Gardin's return, the following History of Present Illness was noted:

> The patient presents with testicular pain and scrotal swelling, The onset was 24
> hours ago, The course/duration of symptoms is fluctuating in intensity, Type of
> injury: none. Location: Left testicle. Radiating pain: none. The character of
> symptoms is sharp, swelling and redness. The exacerbating factor is Palpation.
> The relieving factor is lying down. Risk factors consist of none. Prior episodes:
> none. Therapy today: none. Associated symptoms: none. **Pt is a 2yo previously
> healthy M presenting today after being called back for reevaluation due to
> unclear US reading with testicular pain and swelling x 24 hours. Pt was here
> at 3am today for the same complaint in which he was evaluated for testicular
> torsion by testicular US. The US tech stated that she saw good flow and
> evidence of epididymitis and the pt was evaluated by urology. Pt was sent
> home with Motrin and told to f/u with pediatrician. Upon reevaluation of the
> US by the radiology department there was unconclusive evidence of good
> blood flow and pt was reached to return to SCHED for further evaluation**.
> Mom stated that when the pt woke up from a nap yesterday @1500 she noticed
> the pt was walking funny and crying so she evaluated him and saw L sided
> testicular pain and swelling. Mom called the pediatrician and was told to continue
> to monitor with possibility of hydrocele. The swelling slightly reduced throughout
> the day but worsened at night and mom noticed new erythema of the L testicle
> and came into SCHED. Today mom denies fever, chills, n/v/d, hematuria. Pt is
> eating, drinking, voiding and stooling per baseline. No allergies.

69.  The attending staff members at St. Christopher's Hospital further noted the following

Medical Decision Making Rationale:

> Rationale: 2 yo previously healthy M returning for reevaluation of L testicle
> after being released this morning with dx of epididymitis. US was reviewed later
> this morning and pt was called to return to ED for reevaluation due to

nonconclusive blood flow to L testicle. Pt will get repeat US doppler STAT, Urology was notified @1616 that pt was in the ED and will be notified once US doppler is done for evaluation.

70.   The repeat scrotal ultrasound report noted that:

The left testis demonstrates an abnormal heterogeneous and mildly increased echogenicity grayscale appearance. No blood flow could be documented within the left testicle, even with power Doppler imaging. The left scrotal skin is thickened. A small reactive hydrocele is evident. The left testicle measures 1.5 x 1.2 x 1.2 em, corresponding to a volume of 1.1 mL. The left epididymis is echogenic.

IMPRESSION:

1.      Ultrasound findings consistent with left testicular torsion given the heterogeneous echotexture and increased size of the left testicle relative to the right testicle, accompanied by absence of blood flow. Findings were immediately conveyed to the emergency room physician at the time of the examination by Dr. Higgins.

2.      Normal-appearing right testis, which retracted into the inguinal canal during the examination. Arterial blood flow was documented. Venous blood flow could not be documented but the examination was limited secondary to patient motion.

71.   Based upon these findings, Baby Gardin was referred for "urgent scrotal exploration with possible left testicular de-torsion, left orchiectomy vs orchidopexy, and right testicular fixation." In this regard, the surgeon, Dr. Zarine Balsara, noted in the Operative Report that:

Andres is a 2yo M with acute-onset left testicular swelling and pain. He was initially seen in the St. Chris ED where a scrotal U/S was read as normal. Upon re-review of the U/S by a different radiologist, concern was raised for possible left testicular torsion. The family was called back to the ED a few hours later and a repeat scrotal U/S showed absence of flow to the left testicle with surrounding inflammation. Urology was consulted and determined that Andres needed urgent scrotal exploration with possible left testicular de-torsion, left orchiectomy vs orchidopexy, and right testicular fixation.

72.   Upon information and belief, notwithstanding the statements and implications in Dr.

Balsara's report, the original scrotal ultrasound was never "read as normal" by a radiologist or other physician during the initial emergency room visit.

