## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Lasheena Sipp- Lipscomb and Andres Gardin, Sr., Individually and in their own right and as Parents and Natural Guardians of A G, Jr., a Minor<br><br>        v.<br>Einstein Physicians Pennypack Pediatrics, *et al.* | **Jury Trial Demanded**<br><br>Civil Action No. 2:20-cv-01926-MMB |

## ORDER

AND NOW, this _____ day of _____, 2022, upon consideration of Plaintiffs' Motion In Limine to Preclude Speculative Opinion of Defense Expert Richard Oken, M.D., and any response thereto, it is hereby ORDERED that the Motion is GRANTED.

Dr. Oken shall be prohibited at trial from testifying to the opinions contained in paragraphs 1 and 4 of his report and associated opinions in the concluding paragraphs of that report.


BY THE COURT:


_____
MICHAEL M. BAYLSON, J.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Lasheena Sipp- Lipscomb and Andres Gardin, Sr., Individually and in their own right and as Parents and Natural Guardians of A G, Jr., a Minor<br><br>          v.<br>Einstein Physicians Pennypack Pediatrics, *et al.* | **Jury Trial Demanded**<br><br>Civil Action No. 2:20-cv-01926-MMB |

## PLAINTIFFS' MOTION IN LIMINE TO PRECLUDE
## SPECULATIVE OPINION OF DEFENSE EXPERT RICHARD OKEN, M.D.

Plaintiffs hereby move to preclude Defendants Einstein Physicians Pennypack Pediatrics (**Pennypack**) (AG Jr.'s pediatrician's office) and Albert Einstein Healthcare Network (collectively **Einstein**) from offering the speculative opinions of Richard L. Oken, M.D. about his "alternative suggestions for the sequence of events" at Bullet Point Nos. 1 and 4 and his related conclusions in his report. Exhibit 1. Because Dr. Oken's "alternative suggestions" and related conclusions impermissibly usurp the function and role of a jury, his testimony related to same should be precluded.

**FACTS**

At 3:49 PM on July 23, 2019, Plaintiff, Lasheena Sipp- Lipscomb (**Mother**) made a 2 minute 41 second telephone call to 2 year old AG Jr.'s pediatrician's office, Pennypack. There is no dispute that this telephone call was made as Mother's cell phone records produced under Court Order by T-Mobile confirm the call.[1] There is no record, however, of this call in AG Jr.'s Pennypack medical

---

[1]Exhibit 2 (Mother's T-Mobile call detail records. T-Mobile records use Coordinated Universal Time (UTC) such that the relevant call at 19:47:08 UTC, converts to 3:47 PM Eastern Daylight Time); Exhibit 3 at Sipp-Lipscomb Tr. 29:21–23, 73:6–8, 199:18–19; Exhibit 4 at Brown Tr. 15:8–15.

chart in violation of Pennsylvania statutes[2] as well as Einstein's own policies.[3] Likewise, Dr. Oken concedes and acknowledges that, "Telephonic medical advice should be documented in the medical record." Exhibit 1 at 3. Einstein further concedes that it cannot "identify which one of [the three nurses responsible for telephone triage and on duty at the time of the call] spoke to Miss. Lipscomb" because "[t]hey don't have any memory one way or the other" "of any phone call." Exhibit 4 at Brown Tr. 23:11–24:5.

Almost twelve (12) hours after the call, at about 3:08 AM, AG Jr. presented with his parents to the Emergency Department at St. Christopher's Hospital for Children (**SCHC**). The SCHC ED recorded Mother's history of her call 12 hours earlier to Pennypack, stating that AG Jr. had "testicular pain and scrotal swelling. The onset was 12 hours ago … left testicular pain/swelling that began ~1500 yesterday," and that Mother "called the pediatrician's office and was advised that the swelling could be 2/2 to fluid accumulation and that she should observe the pt to see if the swelling resolved with time."