73. Because of the delay in the scrotal exploration and diagnosis, Baby Gardin's left testicle was no longer salvageable and, as a result, was required to be permanently removed during the surgery. In this regard, Dr. Balsara noted in the Operative Report that upon opening the scrotum:

> the dartos was markedly edematous and inflamed. We focused first on the affected left side and opened the dartos layers and then entered a very thickened and inflamed tunica vaginalis of the left testicle. The left testicle was then brought out of the scrotum onto the field. The left testicle was appeared dark blue/purplish in color. There was a 360 degree twist of the left spermatic cord. The left testicle and cord were de-torsed completely. However, the left testicle did not change color and still appeared unhealthy. The left testicle was then wrapped in warm saline-soaked gauze to see if over time there would be any improvement in appearance/viability.…

> We then turned our attention back to the left testicle which still appeared blue/purple in appearance. Intra-operative Doppler was placed on the testicle but no flow could be appreciated. We then incised the tunica albuginea. No bleeding was seen and the seminiferous tubules appeared brown and gelatinous, suggesting lack of viability of the left testicle. Doppler was repeated but there was still no flow appreciated. At this point, **we made the decision to remove the left testicle**.…

> The left hemiscrotum was edematous, erythematous, and indurated. The dartos was significantly inflamed. Upon bringing up the left testicle into the wound, we appreciated that there was, indeed, an intravaginal left testicular torsion. The left testicle was twisted 360 degrees and was dark blue/purplish in appearance. Upon de-torsion and surrounding the testicle with warm compresses, we appreciated no change in appearance of the testicle, ie it did not pink up. Upon incision of the tunica albuginea, there was no active bleeding of the seminiferous tubules and the tubules appeared dark and gelatinous (ie non-viable). Likewise, no intra-operative Doppler flow could be appreciated within the left testicle either before or after incision of the tunica albuginea. Therefore, we determined that the left testicle was non-viable and we proceeded with left orchiectomy.

74. Upon information and belief, the "preliminary report … by teleradiology" referenced by Dr. Higgins *supra* does not exist, no such report was otherwise sought or obtained, and

teleradiology was never consulted. Likewise, there was no initial review by a "radiologist" as implied by Dr. Balsara in her Operative Report. Instead, upon information and belief, the only radiology staff member to interpret and report the results of the scrotal ultrasound was Ultrasound Technician Doe who lacked the license, credentials, authority and training to do so.

75.     In this regard, on August 6, 2019, Plaintiff Lipscomb requested all medical records associated with the care and treatment received by Baby Gardin. The records produced did not identify any teleradiology personnel or contain any "preliminary report … by teleradiology" or any report by a radiologist.

76.     On August 15, 2019, Plaintiff's counsel again requested, *inter alia*,:

>   3.     Records sufficient to identify the teleradiology personnel and/or service identified in the ultrasound report by Timothy Higgins, MD on July 24, 2019 at 13:25.

>   4.     All preliminary ultrasound reports identified in the ultrasound report by Timothy Higgins, MD on July 24, 2019, at 13:25.

77.     On August 26 and September 6, 2019, Plaintiff's counsel again requested these records, and was advised by the St. Chris Entities on September 9, 2019, that "According to Medical Records Department, the parents received the records on 8/7/2019."

78.     On September 10 and 17, 2019, Plaintiff's counsel wrote again to advise that significant items from the medical records were still missing including the items referenced above, and to further specify a demand for all audit trails associated with medical records, dictation, and any teleradiology link utilized concerning Andres Gardin, Jr., as well as all electronic communications including emails, text messages and transmission of ultrasound images and data with any teleradiology personnel, including but not limited to

Timothy Higgins, M.D., in connection with the care and treatment of Andres Gardin, Jr.

79.   No documents or information were produced in response to these requests.

80.   On December 2, 2019, Plaintiff's counsel wrote again requesting specifically, *inter alia*,:

> 4.   The "preliminary report ... provided by teleradiology indicating no evidence of testicular torsion on this limited evaluation" as referenced in the US Scrotum report and the US Art/Vein ABD/Pelvis/Scrotal Complete authored by Timothy Higgins, M.D. at 13 :25 on 07/24/2019, together with all documents sufficient to identify the unnamed "teleradiology" personnel. SCHC 0063 and SCHC 0064.