---

[2] 40 Pa. Stat. Ann. § 1303.511(a) ("Entries in patient charts concerning care rendered shall be made contemporaneously or as soon as practicable."); 49 Pa. Code § 16.95(a). (Medical records) ("A physician shall maintain medical records for patients which accurately, legibly and completely reflect the evaluation and treatment of the patient. The components of the records are not required to be maintained at a single location. Entries in the medical record shall be made in a timely manner.") and (b) (" (b) The medical record shall contain information sufficient to clearly identify the patient, the person making the entry if the person is not the physician—such as a physician assistant or a certified registered nurse practitioner—the date of the medical record entry and patient complaints and symptoms.").

[3] Exhibit 4, deposition of Einstein's corporate designee most knowledgeable about Pennypack's policies and procedures for documenting patient telephone calls, Tr. 19:1–7, 27:23–28:1, and 43:5–13 (Einstein's policy concerning telephone calls concerning patient health is that "All calls are to be documented," "through our EMR system, which is our electronic medical record"); accord Exhibit 5, deposition of Einstein employee Patricia Madison, RN, Tr. 11:11–12:5, 20:22–21:11 (Einstein instituted an "invariable" "policy and procedure" that the Triage Nurses must "document" "every phone call" "by entering information into the clinical chart on the computer."); accord Exhibit 6, deposition of Einstein employee Allyson McDonnell, RN, Tr. 37:8–22. (Einstein's "policy and procedure" requires "that all calls to the triage nurses must be documented," even "[i]f the child has symptoms and the caller declines this triage.").

**History of Present Illness**
**The patient presents with testicular pain and scrotal swelling. The onset was 12 hours ago**. The course/duration of symptoms is fluctuating in intensity. Type of injury: none. Location: Left testicle. Radiating pain: none. The character of symptoms is sharp. The exacerbating factor is palpation. The relieving factor is lying down. Risk factors consist of none. Prior episodes: none. Therapy today: none. Associated symptoms: none.

Previously healthy 2 y/o M **presents with left testicular pain/swelling that began ~1500 yesterday**. Mom reports that after the pt woke up from a nap he was walking with his legs farther apart than usual while leaning forward. She examined him and noted that his left testicle was swollen and tender to the touch. **She reports that she called the pediatrician's office and was advised that the swelling could be 2/2 to fluid accumulation and that she should observe the pt to see if the swelling resolved with time**. The swelling improved during the evening and then worsened at night.

Exhibit 7 at SCHC000010–13. Dr. Erin Hassel, one of the SCHC ED physicians responsible for the

creation of this ED Note and the treatment of AG Jr. testified that the written History of Present

Illness was "reliabl[y]" recorded. Exhibit 8 at Hassel Tr. 22:23–23:24.

When AG Jr. presented again to the SCHC ED at around 3:44 PM on July 24, 2019 (nearly

24 hours after the call to Pennypack), Mother reported the same history, stating that:

**History of Present Illness**
**The patient presents with testicular pain and scrotal swelling, The onset was 24 hours ago.** The course/duration of symptoms is fluctuating in intensity, Type of injury: none. Location: Left testicle. Radiating pain: none. The character of symptoms is sharp, swelling and redness. The exacerbating factor is Palpation. The relieving factor is lying down. Risk factors consist of none. Prior episodes: none. Therapy today: none. Associated symptoms: none. Pt is a 2yo previously healthy M presenting today after being called back for reevaluation due to unclear US reading **with testicular pain and swelling x 24 hours**. Pt was here at 3am today for the same complaint in which he was evaluated for testicular torsion by testicular US. The US tech stated that she saw good flow and evidence of epididymitis and the pt was evaluated by urology. Pt was sent home with Motrin and told to f/u with pediatrician. Upon reevaluation of the US by the radiology department there was unconclusive evidence of good blood flow and pt was reached to return to SCHCED for further evaluation. **Mom stated that when the pt woke up from a nap yesterday @1500 she noticed the pt was walking funny and crying so she evaluated him and saw L sided testicular pain and swelling. Mom called the pediatrician and was told**

3

> **to continue to monitor with possibility of hydrocele.** The swelling slightly reduced throughout the day but worsened at night and mom noticed new erythema of the L testicle and came into SCHED. Today mom denies fever, chills, n/v/d, hematuria. Pt is eating, drinking, voiding and stooling per baseline. No allergies.

Exhibit 9 at SIPP-LIPSCOMB 000002 (emphasis added).