> 5.   With regard to the statement in the operative report of Zarine R. Balsara, M.D. that "He was initially seen in the St. Chris ED where scrotal US was read as normal. Upon re-review of the u/s by a different radiologist, concern was raised for possible left testicular torsion," all documents sufficient to identify (1) the unnamed person who "read" the ultrasound as "normal" and (2) the "different radiologist," together with all documents related to the initial "read[ing]" and "re-review." SCHC 0018.

> 9.   All audit trails and audit logs associated with the electronic medical records, dictation, and any teleradiology link concerning or related to Andres Gardin, Jr.

> 10.   All electronic communications including emails, text messages and transmission(s) of ultrasound images and data with any teleradiology personnel in connection with the care and treatment of Andres Gardin, Jr.

81.   The St. Chris Entities have failed and otherwise refused to provide this information and documentation, and upon such information and belief, no such documentation concerning a "preliminary report ... provided by teleradiology" or initial review by a "radiologist" exists, and no such persons or entities were consulted during Baby Gardin's initial emergency room visit. To the extent Teleradiologist Doe did intepret Baby Gardin's scrotal ultrasound, the interpretation was wrong and below the standard of care.

82.   Defendants' deviation from the applicable standard of care and statutory and regulatory requirements was so egregious in this case that it evidences a conscious, reckless, willful,

wanton and/or intentional disregard the substantial risk of serious harm to the patient.

83.    Defendants' conduct was negligent, reckless, wanton, willful, and/or intentional.

84.    Defendants' failures, including the failure to evaluate Baby Gardin timely and properly,
       created great danger to Baby Gardin.

85.    Defendants knew or had reason to know of the magnitude of the risk involved in the
       conduct at issue in this case.

86.    Defendants' conduct was outrageous.


# COUNT I
# VIOLATIONS OF EMTALA

## Plaintiffs v. STCH LLC, AAHS LLC, PAHS LLC and PAHH LLC

87.    Plaintiffs incorporate the foregoing and subsequent paragraphs as though set forth fully
       herein.

88.    On July 24, 2019, Baby Gardin presented to the emergency department at St.
       Christopher's Hospital for examination and/or treatment of a medical condition.

89.    In violation of the duties under EMTALA, St. Christopher's Hospital failed and
       otherwise refused to provide for an appropriate medical screening examination.

90.    In violation of the duties under EMTALA, although St. Christopher's Hospital knew that
       Baby Gardin was presenting with an emergency medical condition, *i.e.*, acute scrotal
       pain, St. Christopher's Hospital failed and otherwise refused to provide such further
       medical examination and such treatment as may be required to stabilize the medical
       condition, and instead discharged Baby Gardin to home.

91.    As result of the failure to provide appropriate medical screening and stabilization,

Plaintiffs have suffered permanent and severe damages including the loss of Baby Gardin's left testicle.

**WHEREFORE**, Plaintiffs request compensatory and punitive damages against the Defendants named in this count, jointly and severally, in an amount in excess of $150,000 plus costs, interest and all other recoverable damages.

## COUNT II
## NEGLIGENCE

### Plaintiffs v. Agent Doe

92. Plaintiffs incorporate the foregoing and subsequent paragraphs as though set forth fully herein.

93. Agent Doe owed Plaintiffs a duty to possess and exercise the degree of skill and knowledge ordinarily possessed by physician office staff members delegated the responsibility to collect medical information from patients and care takers and to provide instructions for follow-up care.

94. Agent Doe breached the duties owed to Plaintiffs.

95. In addition to the breaches of duty detailed above, Agent Doe's breaches of duty included the following:

   a. Failing to properly collect and act upon the medical information reported by Plaintiff Lipscomb.

   b. Failing to make full and complete entries in the patient's chart.

   c. Failing to direct Plaintiffs to immediately seek an emergency medical assessment and treatment.

d.      Failing to ensure that Baby Gardin's condition was properly managed.

e.      Failing to consult with a physician or treating health professional.

f.      Recommending a course of action that delayed the correct diagnosis and/or treatment of Baby Gardin's condition.