At her deposition, Mother was not confronted with her near-contemporaneous earlier recorded statements in the SCHC ER, but nonetheless testified concerning the Pennypack call that she spoke with a nurse for "about two minutes or so, two and a half minutes," and explained that AG Jr.'s left testicle "was swollen and painful" and that it was "red." Exhibit 3 at Sipp-Lipscomb Tr. 29:4–8, 204:7–14.

> I told her he literally just woke up from his nap and walked out to the kitchen to come to me. And as he was walking, he was walking funny and he was whining.… I told her that I pulled his pants down and I looked and I seen that his testicle was swollen and it was red.

Exhibit 3 at Sipp-Lipscomb Tr. 28:2–10.

Plaintiffs' experts criticize Einstein's triage nurses for negligently informing Mother to observe AG Jr. at home, rather than immediately sending AG Jr. to the emergency room, as testicular swelling or pain is a medical emergency requiring immediate investigation for testicular torsion as there is a risk of losing the testicle.[4] Likewise, the SCHC related defendants (SCHC, Ms. Bartkus,

---

[4]As stated by Plaintiff's expert pediatrician, Daniel Rauch, MD:

> Pennypack Pediatrics failed to meet the standard of care by not recommending that [AG Jr.] be brought to immediate medical attention for evaluation. In a child without any prior history of scrotal or groin problems, such as [AG Jr.], the most important consideration for acute onset of testicular pain and/or scrotal swelling is the possibility of testicular torsion because there is a limited time frame to intervene before the testicle is lost due to lack of blood flow.[] The presence of an acute scrotum under these circumstances constitutes a well-recognized urological emergency. Although there are other causes of testicular pain and scrotal swelling and torsion is relatively uncommon in young children the priority is still to evaluate for torsion because of the potential dire consequence. Additionally, the evaluation
> (continued...)

and Drs. Hassel, Nath, Cho, Concodora and Kalyanpur) also criticize Einstein's triage nurses for not

immediately sending AG Jr. to the emergency room.[5] The Einstein triage nurses also

---

[4](...continued)

generally is a non-invasive ultrasound exam that poses no risk to the child. The failure to have [AG Jr.] be seen immediately led to delay in diagnosis and loss of his testicle. Pennypack Pediatrics additionally failed to meet the standard of care by having no record of the call or advice given.

Exhibit 10.

[5]Scott Berger, MD (Dr. Kalyanpur's neuroradiology expert), opines that:

[O]ne of the most important factors demonstrated to be predictive of IOV [Intraoperative Viability] and DTA [Delayed Testicular Atrophy] is the time elapsed from the onset of pain until the patient is treated. 6 hours from the onset of pain is often considered the cutoff between when a patient with testicular torsion has a greater than 50% change of IOV, and when the chance is less than 50%. After 6h, rates of IOV have been reported from 44% to 0% by various authors. In terms of DTA, several authors have reported on a cutoff of about 8-12 hours, i.e. the likelihood that a testis found to be viable in the OR becomes atrophic, increases significantly at 8-12 hours....

[I]t is my opinion that there are several factors that influenced the outcome for Andres.

1. DURATION OF SYMPTOMS: First and foremost, there was a long delay between the onset of symptoms and presenting to the SCHC ER for care. As I explained above, duration of symptoms is one of the most important predictors of outcome, and his parents did not bring Andres to the ED until 12 hours after the onset of symptoms, and it would have been 14-16 hours since the onset of pain even if he had been taken to the OR at the first ER visit.

See Exhibit 11 at 6–7, 15–16, 17 (relevant portions highlighted in exhibit).

Matthew Eisenberg, M.D. (SCHC, Ms. Bartkus, and Drs. Hassel and Nath's emergency medicine expert) opines that:

The standard of care requires an US of the scrotum with doppler to evaluate for blood flow to the testicles - a finding that, if present, excludes a diagnosis of testicular torsion. Testicular torsion, if not identified and corrected rapidly, leads to ischemia, infarct and testicular loss....