96.    Defendants' breaches of duty injured Baby Gardin and were a direct, proximate and factual cause of Plaintiffs' injuries.

**WHEREFORE**, Plaintiffs request compensatory and punitive damages against the Defendant named in this count, jointly and severally, in an amount in excess of $150,000 plus costs, interest and all other recoverable damages.

## COUNT III
## NEGLIGENT SUPERVISION

### Plaintiffs v. Pennypack and AEHN

97.    Plaintiffs incorporate the foregoing and subsequent paragraphs as though set forth fully herein.

98.    Defendants are responsible for the actions of their staff members, including Agent Doe, whom they supervised.

99.    Defendants negligently supervised Agent Doe which caused damage to Plaintiffs as described herein.

**WHEREFORE**, Plaintiffs request compensatory and punitive damages against the Defendants named in this count, jointly and severally, in an amount in excess of $150,000 plus costs, interest and all other recoverable damages.

## COUNT IV
## VICARIOUS LIABILITY / RESPONDEAT SUPERIOR

### Plaintiffs v. Pennypack and AEHN

100.   Plaintiffs incorporate the foregoing and subsequent paragraphs as though set forth fully
herein.

101.   At all relevant times, Agent Doe was engaged as the actual, apparent and/or ostensible
agent of Pennypack and AEHN, and was acting within the course and scope of such
agency such that Pennypack and AEHN are responsible, vicariously or otherwise, for the
actions and omissions of Agent Doe.

   **WHEREFORE**, Plaintiffs request compensatory and punitive damages against the
Defendants named in this count, jointly and severally, in an amount in excess of $150,000 plus
costs, interest and all other recoverable damages.

## COUNT V
## CORPORATE NEGLIGENCE

### Plaintiffs v. Pennypack and AEHN

102.   Plaintiffs incorporate the foregoing and subsequent paragraphs as though set forth fully
herein.

103.   Pennypack and AEHN had duties including to (1) use reasonable care in the maintenance
of safe and adequate facilities and equipment; (2) select and retain only competent
medical staff; (3) oversee all persons who practice medicine within its walls as to patient
care; and (4) formulate, adopt and enforce adequate rules and policies to ensure quality

care for the patients.

104.    Upon information and belief, Pennypack and AEHN allowed Agent Doe to provide medical instructions to Plaintiffs with inadequate supervision.

105.    Upon information and belief, Pennypack and AEHN Pennypack failed to formulate, adopt and enforce rules and policies to ensure quality patient care including policies and rules related to receiving and acting upon telephone reports from patients and their care takers, documenting telephone encounters, and management of telephone encounters.

106.    Upon information and belief, Pennypack and AEHN failed to properly oversee all persons who practiced medicine at its facility and participated in rendering substandard care to Baby Gardin, including Agent Doe.

107.    Upon information and belief, Pennypack and AEHN failed to select and retain only competent staff to dispense medical advice to patients and their care takers.

108.    Pennypack's and AEHN's breaches of these duties are a direct and proximate cause of Plaintiffs' injuries and/or substantially contributed to those injuries.

**WHEREFORE**, Plaintiffs request compensatory and punitive damages against the Defendants named in this count, jointly and severally, in an amount in excess of $150,000 plus costs, interest and all other recoverable damages.

## COUNT VI
## NEGLIGENCE

**Plaintiffs v.**
**Erin E. Hassel, MD, Pramath Nath, MD, Charles W. Concodora, MD, Urologist Doe, Teleradiologist Doe, and Ultrasound Technician Doe**

109.    Plaintiffs incorporate the foregoing and subsequent paragraphs as though set forth fully

herein.

110.   Drs. Hassel, Nath, and Concodora, Urologist Doe and Teleradiologist Doe owed

Plaintiffs a duty to possess and exercise the degree of skill and knowledge ordinarily

possessed by physicians and physicians delegating to ultrasound technicians.