One final note - it is generally understood that after approximately 6 hours from the onset of symptoms of torsion, the child is at risk for losing the testicle. If detorsion does not occur for 12 hours, testicular viability falls to as low as 20%. [AG Jr.] did not initially present to the SCHC ED until > 12 hours from the time that his mother discovered the testicular swelling, and the actual time of symptom onset may have been several hours earlier, since [AG Jr.] was not yet verbal and could not tell his mother he was in pain. The final ultrasound read by Dr. Higgins was not reported until 10:00 am, at least 19 hours after the

(continued...)

---

[5](...continued)

> onset of symptoms. Even had [AG Jr.] still been in the SCHC ED, repeating the ultrasound and getting [AG Jr.] to the operating room would have taken at least another 1-2 hours. As a result, had Dr. Hassel and Dr. Nath done exactly what the plaintiff's experts contend, a minimum of 20 hours would have already passed from the time of symptom onset to the time of detorsion, and there is substantial reason to believe that [AG Jr.'s] left testicle would not have been able to be saved.

See Exhibit 12 at 2, 4–5 (relevant portions highlighted in exhibit).

Jonathan C. Routh, M.D. (Dr. Cho's pediatric urology expert) opines that:

> It is less clear, however, whether there would have been a significant difference in the ultimate outcome for [AG] Jr., had the correct diagnosis been made at [at SCHC] that time. The parents both state in their depositions that [AG] Jr's pain began at the time that Ms. Sipp-Lipscomb telephoned Pennypack Pediatrics (3:47 pm on July 23, 2019). Given that history, his testicle would have been ischemic for 12 hours at the time the family initially took him to the ER.… The…widely accepted… standard of care…[is] less than 4 hours from the time of presentation to the time that a plan is executed, for example by taking the patient with presumed testicular torsion to the operating room for surgery.…[Dr. Kalyanpur's] interpretation was signed at 5:35 am, 14 hours after the time of initial symptom onset. Under the best possible circumstances - if the ultrasound diagnosis had been correct, and if Drs. Cho and Concodora had acted on that information - that 14-hour delay means that the testicle would have a high probability (defined as greater than 50%, and in my experience up to 75%) of being removed at the time of surgery or of shrinking due to prolonged ischemia even if it was left in place.

See Exhibit 13 at 4 (relevant portions highlighted in exhibit). See also Dr. Routh's supplemental report attached as Exhibit 14 at 2 (relevant portions highlighted in exhibit).

Andew J. Kirsch, M.D. (Dr. Concodora's pediatric urology expert) opines that:

> **1. Failure to timely diagnose and treat testicular torsion (which is a surgical emergency).**
>
> Timely diagnosis of testis torsion is critical.…in the youngest patients, such as the patient in question, sonography is especially important as physical exam is less reliable than in older children.…A proper and timely report is thus critical. In this case, the report was not available until 5:30 AM.…With surgery prep time added on, this increases the time window to at least 15+ hours.

See Exhibit 15 at 3 (relevant portions highlighted in exhibit).

Adam B. Hittelman, M.D. (Dr. Kalyanpur's pediatric urology expert) opines that:

> Although this is a very unfortunate and devastating event for this patient and his family, I think it is of reasonable likelihood that the testicle was already injured at the time of the initial ultrasound. This ultrasound was performed approximately 12 hours after the initial presentation of pain, a significant amount of time for a testicle to be torsed.…Testicular injury is related to degree of constriction of blood (related to the severity or number of

(continued...)

admit and concede that telephone reports of scrotal swelling *and/or* scrotal pain constitute a urological emergency that requires emergent attention at a hospital emergency room. Exhibit 5 at Madison Tr. 14:11–20; Exhibit 6 at McDonnell Tr. 28:7–24, and Exhibit 17 at Barlow Tr. 15:12–21 and 21:24–22:6.

On this record, Einstein presents the expert report of pediatrician Richard Oken, MD, who offers opinions in four basic categories.