111.   Ultrasound Technician Doe owed Plaintiffs a duty to possess and exercise the degree of

skill and knowledge ordinarily possessed by ultrasound technicians.

112.   Defendants breached their duties owed to Plaintiffs.

113.   In addition to the breaches of duty detailed above, Defendants' breaches of duty included

the following:

   a.   Failing to properly evaluate Baby Gardin.

   b.   Improperly delegating to and relying upon Ultrasound Technician Doe.

   c.   Failing to properly interpret the patient's sonogram.

   d.   Failing to provide proper and timely medical treatment.

   e.   Failing to provide a proper and timely diagnosis.

   f.   Failing to ensure that Baby Gardin's condition was properly managed.

   g.   Failing to provide the care and attention required by the severity of Baby Gardin's

   condition.

   h.   Allowing and delegating the responsibility to Ultrasound Technician Doe to

   interpret Baby Gardin's sonograms.

   i.   Failing to document the encounter with Baby Gardin.

   j.   Improperly discharging Baby Gardin.

   k.   Abandoning the patient.

l.     Failing to provide even basic care under the circumstances presented.

m.    Recommending a course of treatment that delayed the correct diagnosis and/or treatment of Baby Gardin's condition.

n.     Failing to order timely a repeat ultrasound.

o.     Failing to obtain timely and proper ultrasound interpretation.

p.     Failing to order or perform timely a scrotal exploration.

q.     Engaging in and/or permitting the unauthorized practice of medicine.

r.     Failing to demand that a radiologist interpret the sonogram prior to discharge.

114.   Defendants' breaches of these duties are a direct and proximate cause of Plaintiffs' injuries and/or substantially contributed to those injuries.

   **WHEREFORE**, Plaintiffs request compensatory and punitive damages against the Defendants named in this count, jointly and severally, in an amount in excess of $150,000 plus costs, interest and all other recoverable damages.

## COUNT VII
## NEGLIGENCE *PER SE*

**Plaintiffs v.**
**Erin E. Hassel, MD, Pramath Nath, MD, Charles W. Concodora, MD, Urologist Doe, Ultrasound Technician Doe, STCH LLC, AAHS LLC, PAHS LLC and PAHH LLC**

115.   Plaintiffs incorporate the foregoing and subsequent paragraphs as though set forth fully herein.

116.   In its Practice Parameter for Communication of Diagnostic Imaging Findings, the American College of Radiology directs that "[i]t is not appropriate for nonphysicians to provide interpretations and/or generate diagnostic reports (final or preliminary)."

117.    The Medical Practice Act of 1985 and the Osteopathic Medical Practice Act, and the regulations promulgated thereunder, prohibit and make unlawful the unauthorized practice of medicine.

118.    Notwithstanding same, upon information and belief, the actions taken by Ultrasound Technician Doe constituted the unauthorized practice of medicine, and those actions were endorsed by, encouraged by and/or undertaken at the direction or under the supervision or delegation of Erin E. Hassel, MD, Pramath Nath, MD, Charles W. Concodora, MD, Urologist Doe, Ultrasound Technician Doe, STCH LLC, AAHS LLC, PAHS LLC and PAHH LLC.

119.    At no time was the delegation by Drs. Hassel, Nath, and Concodora and Urologist Doe to Ultrasound Technician Doe as stated herein consistent with the standards of acceptable medical practice.

120.    At no time, upon information and belief, did Drs. Hassel, Nath, and Concodora and Urologist Doe have knowledge or a reasonable belief that Ultrasound Technician Doe had the education, training, experience and continued competency to safely perform the services being delegated.

121.    At no time, upon information and belief, did Drs. Hassel, Nath and/or Concodora and/or Urologist Doe actually determine that the delegation to Ultrasound Technician Doe did not create an undue risk to Baby Gardin.