1.  Speculative lay opinion about the contents of the 2 minute 41 second telephone call (opining falsely about Pennypack's alleged telephone advice custom and practice and alternatively speculating that Mother was either "on hold during the entire call" or articulated a description of the complaints that "generated an impression… of a painless" circumstance);

2.  That even with the twelve (12) hour delay caused by Pennypack, AG Jr.'s left testicle had an 80% salvage rate at the time of presentation to the SCHC ED;

3.  That there is evidence that AG Jr.'s torsed left testicle "detorqued," between the time Mother called Pennypack and AG Jr.'s presentation to the SCHC ED 12 hours later which would increase the salvageability of the testicle upon presentation at the SCHC ED; and

4.  Speculative opinion that even had Pennypack immediately sent AG Jr. to the SCHC

---

[5](...continued)
   twists of the torsed cord) and ischemia time, with recommendations in most institutions to surgically intervene within 4 hours.

See Exhibit 16 at 4–5 (relevant portions highlighted in exhibit).

ED at 3:47 PM on July 23 (*i.e.* there had been no 12 hour delay) "the same sequence

of events with diagnosis and treatment would have ensued at SCHC - the same

evaluation in the ER, the same ultrasound interpretation by the teleradiologist, etc.,

resulting in the same outcome: discharge of the patient, surgical delay and testicular

loss."

Plaintiff moves *in limine* to preclude Dr. Oken from opining at trial on items 1 and 4 of his

opinion and related commentary in the concluding paragraphs of his report.

**ARGUMENT**

"The proponent of the expert testimony has the burden of establishing its admissibility by a

preponderance of the evidence.… 'Under Rule 702, the district court acts as a 'gatekeeper' to ensure

that 'the expert's opinion [is] based on the methods and procedures of science rather than on

subjective belief or unsupported speculation.'" *myService Force, Inc. v. Am. Home Shield*, No. 10-

6793, 2014 U.S. Dist. LEXIS 61207, *13 (E.D. Pa. May 1, 2014) (Padova, J.) (citations omitted).

The requirements for admissibility under Rule 702 are "qualification, reliability and fit." *Id*. at *14.

> The Third Circuit has explained that qualification means "'that the witness possess specialized expertise.'" … Reliability means that the "'the expert's opinion must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief.'" …Fit means that "'the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.'"…
>
> … "'[T]he reliability analysis [required by Daubert] applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion.'" … "'When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.'" …
>
> Fit pertains "'primarily to relevance.'"… "The expert's testimony must 'fit' under the

facts of the case so that 'it will aid the jury in resolving a factual dispute.'" …This element "'requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'" … "In other words, expert testimony based on assumptions lacking factual foundation in the record is properly excluded."

*Id*. at *14-16 (citations omitted).

As Judge Dalzell remarked in *Amadio v. Glenn*:

As *Daubert* explains: "The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation." … In other words, in order for scientific testimony to be sufficiently reliable it "must be derived by the scientific method" and "must be supported by appropriate validation -- i.e., 'good grounds,' based on what is known." … The scientific method requires "the generation of testable hypotheses that are then subjected to the real world crucible of experimentation, falsification/validation, and replication." …

We must also consider "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." … "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." …This helpfulness requirement -- which our Court of Appeals calls "fit" -- is, in the end, "the ultimate touchstone of admissibility."

*Amadio v. Glenn*, No. 09-4837, 2011 U.S. Dist. LEXIS 9549, *6–8 (E.D. Pa. Feb. 1, 2011) (citations omitted).

Separately, under Federal Rule of Evidence 403, the determination of credibility is squarely the jury's function and it is simply not impermissible for an expert to opine concerning a witness' credibility. See e.g. *Coney v. NPR, Inc.*, 312 Fed. App'x 469, 474 (3d Cir. 2009) ("A doctor …cannot pass judgment on the alleged victim's truthfulness in the guise of a medical opinion because it is a jury's function to decide credibility."). In *Bistrian v. Levi*, Judge Rufe explained *Coney's* holding that "[a] doctor ... cannot pass judgment" on the victim's "truthfulness in the guise of a medical opinion," because "to answer the very question [is] at the heart of the jury's task—could

[Plaintiff] be believed? ... Opinions of this type create a serious danger of confusing or misleading the jury, causing it to substitute the expert's credibility assessment for its own common sense determination." 443 F. Supp. 3d 576, 578-579 (E.D. Pa. 2019). Likewise, the Second Circuit explained in *Nimely v. City of New York*, that "this court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702." 414 F.3d 381, 397 (2d Cir. 2005).