122.    At no time, upon information and belief, did Erin E. Hassel, MD, Pramath Nath, MD, Charles W. Concodora, MD, Dr. Doe, Ultrasound Technician Doe, STCH LLC, AAHS LLC, PAHS LLC and PAHH LLC, and/or their agents, servants or employees, explain to any of the Plaintiffs the delegation of the medical service to Ultrasound Technician Doe

and provide a reasonable opportunity for the Plaintiffs to object.

123.   The Medical Practice Act of 1985 and the Osteopathic Medical Practice Act, and the regulations promulgated thereunder, prohibit and make unlawful the delegation by Defendants to Ultrasound Technician Doe to the perform medical services as stated herein under the circumstances alleged in this Complaint.

124.   The negligent, willful, wanton, reckless, intentional, and outrageous violations of the Medical Practice Act of 1985 and the Osteopathic Medical Practice Act, and the regulations promulgated thereunder, caused damage to Plaintiffs as described herein.

**WHEREFORE**, Plaintiffs request compensatory and punitive damages against the Defendants named in this count, jointly and severally, in an amount in excess of $150,000 plus costs, interest and all other recoverable damages.

## COUNT VIII
## NEGLIGENT SUPERVISION

### Plaintiffs v. STCH LLC, AAHS LLC, PAHS LLC and PAHH LLC

125.   Plaintiffs incorporate the foregoing and subsequent paragraphs as though set forth fully herein.

126.   Defendants are responsible for the actions of their staff members, including Ultra Technician Doe, whom they supervised.

127.   Defendants negligently supervised Ultrasound Technician Doe and allowed Ultrasound Technician Doe to be negligently supervised which caused damage to Plaintiffs as described herein.

**WHEREFORE**, Plaintiffs request compensatory and punitive damages against the

Defendants named in this count, jointly and severally, in an amount in excess of $150,000 plus costs, interest and all other recoverable damages.

## COUNT IX
## VICARIOUS LIABILITY / RESPONDEAT SUPERIOR

### Plaintiffs v. STCH LLC, AAHS LLC, PAHH LLC, PAHS LLC and UFC LLC

128.    Plaintiffs incorporate the foregoing and subsequent paragraphs as though set forth fully herein.

129.    At all relevant times, Drs. Hassel, Nath, and Concodora, Urologist Doe, Teleradiologist Doe, and Ultrasound Technician Doe were engaged as the actual, apparent and/or ostensible agents of the St. Chris Entities and/or UFC LLC, and were acting within the course and scope of such engagement such that the St. Chris Entities and UFC LLC are responsible vicariously or otherwise for their actions and omissions.

**WHEREFORE**, Plaintiffs request compensatory and punitive damages against the Defendants named in this count, jointly and severally, in an amount in excess of $150,000 plus costs, interest and all other recoverable damages.

## COUNT X
## CORPORATE NEGLIGENCE

### Plaintiffs v. STCH LLC, AAHS LLC, PAHS LCC and PAHH LLC

130.    Plaintiffs incorporate the foregoing and subsequent paragraphs as though set forth fully herein.

131.    The St. Chris Entities had duties including to (1) use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) select and retain only competent

medical staff; (3) oversee all persons who practice medicine within its walls as to patient care; and (4) formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

132.   Upon information and belief, the St. Chris Entities failed to select and retain only competent medical staff to interpret and rely properly upon the interpretation of sonograms.

133.   Upon information and belief, the St. Chris Entities failed to formulate, adopt and enforce rules and policies to ensure quality patient care including policies and rules related patient assessments, discharge, reading sonograms, reporting ultrasound results, and utilizing ultrasound technicians.

134.   Upon information and belief, the St. Chris Entities failed to properly oversee all persons who practiced medicine at their facility and participated in rendering substandard care to Baby Gardin, including Ultrasound Technician Doe.

135.   Upon information and belief, the St. Chris Entities failed to use reasonable care in the maintenance of safe and adequate facilities and equipment including in connection with the utilization of ultrasound facilities and equipment and radiology/teleradiology services.

136.   During the summer of 2019, St. Christopher's Hospital endured significant financial upheaval which lasted up through and beyond Baby Gardin's admissions on July 24, 2019.