Because the challenged opinions of Dr. Oken do not meet the requirements of "qualification, reliabilit, and fit," and constitute impermissible credibility judgments, his associated testimony should be precluded.

**A.      Unwarranted Speculation as to the Contents of Mother's Call to Pennypack Pediatrics**

Dr. Oken's speculation about the possible content of Mother's call to Pennypack is far outside his medical expertise and improperly invades the province of the jury. Specifically, Dr. Oken opines as follows:

> I wish to offer alternative suggestions for the sequence of events that produced a scenario that resulted in testicular torsion and loss of the testicle.
>
> 1.      A call was apparently placed to Pennypack Pediatrics at 3:47 pm on July 23rd and lasted 2 minutes, 41 seconds. [AG Jr.'s] mother testified that she described the onset of testicular swelling and that [AG Jr.] was "walking with his leg out" or "walking funny." She did not mention complaints of pain in her deposition. There is no record of this call in the practice, and all three pediatric triage nurses had no recollection or record or this telephone encounter. Each nurse testified under oath that it would not have been their custom and practice to provide only phone advice in response to a complaint of testicular swelling and pain, but rather to advise an immediate examination in a pediatric emergency room. *One possible explanation is that the mother was on hold during the entire call and therefore no discussion or recommendation came from the Pennypack nurses. Another more likely*

10

> *explanation was that the description of swelling generated an impression that this was the description of a painless, fluid-filled hydrocele. In this circumstance, no emergency action would be required unless there was pain and the swelling did not resolve.*

Exhibit 1 at 2 (emphasis added).

> After review of the depositions and training of the three pediatric triage nurses: McDonnell, Madison, and Barlow and review of their pediatric telephone triage protocols, I find it hard to believe that they would not have referred [AG Jr.] and documented the call in this clinical situation if the mother had included a description of pain on the afternoon of July 23rd. I can only conclude that this history was not provided. All three nurses testified that a swollen and painful testicle in a male patient as described represents a true pediatric emergency.

> After review of the materials presented in this case, I offer alternative theories as to the chain of events

Exhibit 1 at 3. These speculative opinions are misleading and contradict the record.

First, it is simply false and misleading that "Each nurse testified under oath that it would not have been their custom and practice to provide only phone advice in response to a complaint of testicular swelling and pain, but rather to advise an immediate examination in a pediatric emergency room." While each of the Einstein triage nurses testified and admitted that scrotal swelling *or* scrotal pain constitutes a urological emergency that requires immediate emergency room attention, at least one of nurses—Nurse Frances Barlow—testified that she has **no experience** with patient complaints of scrotal pain or scrotal swelling. Exhibit 17 at Barlow Tr. 14:8–17:5.[6] See *Plaintiff's Motion in*

---

[6]Likewise, Dr. Oken claims that "All three nurses testified that a swollen and painful testicle in a male patient as described represents a true pediatric emergency." Again, this is false. These nurses each testified that *either* scrotal swelling *or* scrotal pain are true pediatric emergencies. Specifically, Nurse Barlow testified:

> A.  Whenever there's any testicular pain or swelling that the child or person is to be sent to the emergency room for further evaluation.

> Q.  Okay. And why is that?

(continued...)

*Limine to Preclude Einstein from Offering or Arguing Alleged Evidence of Habit or Routine*

---

[6](...continued)

A.  Because of the possibility of testicular torsion, which could eventually lead to the person losing the testicle.

Q.  And that's a pretty serious circumstance. Do you understand that?

A.  Yes….

Q.  …Did you understand at the time that a scrotal swelling or scrotal pain was a pediatric urological emergency?

A.  Yes.

Q.  And it was emergencies just like that that were to be given the highest priority?

A.  Yes.

Exhibit 17 at Barlow Tr. 15:12–21, 21:24–22:6. Nurse McDonnell testified that:

Q.  Do you understand that scrotal swelling or scrotal pain is an emergency situation?

A.  Yes.

Q.  And in that case, should a patient be directed to proceed immediately to the emergency room?

A.  Yes.

Q.  And why is that?

A.  Because it's a medical emergency. They need an ultrasound to rule out testicular torsion.

Q.  Do you understand the consequences of not having an ultrasound to rule out testicular torsion?…

THE WITNESS: Yes.