137.   On or about June 30, 2019, STCH LLC and PAHS LLC declared and filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware at Case No. 19-11466(KG) (Jointly Administered).

138. Upon information and belief, the significant financial upheaval experienced by St. Christopher's Hospital detrimentally impacted its operations including its ability to maintain its facilities, to oversee and supervise staff, to purchase necessary supplies, to select and retain staff, and to enforce rules and procedures.

139. In this regard, upon information and belief and by way of example:

   a.   Beginning in May 2019, the St. Chris Entities defaulted under its Emergency Room On-Call Services Agreement and other ancillary agreements that provide for 24/7 on-call pediatric urology coverage to the emergency room by failing and otherwise refusing to pay UFC LLC for the amounts owed for on-call coverage including $37,200 for May 2019, $36,000 for June 2019, $37,200 for July 2019, and $37,200 for August 2019 for coverage purportedly provided by UFC LLC through its physicians including Dr. Concodora and Urologist Doe.

   b.   Beginning months before the bankruptcy and continuing thereafter, the St. Chris Entities defaulted under a Master Services Agreement (**"MSA"**) and Transition Services Agreement (**"TSA"**) with Tenet Business Services Corporation (**"Tenet"**) and Conifer Revenue Cycle Solutions, LLC (**"Conifer"**), respectively, by failing and refusing to pay Tenet and Conifer more than Fifty Eight Million Dollars ($58,000,000.00) for outstanding fees and costs owed for critical services under the TSA and MSA, such that on July 26, 2019, Tenet and Conifer advised that they "can no longer continue to provide services to the Debtors unless Tenet and Conifer are fully compensated in cash on the terms set forth in the now-terminated TSA and MSA."

   c.   The critical services provided for under the TSA included Tenet's agreement to

administer electronic patient medical records and related information technology systems for St. Christopher's Hospital. Likewise, the critical services provided for under the MSA included Conifer's agreement to provide on-site patient access services, including patient check in and registration, patient check out and payment, patient scheduling for future appointments, and other non-medical patient-facing administrative services.

140.   Upon information and belief, the failures to maintain facilities, oversee and supervise staff, purchase necessary supplies, select and retain staff, and enforce rules and procedures, were never disclosed by Defendants to patients at St. Christopher's Hospital, including Plaintiffs, and greatly jeopardized the health, welfare and safety of Baby Gardin and other patients.

141.   The St. Chris Entities' negligent, willful, wanton, reckless, intentional, and outrageous breaches of these duties and failures to disclose are a direct and proximate cause of Plaintiffs' injuries and/or substantially contributed to those injuries.

**WHEREFORE**, Plaintiffs request compensatory and punitive damages against the Defendants named in this count, jointly and severally, in an amount in excess of $150,000 plus costs, interest and all other recoverable damages.

142.   Certificates of Merit as to Defendants are attached as follows:

Exhibit 1       Einstein Physicians Pennypack Pediatrics

Exhibit 2       Albert Einstein Healthcare Network

Exhibit 3       Agent Doe

Exhibit 4       St. Christopher's Healthcare, LLC

Exhibit 5        American Academic Health System, LLC

Exhibit 6        Philadelphia Academic Health Holdings, LLC

Exhibit 7        Philadelphia Academic Health System, LLC

Exhibit 8        Ultrasound Technician Doe

Exhibit 9        Erin E. Hassel, MD

Exhibit 10       Pramath Nath, MD

Exhibit 11       Urology for Children, LLC

Exhibit 12       Charles W. Concodora, MD

Exhibit 13       Urologist Doe

Exhibit 14       Teleradiologist Doe


JOKELSON LAW GROUP, P.C.


By:     s/David E. Jokelson
        Derek E. Jokelson, Esquire
        David E. Jokelson, Esquire
        230 S. Broad Street, 10th Floor
        Philadelphia, Pa. 19102
        (215) 735-7556

        *Attorneys for Plaintiffs*

Date: April 16, 2020