Q.  And what are those consequences?

A.  Loss of testicle.

Exhibit 6 at McDonnell Tr. 28:7–24. Nurse Madison testified that:

Q.  Now, this record, are you familiar with any -- with whether or not scrotal pain or scrotal swelling in a young boy is an emergency?

A.  Yes.

Q.  And is it an emergency?

A.  Yes.

Q.  And why is it an emergency?

A.  Because the child could possibly lose a testicle if not seen immediate -- you have to get it immediate attention.

Exhibit 5 at Madison Tr. 14:11–20.

*Practice under FRE 406 to Prove What Was or Would Have Been Stated to Plaintiff During the Call on July 23, 2019*, ECF No. 188 *passim*. Because Nurse Barlow testified that she had no relevant experience addressing patient scrotal complaints, evidence of alleged habit or routine practice to establish what was said or would have said to the Plaintiff is entirely impermissible. See ECF No. 188, *passim*.

Next, because Dr. Oken "find[s] it hard to believe that they would not have referred [AG] Jr. and documented the call in this clinical situation if the mother had included a description of pain," he concludes that "this history was not provided." From this impermissible credibility determination, Dr. Oken posits competing factual "explanation[s]," otherwise described as "alternative theories as to the chain of events," which he ranks from "possible" to "more likely." Because the nurses have no memory, Dr. Oken claims that its "possible" that Mother simple waited "on hold" for the duration of the call and never spoke to the nurse. "More likely," he claims, Mother's "description of swelling generated an impression that this was the description of a painless, fluid-filled hydrocele.[7] In this circumstance, no emergency action would be required unless there was pain and the swelling did not

---

[7]Relatedly, as quoted above, Dr. Oken writes that Mother "did not mention complaints of pain in her deposition." Again, this is false and contradicts the record. On questioning by Einstein's counsel, Mother confirmed that she reported both swelling and pain to the Einstein triage nurse:

A.  I pushed the button for a nurse practitioner....

Q.  And I don't want to go over old ground. You told us how you described the --- your son's left testicle. **You said it was** swollen and **painful**. Is that **correct**?

A.  **Yes.**

Q.  Did you say anything to this individual on the phone about the color of the testicle?

A.  I told her it was red.

Q.  What questions did she ask you?

A.  I did most of the talking.

Exhibit 3 at Sipp-Lipscomb Tr. 204:3–16 (emphasis supplied).

resolve."

This presentation of competing "possibilities" is impermissible on every level. Dr. Oken has no expertise in determining the content of a telephone call. This is a jury function. Dr. Oken's non-scientific speculative guesswork regarding what happened during that telephone call cannot be tested, is not subject to peer review, is not subject to a known rate of error, is not subject to any applicable standards, and is not a technique that has been accepted by the scientific community. First, Dr. Oken impermissibly claims that Mother's testimony is false and untrustworthy, and contradicts the only facts of record. Second, these "alternative theories" are simply "inappropriate hypothetical speculation that offers no assistance to a finder of fact." *Holderbaum v. Carnival Corp.*, No. 13-24216, 2015 U.S. Dist. LEXIS 183849, *11 (S. D. Fla. Aug. 19, 2015) (Precluding expert's alternative hypotheses to explain how a fall happened because "alternative explanations must be supported with a sufficient scientific methodology" and not "speculation."). Here, there is no scientific methodology supporting Dr. Oken's speculation as to what transpired during the call. Einstein has no records, the nurses have no memory, and no habit or routine practice can be established. Accordingly, Dr. Oaken's opinions are pure and impermissible speculation. Additionally, his claim that "no emergency action would be required unless there was pain" contradicts the admissions of the Einstein nurses who each testified that either swelling or pain required emergency action. For these reasons, Einstein cannot establish Dr. Oken's "qualifications" (he is unqualified to divine "possible" facts), the "reliability" of Dr. Oken's opinions (his opinions are not "based on the methods and procedures of science rather than on subjective belief"), or that Dr. Oken's testimony "fits" the facts of the case (his "testimony [is] based on assumptions lacking factual foundation"). See *myService Force, Inc.*, 2014 U.S. Dist. LEXIS 61207 at *14–16.

14

**B.**     **Unwarranted Speculation as to What Would Have Happened Had AG Jr. Been Directed to the Emergency Room 12 Hours Sooner**

In his fourth opinion, Dr. Oken also impermissibly speculates that AG Jr. would have experienced the same outcome if he had presented for an earlier ER evaluation.

> 4.     Finally, I submit that even if Pennypack Pediatrics had referred [AG Jr.] for ER evaluation on the evening of July 23,2019, the same sequence of events with diagnosis and treatment would have ensued at SCHC - the same evaluation in the ER, the same ultrasound interpretation by the teleradiologist, etc., resulting in the same outcome: discharge of the patient, surgical delay and testicular loss.
>
> … I … submit that [the] alleged failure to act by Pennypack Pediatrics had no impact on the child's ultimate outcome, given the subsequent events that transpired in the SCHC emergency room on the morning of July 24, 2019.

Exhibit 1 at 3. These conclusions about what would have happened if AG Jr. had been sent to the ER 12 hours earlier are pure speculation. Dr. Oken is not a soothsayer and connect predict a past that didn't happen. Had AG Jr. been referred immediately to the ER 12 hours sooner, it is simply unknowable whether he would have been taken to the SCHC ER or another ER at that time of day, whether he would have been treated by the same SCHC healthcare professionals,[8] whether he would have squirmed as much earlier during the ultrasound, or whether the same events would have transpired generally. As such, this opinion is not admissible.

**CONCLUSION**

Accordingly, for the reasons set forth above, Plaintiffs respectfully request that Einstein be precluded from offering the opinions of Dr. Richard Oken proffered in Bullet Points 1 and 4 and the

---

[8]In fact, it is known that the ultrasound technologist, Defendant Haley Bartkus, was not on duty until 10:30 PM on July 23, 2019, and therefore would not have been present to perform or misread the ultrasound. Exhibit 18. Likewise, Dr. Kalyanpur was not on duty under 2:30 AM on July 24, 2019, and therefore was not available to misread the ultrasound hours earlier. Ex. 19 (identifying that Dr. Kalyanpur was on duty from 12:00 to 18:00. It is believed that this is India Standard Time which converts to 2:30 AM to 8:30AM Eastern Daylight Time.

related concluding paragraphs in his report.

JOKELSON LAW GROUP, P.C.

Date: May 20, 2022                    By:  s/David E. Jokelson
                                          DAVID E. JOKELSON, ESQUIRE
                                          DEREK E. JOKELSON, ESQUIRE
                                          230 S. Broad Street, 10th Floor
                                          Philadelphia, PA 19102
                                          (215) 735-7556

                                          *Attorneys for Plaintiffs*

16

## CERTIFICATE OF SERVICE

I, DAVID E. JOKELSON, hereby certify that on May 20, 2022, a true and correct copy of

the Plaintiffs' Motion in Limine to Preclude Speculative Opinion of Defense Expert Richard Oken,

M.D. was served *via* the Court's ECF System upon the following:


Gary M. Samms, Esquire
Edvard Wilson, Esquire
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102-2101


Joseph Zack, Esquire
Post & Post, LLC
200 Berwyn Park
920 Cassatt Road
Suite 102
Berwyn, PA  19312


George L. Young, Esquire
Kiernan Trebach LLP
Ten Penn Center Plaza
Suite 770
1801 Market Street
Philadelphia, PA 19103


John P. Shusted, Esquire
Nikki Mosco, Esquire
German Gallagher & Murtagh
The Bellevue, Suite 500
200 S. Broad Street
Philadelphia, PA  19102


Jacqueline M. Reynolds, Esquire
E. Chandler Hosmer, III, Esquire
Marshall Dennehey Coleman,
   Warner & Goggin
620 Freedom Business Center
Suite 300
King of Prussia, PA 19406


JOKELSON LAW GROUP, P.C.


By: s/David E. Jokelson
        DAVID E. JOKELSON, ESQUIRE
        230 S. Broad Street
        10th Floor
        Philadelphia, PA 19102
        (215) 735-7556

        *Attorney for Plaintiffs*