### IN THE UNITED STATES DISTRICT COURT FOR THE

### EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LASHEENA SIPP-LIPSCOMB AND** | **: CIVIL ACTION NO. 20-cv--01926** |
| **ANDRES GARDIN, SR., Individually and in** | **:** |
| **their own right and as Parents and Natural** | **:** |
| **Guardians of ANDRES GARDIN, JR., a minor** | **:** |
| | **:** |
| **V.** | **:** |
| | **:** |
| **EINSTEIN PHYSICIANS PENNYPACK** | **:** |
| **PEDIATRICS, et al** | **:** |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2022, upon

consideration of Defendants, Charles W. Concodora, M.D. and Urology for Children's, Motion

*in Limine* to preclude any testimony, argument and evidence regarding money owed to Urology

for Children by St. Christopher's Hospital, and any response thereto, it is hereby **ORDRED** and

**DEREED** that said Motion is  **GRANTED**.

It is further **ORDERED** and **DECREED** that Plaintiffs are precluded from offering,

referring to or otherwise introducing any testimony, argument or evidence regarding money

owed to Urology for Children by St. Christopher's Hospital.

BY THE COURT:

_____

MICHAEL M. BAYLSON, J.

2247947.1

## IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LASHEENA SIPP-LIPSCOMB AND** | : CIVIL ACTION NO. 20-cv--01926 |
| **ANDRES GARDIN, SR., Individually and in** | : |
| **their own right and as Parents and Natural** | : |
| **Guardians of ANDRES GARDIN, JR., a minor** | : |
| | : |
| **V.** | : |
| | : |
| **EINSTEIN PHYSICIANS PENNYPACK** | : |
| **PEDIATRICS, et al** | : |

### MOTION *IN LIMINE* OF DEFENDANTS,
### CHARLES W. CONCODORA, M.D. AND UROLOGY FOR CHILDREN,
### TO PRECLUDE ANY TESTIMONY, ARGUMENT AND EVIDENCE
### REGARDING MONEY OWED TO UROLOGY FOR CHILDREN
### <u>BY ST. CHRISTOPHER'S HOSPITAL</u>

Defendants, Charles W. Concodora, M.D. and Urology for Children, by and through their

attorneys, German Gallagher and Murtagh, P.C., hereby move to preclude Plaintiffs from

introducing testimony, argument and evidence regarding money owed to Urology for Children

by St. Christopher's Hospital at the time of trial.

**I.     FACTS**

This matter arises out of Plaintiffs' allegations that the Defendants were negligent which

caused a delay in the diagnosis and treatment of the Minor Plaintiff's testicular torsion.

Plaintiffs' sole claim against Moving Defendant, Dr. Concodora, is for negligence. Plaintiffs'

sole theory of liability against Moving Defendant, Urology for Children, is for vicarious liability

for the alleged negligence of Dr. Concodora.

However, over the course of this litigation, Plaintiffs have alleged and implied that  Dr.

Concodora did not come to the hospital to see the minor Plaintiff due to "St. Chris' failure and

refusal to pay for the on-call urology service provided by the attending urologist, Charles

2247947.1

Concodora, MD and his practice, Urology for Children, LLC". By way of example, in Plaintiff's

settlement demand letter dated March 16, 2022, Plaintiff stated the following:

> Moreover, lurking behind this fact pattern was St. Chris' failure and refusal to pay for the on-call urology service provided by the attending urologist, Charles Concodora, MD and his practice, Urology for Children, LLC. In this regard, Dr. Concodora and other physicians employed by Urology for Children, LLC, were providing over 700 hours each month for on-call coverage services of the St. Chris ER. St. Chris, however, due to its financial difficulties and looming bankruptcy, stopped paying for these services in April 2019, and as confirmed in a later bankruptcy filing was delinquent by more than $100,000 by the time of the instant malpractice on July 24, 2019. ***A jury will consider these facts*** (among other egregious facts including the unauthorized practice of medicine by St. Chris' ultrasound technologist and the ER physicians' reliance upon same), ***when it considers Dr. Concodora's failure and/or refusal to appropriately respond between 5:00-6:00 AM on July 24, 2019, when he was contacted (presumably at home) by the urology resident and failed and/or refused to remotely access Andres' electronic medical records and/or otherwise travel to St. Chris to address the clear urological emergency.***

*See* Exhibit A at pg. 3 (emphasis added).

Importantly, when Dr. Concodora was questioned at his deposition by Plaintiff's counsel

about any debt that was owed by St. Christopher's Hospital to Urology for Children, Dr.

Concodora testified that he had no knowledge of the filing in the US District Court by Urology

for Children nor did he have any knowledge that St. Christopher's Hospital owed money to

Urology for Children. Specifically, he was questioned and testified as follows:

15   Q.   Did there come a time when Urology for
16   Children was not being paid by St. Christopher's
17   Hospital?
18   A.   I'm not privy to that information.
19   Q.   I'm going to show you a document.  This is a
20   filing in the United States District Court by
21   Urology for Children.  Let me show you here on page
22   2 of this filing, there is a footnote, too, that
23   refers to agreements that are with St.
24   Christopher's Hospital and one of them is a service

1   agreement.
2            I think I raised that before when we
3   were off the record in the beginning of the
4   deposition.
5            Do you have any knowledge about that
6   service agreement?
7   A.   No, I do not.

*See* Exhibit B at pgs. 83:15-24 - 84:1-7

18   Q.   It identifies in here that the debtors, which
19   is the entity that own St. Christopher's Hospital
20   were obligated to make payments to Urology for
21   Children for services rendered and that the debtors
22   defaulted on their obligation to make all required
23   payments, and in that regard it identifies that the
24   debtors owe Urology for Children $37,200 for

1   on-call coverage during May of 2019; $36,000 for
2   June of 2019; $37,200 for July of 2019.  Were you
3   ever made aware of any of that?
4   A.   No.

*See* Exhibit B at pgs. 84:18-24 – 85:1-4.

Thus, Moving Defendants anticipate that Plaintiffs will attempt to introduce testimony, argument and/or evidence regarding money that was owed to Urology for Children by St. Christopher's Hospital and allege and/or imply that Dr. Concodora did not come to the hospital to see the minor Plaintiff because of the money that was owed to Urology for Children. Defendants, Dr. Concodora and Urology for Children, have vehemently denied this allegation and maintain that Plaintiffs' reference to any money owed by St. Christopher's Hospital is entirely irrelevant to this matter and had absolutely no relation to Dr. Concodora and Urology for Children's involvement with the minor Plaintiff.

## II.     LEGAL ARGUMENT

### A.     Evidence of money owed by St. Christopher's Hospital to Urology for Children is Irrelevant.

Under Fed. R. Evid. 401, evidence is relevant if it: (1) has any tendency to make a fact more or less probable than it would be without the evidence; and (2) the fact is of consequence in determining the action.  Evidence that is irrelevant is not admissible.  Fed. R. Evid. 402.

Any money owed to Urology for Children by St. Christopher's Hospital is entirely irrelevant to the issue of whether the defendants exercised the requisite standard of care at the time of the minor Plaintiff's care. Thus, any money that was owed to Urology for Children by St. Christopher's Hospital has no probative value and no bearing whatsoever on the issue the jury is to decide: whether the defendants conduct with respect to the minor Plaintiff's care fell below the standard of care. Introduction of the evidence would serve no legitimate purpose. Plaintiff's only intention to introduce such evidence and/or testimony would be to divert the jury's attention away from the real issues in the case. Thus, admitting this evidence would only serve to confuse the jury and divert their attention away from the specific issues in this case. As such, the Court should not permit such irrelevant evidence at trial.  *See* Fed. R. Evid. 402

**B.      Any probative value of evidence of money owed by St. Christopher's Hospital to Urology for Children is outweighed by a danger of undue prejudice.**

Even if Plaintiff's anticipated evidence or testimony regarding money owed to Urology for Children by St. Christopher's Hospital was relevant (which it is not), it should nonetheless be excluded under Fed. R. Evid. 403, which provides that:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Allowing the jury to hear testimony, argument or evidence regarding money owed to Urology for Children by St. Christopher's Hospital would unfairly prejudice the Defendants, as this information could cause the jury to view Moving Defendants in an unfavorable light. Any purported value of evidence and/or testimony that St. Christopher's Hospital owed Urology for Children money will inevitably prejudice, confuse and mislead the jury against Moving Defendants. Moreover, it will cause undue delay and waste the jury's time, as such information is not dispositive of the issue before the jury. As such, the Court should not permit such evidence at trial.

### III.     CONCLUSION

For the reasons set forth above, Defendants, Charles W. Concodora, M.D. and Urology for Children, respectfully request that the Court grant their Motion *in Limine* and preclude any argument, testimony or evidence regarding money owed to Urology for Children by St. Christopher's Hospital.

GERMAN, GALLAGHER & MURTAGH


BY:___/s/ John P. Shusted_____
John P. Shusted
I.D. #44675 shustedj@ggmfirm.com
Nikki A. Mosco
I.D. #320709 moscon@ggmfirm.com
The Bellevue, Suite 500
200 S. Broad Street
Philadelphia, PA  19102
Shusted Direct: 215-875-4037
Main:  215-545-7700
F:  215-732-4182

Attorneys for Defendants,
Charles W. Concodora, M.D. and
Urology for Children

2247947.1

## IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **LASHEENA SIPP-LIPSCOMB AND** | **: CIVIL ACTION NO. 20-cv--01926** |
| **ANDRES GARDIN, SR., Individually and in** | **:** |
| **their own right and as Parents and Natural** | **:** |
| **Guardians of ANDRES GARDIN, JR., a minor** | **:** |
| | **:** |
| **V.** | **:** |
| | **:** |
| **EINSTEIN PHYSICIANS PENNYPACK** | **:** |
| **PEDIATRICS, et al** | **:** |

### MEMORANDUM RE: THE MOTION *IN LIMINE* OF DEFENDANTS, CHARLES W. CONCODORA, M.D. AND UROLOGY FOR CHILDREN, TO PRECLUDE ANY TESTIMONY, ARGUMENT AND EVIDENCE REGARDING MONEY OWED TO UROLOGY FOR CHILDREN BY ST. CHRISTOPHER'S HOSPITAL

This matter arises out of Plaintiffs' allegations that the Defendants were negligent which caused a delay in the diagnosis and treatment of the Minor Plaintiff's testicular torsion. Plaintiffs' sole claim against Moving Defendant, Dr. Concodora, is for negligence. Plaintiffs' sole theory of liability against Moving Defendant, Urology for Children, is for vicarious liability for the alleged negligence of Dr. Concodora.

However, over the course of this litigation, Plaintiffs have alleged and implied that  Dr. Concodora did not come to the hospital to see the minor Plaintiff due to "St. Chris' failure and refusal to pay for the on-call urology service provided by the attending urologist, Charles Concodora, MD and his practice, Urology for Children, LLC". By way of example, in Plaintiff's settlement demand letter dated March 16, 2022, Plaintiff stated the following:

> Moreover, lurking behind this fact pattern was St. Chris' failure and refusal to pay for the on-call urology service provided by the attending urologist, Charles Concodora, MD and his practice, Urology for Children, LLC. In this regard, Dr. Concodora and other physicians employed by Urology for Children, LLC, were

providing over 700 hours each month for on-call coverage services
of the St. Chris ER. St. Chris, however, due to its financial
difficulties and looming bankruptcy, stopped paying for these
services in April 2019, and as confirmed in a later bankruptcy
filing was delinquent by more than $100,000 by the time of the
instant malpractice on July 24, 2019. ***A jury will consider these
facts*** (among other egregious facts including the unauthorized
practice of medicine by St. Chris' ultrasound technologist and the
ER physicians' reliance upon same), ***when it considers Dr.
Concodora's failure and/or refusal to appropriately respond
between 5:00-6:00 AM on July 24, 2019, when he was contacted
(presumably at home) by the urology resident and failed and/or
refused to remotely access Andres' electronic medical records
and/or otherwise travel to St. Chris to address the clear
urological emergency.***

*See* Exhibit A at pg. 3 (emphasis added).

Importantly, when Dr. Concodora was questioned at his deposition by Plaintiff's counsel

about any debt that was owed by St. Christopher's Hospital to Urology for Children, Dr.

Concodora testified that he had no knowledge of the filing in the US District Court by Urology

for Children nor did he have any knowledge that St. Christopher's Hospital owed money to

Urology for Children. Specifically, he was questioned and testified as follows:

```
15   Q.   Did there come a time when Urology for
16   Children was not being paid by St. Christopher's
17   Hospital?
18   A.   I'm not privy to that information.
19   Q.   I'm going to show you a document.  This is a
20   filing in the United States District Court by
21   Urology for Children.  Let me show you here on page
22   2 of this filing, there is a footnote, too, that
23   refers to agreements that are with St.
24   Christopher's Hospital and one of them is a service
```

```
1   agreement.
2           I think I raised that before when we
3   were off the record in the beginning of the
4   deposition.
5           Do you have any knowledge about that
6   service agreement?
7   A.   No, I do not.
```

*See* Exhibit B at pgs. 83:15-24 - 84:1-7

```
18  Q.   It identifies in here that the debtors, which
19  is the entity that own St. Christopher's Hospital
20  were obligated to make payments to Urology for
21  Children for services rendered and that the debtors
22  defaulted on their obligation to make all required
23  payments, and in that regard it identifies that the
24  debtors owe Urology for Children $37,200 for

 1  on-call coverage during May of 2019; $36,000 for
 2  June of 2019; $37,200 for July of 2019.  Were you
 3  ever made aware of any of that?
 4  A.   No.
```

*See* Exhibit B at pgs. 84:18-24 – 85:1-4.

Thus, Moving Defendants anticipate that Plaintiffs will attempt to introduce testimony, argument and/or evidence regarding money that was owed to Urology for Children by St. Christopher's Hospital and allege and/or imply that Dr. Concodora did not come to the hospital to see the minor Plaintiff because of the money that was owed to Urology for Children. Defendants, Dr. Concodora and Urology for Children, have vehemently denied this allegation and maintain that Plaintiffs' reference to any money owed by St. Christopher's Hospital is

entirely irrelevant to this matter and had absolutely no relation to Dr. Concodora and Urology for

Children's  involvement with the minor Plaintiff.

## <u>ANALYSIS</u>

### A. **Evidence of money owed by St. Christopher's Hospital to Urology for Children is Irrelevant.**

Under Fed. R. Evid. 401, evidence is relevant if it: (1) has any tendency to make a fact

more or less probable than it would be without the evidence; and (2) the fact is of consequence in

determining the action.  Evidence that is irrelevant is not admissible.  Fed. R. Evid. 402.

Any money owed to Urology for Children by St. Christopher's Hospital is entirely

irrelevant to the issue of whether the defendants exercised the requisite standard of care at the

time of the minor Plaintiff's care. Thus, any money that was owed to Urology for Children by St.

Christopher's Hospital has no probative value and no bearing whatsoever on the issue the jury is

to decide: whether the defendants conduct with respect to the minor Plaintiff's care fell below

the standard of care. Introduction of the evidence would serve no legitimate purpose. Plaintiff's

only intention to introduce such evidence and/or testimony would be to divert the jury's attention

away from the real issues in the case. Thus, admitting this evidence would only serve to confuse

the jury and divert their attention away from the specific issues in this case. As such, the Court

should not permit such irrelevant evidence at trial.  *See* Fed. R. Evid. 402

### B. **Any probative value of evidence of money owed by St. Christopher's Hospital to Urology for Children is outweighed by a danger of undue prejudice.**

Even if Plaintiff's anticipated evidence or testimony regarding money owed to Urology for

Children by St. Christopher's Hospital was relevant (which it is not), it should nonetheless be

excluded under Fed. R. Evid. 403, which provides that:

> The court may exclude relevant evidence if its probative value is
> substantially outweighed by a danger of one or more of the
> following: unfair prejudice, confusing the issues, misleading the

> jury, undue delay, wasting time, or needlessly presenting
> cumulative evidence.

Allowing the jury to hear testimony, argument or evidence regarding money owed to Urology for Children by St. Christopher's Hospital would unfairly prejudice the Defendants, as this information could cause the jury to view Moving Defendants in an unfavorable light. Any purported value of evidence and/or testimony that St. Christopher's Hospital owed Urology for Children money will inevitably prejudice, confuse and mislead the jury against Moving Defendants. Moreover, it will cause undue delay and waste the jury's time, as such information is not dispositive of the issue before the jury. As such, the Court should not permit such evidence at trial.

## **CONCLUSION**

For the reasons set forth above, Defendants, Charles W. Concodora, M.D. and Urology for Children, respectfully request that the Court grant their Motion *in Limine* and preclude any argument, testimony or evidence regarding money owed to Urology for Children by St. Christopher's Hospital.

GERMAN, GALLAGHER & MURTAGH

BY:    /s/ John P. Shusted
       John P. Shusted
       I.D. #44675 shustedj@ggmfirm.com
       Nikki A. Mosco
       I.D. #320709 moscon@ggmfirm.com
       The Bellevue, Suite 500
       200 S. Broad Street
       Philadelphia, PA  19102
       Shusted Direct: 215-875-4037
       Main:  215-545-7700
       F:  215-732-4182

       Attorneys for Defendants,
       Charles W. Concodora, M.D. and
       Urology for Children

## IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF PENNSYLVANIA

LASHEENA SIPP-LIPSCOMB AND : CIVIL ACTION NO. 20-cv--01926
ANDRES GARDIN, SR., Individually and in :
their own right and as Parents and Natural :
Guardians of ANDRES GARDIN, JR., a minor :
                 :
         **V.** :
                 :
EINSTEIN PHYSICIANS PENNYPACK :
PEDIATRICS, et al :

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing Motion *in Limine* of Defendants, Charles W. Concodora, M.D. and Urology for Children, to preclude Plaintiffs from introducing any testimony, argument and evidence regarding money owed to Urology for Children by St. Christopher's Hospital at the time of trial was filed with the Court on December 1, 2022 and was served upon all counsel of record via the Court's ECF System.

GERMAN, GALLAGHER & MURTAGH

BY:   /s/ John P. Shusted
          John P. Shusted
          I.D. #44675 shustedj@ggmfirm.com
          Nikki A. Mosco
          I.D. #320709 moscon@ggmfirm.com
          The Bellevue, Suite 500
          200 S. Broad Street
          Philadelphia, PA  19102
          Shusted Direct: 215-875-4037
          Main:  215-545-7700
          F:  215-732-4182

          Attorneys for Defendants,
          Charles W. Concodora, M.D. and
          Urology for Children

## JOKELSON LAW GROUP, P.C.

ATTORNEYS AT LAW
230 South Broad St., 10ᵗʰ Fl.
Philadelphia, PA 19102
——
Tel. (215) 735-7556
Fax (215) 985-0476

David E. Jokelson
Derek E. Jokelson
Debra M. Jokelson*
* Of Counsel

March 16, 2022

***Via Email** gary.samms@obermayer.com,*
*edvard.wilson@obermayer.com **and***
*katherine.robinson@obermayer.com*
Gary M. Samms, Esquire
Edvard Wilson, Esquire
Katherine M. Robinson, Esquire
Obermayer Rebmann Maxwell & Hippel,
LLP
1500 Market Street, Suite 3400
Philadelphia, PA 19102-2101

***Via Email** echosmer@mdwcg.com*
*  **and** jmreynolds@mdwcg.com*
E. Chandler Hosmer, Esquire
Jaqueline M. Reynolds, Esquire
Marshall DenneheyWarner Coleman
  & Goggin, P.C.
620 Freedom Business Center
Suite 300
King of Prussia, PA 19406

***Via Email** gyoung@kiernantrebach.com*
George L. Young, Esquire
Kiernan Trebach LLP
Ten Penn Center Plaza
Suite 770
1801 Market Street
Philadelphia, PA 19103

***Via Email** jzack@postandpost.com*
Joseph Zack, Esquire
Post & Post, LLC
200 Berwyn Park
920 Cassatt Road, Suite 102
Berwyn, PA  19312

***Via Email** shustedj@ggmfirm.com*
*  **and** moscon@ggmfirm.com*
John P. Shusted, Esquire
Nikki Mosco, Esquire
German Gallagher & Murtagh
The Bellevue, Suite 500
200 S. Broad Street
Philadelphia, PA  19102

All Counsel
March 16, 2022
Page 2

Re:     **Sipp-Lipscomb, et al. v. Einstein Physicians Pennypack Pediatrics, et al.**
        **United States District Court for the Eastern District of Pennsylvania**
        **Civil Action No. 20-cv-1926**

Dear Counsel:

In connection with the Order entered by Judge Strawbridge on March 9, 2022 (ECF No. 170), please consider this correspondence to constitute Plaintiffs' settlement demand for the primary insurance and MCare limits for each of the Defendants in this case. This demand is predicated upon a pattern of outrageous neglect and reckless misconduct evidenced by each of the Defendants in myriad ways that resulted in the Minor Plaintiff, Andres Gardin, Jr., losing his left testicle at 27 months of age from an undiagnosed testicular torsion.

Discovery in this case has revealed not only clear breaches of duty and obvious reckless misconduct, but a host of conflicting positions taken by the Defendants and their experts blaming each other for the events at issue. Because of the conflicts between the Defendants, together with the catastrophic injury and the outrageous misconduct, Plaintiffs expect that a jury in this case will award substantial punitive and compensatory damages against each Defendant. In this regard, we call your attention to *Campbell v. Allegheny University Hospital - Hahneman Division*, November Term 1999, No. 0440 (Philadelphia County), wherein the plaintiff was awarded $8.5 Million in compensatory damages at trial for an undiagnosed testicular torsion. Fortunately for the plaintiff in *Campbell*, the torsed testicle on surgical examination did not need to be removed, unlike this case where due to the outrageous delay and misdiagnoses, when exploratory surgery was ultimately performed  more than 24 hours after the child's initial presentation of symptoms, the torsed testicle was found to be no longer viable and required surgical removal.

In this case, each of the co-Defendants associated with St. Christopher's Hospital for Children claim that the original error transpired when the Andres' pediatric practice (operated by the Einstein Defendants) failed to direct his family to the emergency room when his mother first called an Einstein telephone triage nurse at 3:47 PM. In this regard, Andres' mother testified that when her child awoke from a nap around 3:45 PM on July 23, 2019, he had scrotal pain and scrotal swelling. According to the Einstein triage nurses that were deposed in this case, these symptoms constituted a known urological emergency requiring immediate medical attention at an ER. Einstein however did not direct Andres' mother to the ER and instead assured her that the symptoms were likely secondary to fluid accumulation and to simply monitor the child at home unless or until the symptoms worsened. Andres' mother followed this clearly reckless and medically unsupported advice to the letter and when the symptoms worsened in the early morning, she took the child to St. Chris who recorded in the ER note the content of her conversation with the Einstein triage nurse.

Through discovery in this case, Einstein has identified, contrary to its medical record keeping policy, that it cannot locate any record of the call. Nonetheless, the call is not in dispute because the

All Counsel
March 16, 2022
Page 3

telephone records produced by T-Mobile establish that the call was made for 2 minutes and 41 seconds. Moreover, Einstein cannot identify the employee that managed the triage call. Because Einstein has no evidence to dispute Plaintiffs' claim and did not follow its alleged habit, custom and practice, Einstein will be unable to contest a breach of the standard of care. This breach will become only more pronounced as each of the experts for the co-Defendants claim that emergency action should have been taken when the symptoms were first reported at 3:47 PM.

Einstein's grossly reckless errors, in violation of their own policies and procedures, were then compounded when Plaintiffs arrived at the St. Chris ER. Notwithstanding an obvious presentation for a testicular torsion that should have been addressed immediately and/or appropriately managed by St. Chris' ER physicians, ultrasound technician, remote teleradiologist and urology resident and attending, the many opportunities to address Andres' true condition were missed and otherwise recklessly avoided. It is ultimately beyond dispute from St. Chris' own internal investigation that the ultrasound imaging taken that evening failed to demonstrate testicular blood flow which should have triggered a prompt surgical evaluation. Had that action been taken, Andres' testicle would have survived—a point confirmed by both of Einstein's experts who opine that Andres' testicle was salvageable until his premature discharge from St. Chris.

The Defendants associated with St. Chris however have taken conflicting positions with the teleradiologist blaming the ultrasound technician, urology personnel and the ER physicians, and vice-a-versa, including accusations by Plaintiffs and some of the Defendants that St. Chris' ultrasound technician was engaged in the unauthorized practice of medicine without a license. These conflicts will only become more pronounced at trial and Plaintiffs predict will lead to a substantial jury award against all Defendants for both compensatory and punitive damages.

Moreover, lurking behind this fact pattern was St. Chris' failure and refusal to pay for the on-call urology service provided by the attending urologist, Charles Concodora, MD and his practice, Urology for Children, LLC. In this regard, Dr. Concodora and other physicians employed by Urology for Children, LLC, were providing over 700 hours each month for on-call coverage services of the St. Chris ER. St. Chris, however, due to its financial difficulties and looming bankruptcy, stopped paying for these services in April 2019, and as confirmed in a later bankruptcy filing was delinquent by more than $100,000 by the time of the instant malpractice on July 24, 2019. A jury will consider these facts (among other egregious facts including the unauthorized practice of medicine by St. Chris' ultrasound technologist and the ER physicians' reliance upon same), when it considers Dr. Concodora's failure and/or refusal to appropriately respond between 5:00-6:00 AM on July 24, 2019, when he was contacted (presumably at home) by the urology resident and failed and/or refused to remotely access Andres' electronic medical records and/or otherwise travel to St. Chris to address the clear urological emergency.

All of these failures outlined in the reports of Plaintiffs' experts **and** the defense expert reports combined to cause Andres' premature discharge from St. Chris without an appropriate

All Counsel
March 16, 2022
Page 4

diagnosis. This error was only discovered after discharge when the attending on-site radiologist returned to work that morning to discover the misinterpreted ultrasound examination and took extraordinary action to cause the Philadelphia Police to find the family and have them return to the hospital. Unfortunately, because of the delays, Andres' left testicle was no longer salvageable and was discovered to be no longer viable during a surgical exploration later that afternoon.

As noted above, a less severe case of testicular torsion malpractice resulted in an $8.5 million compensatory damage verdict for the plaintiff. It is beyond dispute in this case that Andres Gardin, Jr. is now disfigured with a missing left testicle. Andres Gardin's full damages will not, and cannot be known, until after puberty which is many years away. As noted by Plaintiffs' expert Dr. Casale, "[t]he main concerns of parents and patients who present with loss of a testis are, in no particular order, hormone levels, infertility, disfigurement, psycho-social development, and activity in sports" as well as "an increased risk for conditions such as loss of muscle strength, osteoporosis, loss of sex drive, erectile dysfunction/inability to achieve or maintain erection, hot flashes, weight gain, depression or low mood, and increased risk of cardiovascular disease." I also note that Scott B. Berger, M.D. (Defendant Kalyanpur and Teleradiology Solution's expert) opines that the remaining right testicle was seen on imaging "in the inguinal canal, and in conjunction with its abnormal pear shape, it could represent cryptorchidism," of the remaining right testicle. Cryptorchidism results in infertility as well, meaning that Andres Gardin, Jr. may well have no chance of any future fertility as a result of Defendants' collective outrageous misconduct and lack of proper care.

Finally we ask that counsel for those Defendants that have MCare coverage—Einstein, St. Chris, Dr. Hassel, Dr. Nath and Dr. Cho—timely confirm that an MCare representative will be in attendance at the mediation before Judge Strawbridge.

It is our hope that we can settle this matter with the Defendants through mediation before Judge Strawbridge and we look forward to hearing from each of you in advance of the mediation date.


Very truly yours,

 /s/

DAVID E. JOKELSON
DEREK E. JOKELSON

DEJ\ab
cc:    The Honorable David R. Strawbridge
       (Via Email Strawbridge_Chambers@paed.uscourts.gov)

# In The Matter Of:

*LaSheena Sipp-Lipscomb, et al. vs.*
*Einstein Physicians Pennypack Pediatrics, et al.*

---

*Charles Concodora, MD*
*June 29, 2021*

---

*B&R Services for Professionals, Inc.*
*235 South 13th Street*
*Philadelphia, PA 19107*
*(215) 546-7400*
*cr@brservices.com*

EXHIBIT "B"

Original File 062921pl Concodora.txt
Min-U-Script® with Word Index

Case 2:20-cv-01926-MMB   Document 223   Filed 12/01/22   Page 19 of 42

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                        - - -

LASHEENA SIPP-LIPSCOMB      :  CIVIL ACTION
and ANDRES GARDIN, SR.,     :  No. 2:20-CV-01926-MMB
Individually and in their:
own right, and as Parents:
and Natural Guardians of :
ANDRES GARDIN, JR.,         :
a minor                     :
                            :
vs.                         :
                            :
EINSTEIN PHYSICIANS         :
PENNYPACK PEDIATRICS,       :
et al                       :

                        - - -


          Oral deposition of CHARLES CONCODORA,

M.D., taken remotely pursuant to notice, on

Tuesday, June 29, 2021, commencing at or about 4:05

p.m., before Patricia A. Lipski, RPR, CCR, New

Jersey, Notary Public.

                        - - -


          B & R SERVICES FOR PROFESSIONALS, INC.

               235 SOUTH 13th STREET

          PHILADELPHIA, PENNSYLVANIA 19107

                 (215) 546-7400


          B & R Services for Professionals, Inc.
```

---

**CHARLES CONCODORA, M.D.** — Page 2

```
 1  APPEARANCES:

 2
    JOKELSON LAW GROUP
 3  BY:  DAVID JOKELSON, ESQUIRE
    230 South Broad Street
 4  10th Floor
    Philadelphia, Pennsylvania  19102
 5  215-735-7556
    David@jokelson.com
 6  Counsel for Plaintiffs

 7  KIERNAN TREBACH, LLP
    BY:  GEORGE L. YOUNG, ESQUIRE
 8  Two Penn Center Plaza
    Suite 770
 9  1801 Market Street
    Philadelphia, Pennsylvania  19103
10  215-569-4433
    GYoung@KiernanTrebach.com
11  Counsel for Defendant, Dr. Kalyanpur

12  OBERMAYER, REBMANN, MAXWELL & HIPPEL
    BY:  KATHERINE ROBINSON, ESQUIRE
13  Centre Square West
    1500 Market Street
14  Suite 3400
    Philadelphia, Pennsylvania  19102
15  215-665-3000
    Katherine.Robinson@obermayer.com
16  Gary.samms@obermayer.com
    Counsel for Defendant,
17  St. Christopher's Healthcare, LLC

18  POST and POST
    BY:  ZACHARY FOWLER, ESQUIRE
19  920 Cassatt Road
    200 Berwyn Park
20  Suite 102
    Berwyn, Pennsylvania  19312
21  610-240-9180
    Zfowler@postandpost.com
22  Counsel for Defendants, Einstein

23

24
```

---

**CHARLES CONCODORA, M.D.** — Page 3

```
 1  APPEARANCES:  (Continued)

 2  MARSHALL DENNEHEY WARNER
    COLEMAN & GOGGIN
 3  BY:  E. CHANDLER HOSMER, ESQUIRE
    620 Freedom Business Center
 4  Suite 300
    King of Prussia, Pennsylvania  19406
 5  610-354-8288
    Echosmer@mdwcg.com
 6  Counsel for Defendant, Dr. Cho

 7  GERMAN, GALLAGHER & MURTAGH
    BY:  JOHN SHUSTED, ESQUIRE
 8  200 South Broad Street
    Suite 500
 9  Philadelphia, Pennsylvania  19102
    215-875-4024
10  Shustedj@ggmfirm.com
    Counsel for Defendants, Urology for Children
11  and Dr. Concodora

12

13

14

15

16

17

18

19

20

21

22

23

24
```

---

**CHARLES CONCODORA, M.D.** — Page 4

```
 1                I N D E X

 2  WITNESS                              PAGE

 3  CHARLES CONCODORA, M.D.

 4  By Mr. Jokelson                        6

 5  By Mr. Young                          90

 6

 7              E X H I B I T S

 8  NO.                                  PAGE

 9  P-16            Contract              43

10  P-17            On-Call Log           44

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Case 2:20-cv-01926-MMB   Document 223   Filed 12/01/22   Page 20 of 42

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concordora, MD
June 29, 2021

CHARLES CONCORDORA, M.D.                         Page 5

```
 1              DEPOSITION SUPPORT INDEX
 2
 3  Direction to the Witness Not to Answer
 4  PAGE                                    LINE
 5  41                                      12
 6
 7  Request for Production of Documents
 8  PAGE                                    LINE
 9  NONE
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

CHARLES CONCORDORA, M.D.                         Page 6

```
 1      _ _ _
 2      CHARLES CONCORDORA, M.D., having been
 3  duly sworn, was examined and testified as
 4  follows:
 5      _ _ _
 6      MR. SHUSTED: Dr. Concordora will read
 7  and sign the transcript, Pat.
 8      MR. JOKELSON: That's fine, Pat.
 9      BY MR. JOKELSON:
10  Q.  Good afternoon, Dr. Concordora.
11  A.  Good afternoon.  How are you?
12  Q.  Good.  I understand from your counsel that you
13    just finished up your board examinations?
14  A.  Yes, that's correct.
15  Q.  Congratulations.
16  A.  Thank you.
17  Q.  Was that a recertification or was that your
18    first time taking them?
19  A.  That was the initial certification.
20  Q.  That was the initial certification, so you're
21    not as of yet a board certified urologist?
22  A.  No, I am a board certified urologist.
23  Q.  And what were these boards for?
24  A.  For urology.  This was -- so the American
```

CHARLES CONCORDORA, M.D.                         Page 7

```
 1  Board of Urology requires you to take a written
 2  exam, which I took a few years ago, and then an
 3  oral exam, which was just taken and passed, so I'm
 4  now fully board certified in urology.
 5  Q.  What I meant was prior to passing the oral
 6  portion -- which when was that, in May?
 7  A.  Correct.
 8  Q.  Prior to passing the oral portion in May you
 9  were not board certified; is that correct?
10  A.  I would have been board eligible, yes.
11  Q.  You were on your way?
12  A.  Correct.
13  Q.  But you weren't quite there.  Okay.
14      How old are you, Doctor?
15  A.  Thirty-seven.
16  Q.  When did you graduate med school?
17  A.  That would have been May of 2010.
18  Q.  Does that mean you took time off between
19    college and med school?
20  A.  I finished college in December of 2005.  I
21    finished one semester early.
22  Q.  Where did you graduate college from?
23  A.  That was the College of New Jersey.
24  Q.  And then where did you go for med school?
```

CHARLES CONCORDORA, M.D.                         Page 8

```
 1  A.  University of Medicine and Dentistry New
 2    Jersey Medical School.
 3  Q.  I'm sorry, you may have said this, but when
 4    did you graduate med school?
 5  A.  May of 2010.
 6  Q.  And after graduating med school you went into
 7    an internship?
 8  A.  Correct.
 9  Q.  And that was a one-year program?
10  A.  So for Temple urology that's a six-year
11    program, which consisted of two years of general
12    surgery, and then four years of urology.
13  Q.  So the urology residency starts in your third
14    postgraduate year at the time?
15  A.  Correct.
16  Q.  And that's a four-year residency?
17  A.  Correct.
18  Q.  And so when did you complete your residency?
19  A.  So my residency was complete in the end of
20    June of 2016.
21  Q.  And then did you then move onto a fellowship?
22  A.  Correct.
23  Q.  And what specialization was your fellowship
24    in?
```

Case 2:20-cv-01926-MMB   Document 223   Filed 12/01/22   Page 21 of 42
LaSheena Sipp-Lipscomb, et al. vs.                                    Charles Concodora, MD
Einstein Physicians Pennypack Pediatrics, et al.                             June 29, 2021

CHARLES CONCODORA, M.D.                                    Page 9

1  A.  Pediatric urology.
2  Q.  When did you complete your fellowship -- where
3    did you do your fellowship?
4  A.  Cincinnati Children's, Cincinnati Ohio.
5  Q.  And when did you complete that fellowship?
6  A.  That was completed the end of June of 2018.
7  Q.  Was there any other subspecialty that you
8    pursued?
9  A.  No.
10  Q.  Do you know whether there's any accreditation
11    that's offered to urologists associated with
12    reading urology or scrotal ultrasounds?
13  A.  Reading of scrotal ultrasounds is part of the
14    residency.  I do not have a formal accreditation in
15    radiology.
16  Q.  Well, do you have any kind of accreditation in
17    ultrasound -- ultrasonography and/or urological
18    ultrasounds or scrotal ultrasounds?
19  A.  Can you rephrase that, please?
20  Q.  Yes.  Do you have -- I think it's called the
21    AIUM.  I believe that the American Institute of
22    Ultrasound in Medicine offers an accreditation in
23    ultrasound for urologists.  Do you have any such
24    accreditation?

CHARLES CONCODORA, M.D.                                    Page 10

1  A.  No.
2  Q.  Are you familiar with the accreditation
3    process?
4  A.  No.
5  Q.  Is that something you're going to obtain or
6    are you satisfied with where you are?
7  A.  I'm satisfied with where I am.
8  Q.  Doctor, have you ever been deposed before?
9  A.  No.
10  Q.  So let me explain to you what this is about.
11    A deposition is just a question and answer session
12    where the attorney asks you questions and the
13    deponent answers the questions.  It's not a
14    marathon.  It's not an endurance test.  If you need
15    to take a break, just say, Mr. Jokelson, I need a
16    break.  I need to use the facilities, use the
17    washroom.  Have a glass of water, have a bite to
18    eat, speak with your attorney, any of that is
19    acceptable.  Just say the word and we'll take a
20    break.  Do you understand that?
21  A.  Yes.
22  Q.  And the same thing goes, if I ask a question
23    and the question is confusing to you, just say,
24    Mr. Jokelson, please rephrase the question and I'm

CHARLES CONCODORA, M.D.                                    Page 11

1    happy to do that.  Do you understand that?
2  A.  Yes.
3  Q.  Can we also have the understanding if I ask a
4    question and you don't ask me to rephrase the
5    question, that you've understood the question?
6  A.  Yes.
7  Q.  And do you think you could follow those rules?
8  A.  Yes.
9  Q.  And so far you're doing a good job because a
10    lot of people -- a lot of people during
11    depositions, they'll shrug their shoulders or nod
12    their heads instead of giving verbal answers, and
13    none of that the court reporter can take down.  So
14    it's important you keep your voice up and that you
15    answer the questions in a verbal way so the court
16    reporter can take it down because the court
17    reporter doesn't have any facility to take down
18    nonverbal answers.  Do you understand that?
19  A.  Yes.
20  Q.  Doctor, are you a member of Urology For
21    Children?
22  A.  Yes.
23  Q.  How long have you been a member of that
24    limited liability company?

CHARLES CONCODORA, M.D.                                    Page 12

1  A.  Three years.
2  Q.  And so that would have been -- when did you
3    join them, in 2018?
4  A.  Correct.
5  Q.  And that would have been after your
6    fellowship?
7  A.  Correct.
8  Q.  And as a member of Urology For Children in
9    July of 2019 did you have any relationships with
10    any hospitals where you provided on-call services?
11  A.  Yes.
12  Q.  Which hospitals were those?
13  A.  That would be St. Christopher's Hospital for
14    Children, Abington Memorial Hospital, Shriner's
15    Hospital in Philadelphia, Virtua Hospital in
16    Voorhees.  We also have agreements with St. Luke's,
17    not for call coverage, but for telephone
18    consultations, and then also phone calls from
19    Temple Hospital.
20  Q.  I'm just trying to keep up with you as you're
21    saying this.  So you have an on-call relationship
22    with Shriner's Hospital, St. Christopher's Hospital
23    for Children and Abington Memorial Hospital?
24  A.  Correct.

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

CHARLES CONCODORA, M.D.                                    Page 13

1  Q.  Did I miss any?
2  A.  Virtua Voorhees Hospital System.
3  Q.  And those were all established relationships
4  back in 2019, in July of 2019, correct?
5  A.  In July of 2019, yes.
6  Q.  And then the telephone, you had a relationship
7  with St. Luke's Hospital and Temple University
8  Hospital whereby you just gave telephone consults?
9  A.  It's a very informal relationship where
10  infrequently we would receive a phone call from a
11  physician with a curbside question, very informal.
12  Q.  Is it something that was covered by a
13  contract?
14  A.  I don't know.
15  Q.  Is it something that you bill for?
16  A.  No, we do not bill for that.
17  Q.  And with regard to the hospitals that you
18  provide -- that you provided the on-call coverage
19  for, were you paid -- the group was paid an hourly
20  rate?
21  A.  I believe so.  I would have to check with our
22  office.
23  Q.  Were you also providing -- were you also
24  billing insurance carriers for services that were

CHARLES CONCODORA, M.D.                                    Page 14

1  provided in addition to the hourly rate that you
2  were getting from the hospitals?
3  A.  Once again, I'd have to check with my office.
4  Q.  Do you have an understanding?
5  A.  I have an understanding that we do bill for
6  specific consults at specific locations.  I don't
7  know if there is an overlap between a stipend and
8  the billing.  I stay out of that portion of it.
9  Q.  And by stipend, you mean the hourly rate that
10  the hospital is paying.
11  A.  I believe so, yes.
12  Q.  Let me show you an exhibit.
13      Doctor, can you see this -- are you able
14  to see this agreement on the screen?
15  A.  Yes.
16      MR. JOKELSON: Everybody else can see
17  it, correct?
18      MR. YOUNG: Yes.
19      BY MR. JOKELSON:
20  Q.  Is this the emergency on-call agreement that
21  covered your relationship with St. Christopher's
22  Hospital at the time, do you know?
23      If you want, I can scroll through it.
24  This is what was produced by your counsel in this

CHARLES CONCODORA, M.D.                                    Page 15

1  case.
2  A.  I'm not familiar with this document
3  personally.  This is something between Urology for
4  Children, and as an employee of Urology for
5  Children I'm not intimately aware of this document.
6      MR. JOKELSON: Jack, my understanding is
7  that this is -- this was represented to be
8  the contract; is that correct?
9      MR. SHUSTED: Correct.
10      BY MR. JOKELSON:
11  Q.  If you look on the first page of this
12  agreement, which your counsel has represented is
13  the agreement that was in place between Urology for
14  Children, LLC and the entity operating
15  St. Christopher's Hospital for Children, it talks
16  about in paragraph number one the group's
17  obligations.  Do you see that?
18  A.  Yes.
19  Q.  And it says the group employs, and skipping
20  down, duly licensed physicians, and it says the
21  group shall provide physicians to be on call to
22  provide emergency -- to provide services in the
23  specialty to the hospital's emergency department.
24  Do you see that?

CHARLES CONCODORA, M.D.                                    Page 16

1  A.  I see that.
2  Q.  What are the services that a physician in your
3  capacity provides when you're on call, what does
4  that mean?
5  A.  The services would be coverage of the
6  emergency department for any calls, that also
7  includes inpatient consultations as well.
8  Q.  So when a call comes in about -- you're
9  talking about a call coming in -- a call coming in
10  for a patient where there's a urological concern
11  from the ER?
12  A.  Right.  So the emergency department would
13  actively reach out to us and call our service and
14  that's how they get in touch with Urology for
15  Children when they're wishing to have a consult
16  called in.
17      Are you able to scroll down to the
18  bottom of that, to the signature page?
19  Q.  Yes.  Absolutely.  That's the signature page.
20  A.  I don't see my name on there.  I just wanted
21  to make sure this is something I didn't sign.
22  Q.  I'll represent to you this is a document that
23  was signed on behalf of Urology for Children of
24  which you're a member --

Case 2:20-cv-01926-MMB   Document 223   Filed 12/01/22   Page 23 of 42

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

CHARLES CONCODORA, M.D.                                    Page 17

1  A.   Correct.
2  Q.   By Michael G. Packer, M.D.
3  A.   Thank you.
4  Q.   Although for the record the document that
5  we've been produced, although it's represented to
6  be the actual contract that was in place, is not,
7  in fact, an executed version, but it is, in fact,
8  representative of what the final contract was.
9      What does it mean to provide coverage,
10  what actions do you take when you're the covering
11  doctor?
12  A.   I think I answered that.  It was covering
13  emergency room consultations and inpatient
14  consultations, and if I have a patient admitted
15  under our service, it would be the provider for
16  that patient as well.
17  Q.   When you're covering is there an expectation
18  that you review medical records?
19  A.   The expectation is to provide the standard of
20  care for a patient.
21  Q.   And does the standard of care require that
22  when you're covering the hospital's emergency room
23  that you look at medical records, for instance?
24  A.   The standard of care is to obtain information

CHARLES CONCODORA, M.D.                                    Page 18

1  from multiple sources.
2  Q.   What are the multiple sources from which you
3  obtain information?
4  A.   At a teaching hospital such as
5  St. Christopher's one of those sources is
6  residents, one of the sources is discussions with
7  attendings, that would be --
8  Q.   By attendings you mean the ER attending?
9      MR. SHUSTED: Objection.  Mr. Jokelson,
10  you're going to have to let him finish his
11  answer before you --
12      MR. JOKELSON: I apologize.
13      BY MR. JOKELSON:
14  Q.   Go ahead.
15  A.   Thank you.  So that would be information
16  obtained from multiple sources such as residents,
17  such as discussions with other providers,
18  information obtained specifically from the patient,
19  from also the records as well.
20  Q.   So as the on-call Doctor, you would go to the
21  residents, you would go to the records, you would
22  go to other providers, and you would go to the
23  patients in order to gather your information from
24  which you would make your assessment; is that

CHARLES CONCODORA, M.D.                                    Page 19

1  correct?
2  A.   So each patient interaction, each consult has
3  different context.  You're not going to be doing
4  the same for each patient encounter.
5      For some instances you would be
6  providing information directly from the patient;
7  other instances, this is a telephone consultation.
8  So even though there's multiple sources to obtain
9  information, you're not necessarily using every
10  source every time.
11  Q.   So you can pick and choose which sources you
12  want to use?
13      MR. SHUSTED: Objection.  Argumentative.
14  You can answer.
15      THE WITNESS: I wouldn't say the phrase
16  pick and choose, Mr. Jokelson.  I would use
17  the appropriate information that's necessary
18  to provide the standard of care.
19      BY MR. JOKELSON:
20  Q.   And you're saying that could change depending
21  upon the patient that you're dealing with?
22  A.   Correct.
23  Q.   Now, in this case it's my understanding you
24  were on call on the 24th of July, 2019; is that

CHARLES CONCODORA, M.D.                                    Page 20

1  correct?
2  A.   Only until 7:00 a.m.
3  Q.   Only until 7:00 a.m.  Is that important to you
4  that it was only until 7:00 a.m.?
5  A.   No, that's just an arbitrary time that our
6  coverage ends.
7  Q.   No, you stated as it if it was important for a
8  reason that I wasn't picking up on.
9  A.   I just want to make sure that we all
10  understand that there is a time change here, and
11  since this case expands over the course of the
12  entire day, that we know that at 7:00 a.m. there
13  was a change in coverage, that's the reason I bring
14  that up.
15  Q.   So you're saying that you had no more
16  responsibility after 7:00 a.m.?
17      MR. SHUSTED: Objection.  Go ahead.  You
18  can answer the question.
19      THE WITNESS: Can you rephrase that?
20  What do you mean by no more responsibility?
21      BY MR. JOKELSON:
22  Q.   Your responsibilities ended to the patient at
23  7:00 a.m., is that what you're saying?
24  A.   No.  So we do not just cut off responsibility

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

CHARLES CONCODORA, M.D.                                    Page 21

1    at 7:00 a.m.  The call coverage, meaning anything
2    that's new coming in would be directed to a
3    different provider at that point.
4        If I have an ongoing issue, then my
5    responsibility does not end at that time.
6    Q.   So your responsibility continues beyond the
7        7:00 a.m. hour for patients that you had seen prior
8    to then?
9    A.   Correct.
10   Q.   Let me show you another document.  Doctor, do
11   you see what's on the screen now?
12   A.   Yes.
13   Q.   This is the Urology for Children 2019 time log
14   for on-call services at St. Christopher's Hospital
15   for Children.  Do you see that?
16   A.   I don't specifically see where it says St.
17   Christopher's, but I do recognize this as a call
18   log for some location.
19   Q.   Do you see at the top of the page what I've
20   circled in blue?
21   A.   Yes, now I see St. Christopher's, yes.
22   Q.   So I was correct that this is the time sheet
23   for the on-call services provider for Urology for
24   Children at St. Christopher's in July of 2019,

CHARLES CONCODORA, M.D.                                    Page 22

1    correct?
2    A.   Yes.
3    Q.   And it says this is -- the first column talks
4    about the date services are provided.  It goes into
5    the type of coverage.  In the third column, the
6    hours of coverage, and then later on it gives the
7    physician's name, and then it gives sign off by the
8    physician.  Do you see that?
9    A.   Yes.
10   Q.   So if you go to July 23, I'm going to try to
11   highlight it the best I can.  Do you see that?
12   A.   Yes, I do.
13   Q.   So that was a Tuesday, July 23, and it has
14   under the notes in the fifth column, it identifies
15   that from 5:00 p.m. until 11:59 p.m. on July 23,
16   and then from 12:00 a.m. to 7:59 a.m. on the 24th
17   that you were the on-call physician; is that
18   correct?
19   A.   Yes.
20   Q.   Does that refresh your recollection, Doctor,
21   that the changeover was not 7:00 a.m. but it was
22   rather 8:00 a.m.?
23   A.   Yes, it does.
24   Q.   Is that your signature on the right-hand side?

CHARLES CONCODORA, M.D.                                    Page 23

1    A.   Yes, it is.
2    Q.   And you understood, did you not, that this
3    signature was necessary for you to receive payment
4    from St. Christopher's Hospital?
5    A.   I'm not certain.  Possibly.  I'd have to check
6    with my office about that.
7    Q.   So if you go to the last page what they've
8    done is they've calculated the total number of
9    on-call hours for the month of July is 744 hours,
10   and the hourly rate of 50 dollars an hour for a
11   total fee of $37,200.  Do you see that?
12   A.   Yes, I do.
13   Q.   And then at the bottom of the page, I think
14   I'm reading this correctly, is that your signature
15   at the bottom?
16   A.   Yes, it is.
17   Q.   And you signed that on August 23, 2019?
18   A.   That's what it says, yes.
19   Q.   And you were attesting that "by signing this
20   document the physician hereby affirms and attests
21   to the coverage services and the dates recorded for
22   such services set forth herein were performed by
23   the physician, and that the physician fully
24   performed all services" -- "performed all

CHARLES CONCODORA, M.D.                                    Page 24

1    designated duties during this month."  Is that
2    correct.
3    A.   Yes.
4    Q.   And what are those designated duties that were
5    required?
6    A.   That would be emergency department call
7    coverage.
8    Q.   Again, that's where they call into -- you get
9    a call by someone in the emergency room, you would
10   make your own assessments and evaluations using the
11   using one or more of the sources of information we
12   discussed previously?
13   A.   This is providing our availability to the
14   emergency department for, like I mentioned, for
15   consultations, telephone calls, in that aspect,
16   yes.
17   Q.   As part of that availability when you were
18   making yourself available, did you have access to
19   St. Christopher's Hospital's electronic medical
20   records?
21   A.   So the electronic medical records are
22   available remotely, however, they are notoriously
23   difficult and unreliable to log into.  It requires
24   specific software, specific hardware, which is not

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

CHARLES CONCODORA, M.D.                                          Page 25

1  provided by St. Christopher's, and therefore
2  obtaining those remotely, like I mentioned, is not
3  reliable.
4  Q.  Well, did you ever inform St. Christopher's
5  Hospital that you had unreliable access to medical
6  records?
7  A.  I've been to IT a few times, and that's as far
8  as it's gone.
9  Q.  Well, did you ever inform the patients that
10  you have unreliable access to their medical
11  records?
12      MR. SHUSTED: Objection.  You can
13  answer.
14      THE WITNESS: No, I have not informed
15  patients of that.
16      BY MR. JOKELSON:
17  Q.  Well, is reliable access to medical records
18  important to quality patient care?
19  A.  So let me answer fully.  Access --
20  Q.  Sure.  By the way, Doctor, I expect all of
21  your answers to be full.
22  A.  Okay.  And I also expect to not be cut off.
23  So you mentioned is it important to have reliable
24  access to medical records, medical records, yes.

CHARLES CONCODORA, M.D.                                          Page 26

1  Electronic medical records, that's different.
2  Okay.
3      There's other ways of obtaining that
4  information that does not have to be remotely
5  through electronic systems.
6  Q.  So if you're at home and you're receiving a
7  call at home, how else are you getting these
8  medical records other than electronically?
9  A.  So if I have a resident that is sitting at a
10  computer on site that can read information, that's
11  one way; if I have a physician that is on site that
12  can relay information such as history and physical,
13  that's another way of remotely getting information
14  without logging onto the electronic medical record.
15  Q.  What if you wanted to see the medical record?
16  A.  I could attempt to log on or if it was
17  necessary to, I could, if possible, proceed over to
18  St. Christopher's.
19  Q.  But from home, if you wanted to actually see
20  the medical records yourself or see the ultrasound
21  images or whatever in those medical records, you'd
22  question the reliability of your ability to do that
23  from home?
24      MR. SHUSTED: Objection.  You can

CHARLES CONCODORA, M.D.                                          Page 27

1  answer.
2      MS. ROBINSON: Join.
3      THE WITNESS: Can you rephrase that?
4      BY MR. JOKELSON:
5  Q.  If you personally wanted to see the medical
6  records or, for instance, if you wanted to see an
7  ultrasound study or some other study, and you
8  didn't want to rely upon what the resident had to
9  say, but you wanted to look at it, you could not
10  reliably do that from home; is that correct?
11  A.  If I --
12      MS. ROBINSON: Object to the form.
13      THE WITNESS: If I wanted to and needed
14  to, I could attempt to log on and look.
15      BY MR. JOKELSON:
16  Q.  But it wasn't reliable, was it?
17      MS. ROBINSON: Objection.
18      MR. SHUSTED: Objection.  Argumentative.
19  What is your objection, Miss Robinson?
20      MR. JOKELSON: Why don't we -- if we're
21  going to go into speaking objections, why
22  don't we excuse the witness.
23      MR. SHUSTED: I just want to know the
24  basis of the objection.  That isn't a

CHARLES CONCODORA, M.D.                                          Page 28

1  speaking objection.  What's the basis?
2      MR. JOKELSON: That is a speaking
3  objection.
4      MR. SHUSTED: All right.  Let's pose a
5  different question and move on.
6      MR. JOKELSON: No.  I don't want to pose
7  a different question.  I'd like to get the
8  answer to my question.
9      Why don't we read back the question,
10  back, Pat?
11      (Whereupon the court reporter read back
12  as follows: "Q.  If you personally wanted
13  to see the medical records or, for instance,
14  if you wanted to see an ultrasound study or
15  some other study, and you didn't want to
16  rely upon what the resident had to say, but
17  you wanted to look at it, you could not
18  reliably do that from home; is that
19  correct?")
20      MR. SHUSTED: I object to the question.
21  That's been answered, and you're misstating
22  what he said, so I would ask you to rephrase
23  that question.
24      MR. JOKELSON: I think he said he didn't

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

CHARLES CONCODORA, M.D.                                      Page 29

1   have reliable access.
2       MR. SHUSTED: Well, then he answered
3   that question.
4       BY MR. JOKELSON:
5   Q.   Is that correct?
6       MR. SHUSTED: He already answered what
7   he answered.  Why are you asking the same
8   question again if you already know the
9   answer?
10      You're playing a game here David, which
11  is your taking --
12      MR. JOKELSON: I don't think I'm playing
13  a game at all.
14      MR. SHUSTED: I think you are.
15      MR. JOKELSON: That's an unfortunate
16  statement, Jack.  I don't think that's been
17  the history of this litigation whatsoever.
18      MR. SHUSTED: Let's just move on.  We
19  can figure this out later on.
20      MR. JOKELSON: We always have that
21  right.
22      BY MR. JOKELSON:
23  Q.   Doctor, in this case did you have a resident
24  that was covering for you at the hospital or

CHARLES CONCODORA, M.D.                                      Page 30

1   covering for you at any place?
2   A.   Yes.
3   Q.   And how did that relationship work in terms of
4   when they were to report to you and how they were
5   to handle the call?
6   A.   So St. Christopher's Hospital has an agreement
7   with Temple University Hospital with the urology
8   department.  The urology residents cover St.
9   Christopher's Hospital emergency department, and
10  the consults from the emergency department are
11  directed to the urology resident.  They're the ones
12  that get the first call.
13      After the resident has evaluated the
14  patient, that resident is -- will then reach out to
15  the covering attending.
16  Q.   How is that reach out done?
17  A.   By telephone.
18  Q.   Is it ever done by text message?
19  A.   It can be by text message as well, a mixture
20  of both.
21  Q.   What about e-mail?
22  A.   For consultations for the emergency department
23  in the middle of the night, no.
24  Q.   So just text message and telephone call.  Did

CHARLES CONCODORA, M.D.                                      Page 31

1   you have an understanding of the skill level of
2   your resident in this case?
3   A.   Yes.
4   Q.   What was that?
5   A.   And I'm assuming you're referring to Dr. Cho?
6   Q.   Yes.
7   A.   So Dr. Cho --
8   Q.   Unless there was another resident.
9   A.   No, there wasn't another resident.
10      Dr. Cho is a very competent resident and
11  I had worked with Dr. Cho for some time and have
12  had very good positive interactions with him, and
13  he was very thorough, and I relied -- and he is
14  very competent.
15  Q.   How long a period of time did you have to
16  assess his competency?
17  A.   Let me go through the history of when I first
18  met Dr. Cho, if I can.
19  Q.   Okay.
20  A.   So when I was at Temple University Hospital
21  during residency, during my chief year, Dr. Cho was
22  a medical student on service briefly, and that was
23  my first time interacting with him, so as a medical
24  student I could -- as a chief resident, I could

CHARLES CONCODORA, M.D.                                      Page 32

1   first evaluate his competency as a student and then
2   after my completion of pediatric urology
3   fellowship, then I worked with Dr. Cho while he was
4   a resident at Temple University Hospital.
5       So on multiple occasions -- I had the
6   ability to work with him on multiple consultations,
7   and he was always very thorough with his history
8   and physical.
9   Q.   So how long had you been working with him
10  while he was a urology resident, how many times?
11  A.   And so he -- he was in his PGY-3 year, the
12  beginning of PGY-3 year, so during his PGY-2 year
13  he was on urology, and when he covered Temple
14  Hospital, he also covered Temple -- I'm sorry -- he
15  also covered St. Christopher's Hospital, which
16  would include emergency department consultations.
17      I cannot give you a specific number of
18  how many times I spoke with him, but it was
19  numerous occasions.
20  Q.   Do you know when he started rounding at
21  St. Christopher's Hospital emergency room?
22  A.   The beginning of his PGY-2 year while he
23  provided coverage -- while he provided Temple --
24  when he was on service at Temple University

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

CHARLES CONCODORA, M.D.                    Page 33

1   Hospital, when he's taking call, he's also covering
2   St. Christopher's.
3      It's what we call a call pool where
4   there's multiple hospitals covered at the same
5   time.  So he would cover both Temple Hospital and
6   St. Christopher's Hospital, so he began covering
7   St. Christopher's during his PGY-2 year.
8   Q.  Do you know when he started rounding at St.
9   Christopher's Hospital?
10  A.  What do you mean by rounding at St.
11  Christopher's Hospital?
12  Q.  Do you know when he began his rotation, his
13  pediatric rotation?
14  A.  That makes more sense.
15  Q.  Sure.
16  A.  So he began his pediatric rotation the
17  beginning of July of 2019.
18  Q.  So in that capacity you had only been working
19  with him for a couple of weeks?
20  A.  I've worked with him for over a year, but in
21  the capacity of a resident on the pediatric service
22  it was for a month.
23  Q.  For less than a month, actually, was it not?
24  A.  Twenty-four days.  Actually it would have been

CHARLES CONCODORA, M.D.                    Page 34

1   more than that.  The residents, they change their
2   service late June, because that's when the
3   residency ends, so I don't have a specific date for
4   you, but it would have been late June when he
5   started on the pediatric rotation.
6   Q.  Do you know how many days in July you were on
7   call at the emergency room at St. Christopher's
8   Hospital?
9   A.  No, I can't recall that off the top of my
10  head.
11  Q.  Well, that would be reflected on your time
12  sheet, right?
13  A.  It should.
14  Q.  We were talking before, do you have any
15  understanding about the level of training that
16  Dr. Cho had?
17  A.  What do you mean by level of understanding?
18  Q.  Level of training, training, do you have any
19  understanding as to the level of training that
20  Dr. Cho had?
21  A.  Well, considering I went to the same residency
22  that Dr. Cho did, then, yes, I do.
23  Q.  But you don't know specifically for Dr. Cho,
24  do you?

CHARLES CONCODORA, M.D.                    Page 35

1      MR. SHUSTED: Objection.
2      THE WITNESS: I don't understand what
3   you're saying.
4      BY MR. JOKELSON:
5   Q.  You only know from your experience when you
6   had gone through it, but you don't know what
7   Dr. Cho's experience was, do you?
8      MR. SHUSTED: Objection.  You can
9   answer.
10     THE WITNESS: I understand that Dr. Cho
11  went through the same rotations that every
12  urology resident goes through.  I have a
13  good understanding of the level of training.
14     I have a good understanding of the
15  volume that this -- that this resident has.
16  I have a good understanding of the types of
17  pathology that Dr. Cho would have come
18  across during his training.
19     I have a good understanding of the
20  resources that Dr. Cho would have used
21  during his training.
22     BY MR. JOKELSON:
23  Q.  Do you have any understanding whether Dr. Cho
24  had sufficient training to exclude a diagnosis of

CHARLES CONCODORA, M.D.                    Page 36

1   testicular torsion?
2   A.  Being only a few weeks into his pediatric
3   residency, I had no expectation that he would be
4   able to specifically come up with a diagnosis of
5   testicular torsion on his own --
6   Q.  Did -- I'm sorry.  I didn't mean to cut you
7   off.  Go ahead.
8   A.  There was never an expectation that a resident
9   could come up with a diagnosis on their own.  There
10  is a level of expectation that a resident could
11  obtain a pertinent history, a thorough and complete
12  pertinent history.  There is a level of expectation
13  that a resident can perform a physical exam, and it
14  doesn't matter that it was a child because the
15  components of a physical exam range into adults as
16  well.
17  Q.  Did I ask whether it had to do with a child?
18     MR. SHUSTED: Please don't interrupt,
19  Mr. Jokelson.  He was answering your
20  question and he was answering completely,
21  and you were trying to interrupt and --
22     MR. JOKELSON: I think he was answering
23  his own question, but go on.
24     MR. SHUSTED: No.  He was answering

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

CHARLES CONCODORA, M.D.                    Page 37

1   yours and let him complete it, and if you
2   have a question after that, you can ask that
3   question, or if you're finished with the
4   deposition after that question, that's fine,
5   too, but don't interrupt him, please.
6       BY MR. JOKELSON:
7   Q.  Go on.
8   A.  Ask your question.
9       MR. SHUSTED: What you've done is you're
10  interrupting, please stop doing it.  You've
11  done it like ten times so far.
12      MR. JOKELSON: I've asked him to
13  complete his answer.  That's all I said.
14      MR. SHUSTED: Yes, but you interrupted
15  him so he lost his train of thought.
16      MR. JOKELSON: Pat, why don't you read
17  back his answer and he can finish.
18      (Whereupon the court reporter read back
19  as follows: "A.  There was never an
20  expectation that a resident could come up
21  with a diagnosis on their own.  There is a
22  level of expectation that a resident could
23  obtain a pertinent history, a thorough and
24  complete pertinent history.  There is a

CHARLES CONCODORA, M.D.                    Page 38

1   level of expectation that a resident can
2   perform a physical exam, and it doesn't
3   matter that it was a child because the
4   components of a physical exam range into
5   adults as well.")
6       THE WITNESS: We'll leave it at that,
7   Mr. Jokelson.
8       BY MR. JOKELSON:
9   Q.  So you did give a complete answer?
10      MR. SHUSTED: I'll object to that
11  because you interrupted him and he lost his
12  train of thought.  If you let him finish and
13  then say, Dr. Concodora, I don't think you
14  answered the question, that's fine, but let
15  him finish and let's move on.
16      MR. JOKELSON: I just let him finish and
17  I'm asking if he gave a complete answer.
18  That's all.
19      THE WITNESS: I'm finished with that
20  answer.
21      BY MR. JOKELSON:
22  Q.  Did Dr. Concodora have sufficient training to
23  determine whether or not an ultrasound could
24  demonstrate reliable blood flow?

CHARLES CONCODORA, M.D.                    Page 39

1       MR. SHUSTED: Objection.  You asked
2   whether it was Dr. Concodora.  I think you
3   meant Dr. Cho.
4       MR. JOKELSON: You're right.  That is a
5   mistake.  I meant Dr. Cho.  I apologize.
6       MR. SHUSTED: Just start again.
7       THE WITNESS: Yes, start over, please.
8       BY MR. JOKELSON:
9   Q.  Did Dr. Cho have sufficient training to
10  determine whether an ultrasound could demonstrate
11  blood flow in the testicles?
12  A.  There's no expectation that Dr. Cho would have
13  sufficient training at that point in time.
14  Q.  When would that -- when would that skill be
15  developed, at what point in the residency?
16  A.  Right.  So it varies between residents.  They
17  are -- each resident has exposure to radiologic
18  studies, including scrotal ultrasounds, throughout
19  their entire residency.
20      They will little by little develop these
21  skills necessary to properly interpret these reads,
22  but residents also rely on studies from board
23  certified radiologists.
24  Q.  Did you have any understanding at that point

CHARLES CONCODORA, M.D.                    Page 40

1   in time what his skill level was?
2   A.  Yes.
3   Q.  And what was that?
4   A.  So on numerous previous occasions Dr. Cho was
5   able to look at images and relay information that
6   would correlate with the findings of the
7   radiologist.
8   Q.  How many numerous occasions are we talking
9   about?
10  A.  Once again I mentioned that I don't know of an
11  exact number for you.
12  Q.  How often would Dr. Cho be on call at St.
13  Christopher's Hospital?
14  A.  I don't know.
15  Q.  Well, you went through the program, did you
16  not?  Is there a limit to the number of days per
17  week?
18  A.  So it varies on how many residents are in the
19  call pool, so there could be three residents.
20  There could be five residents.
21  Q.  And when there are three residents, is there a
22  maximum number of days that a resident is permitted
23  to be on call?
24  A.  Yes, there is.

Case 2:20-cv-01926-MMB   Document 223   Filed 12/01/22   Page 29 of 42

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

CHARLES CONCODORA, M.D.                    Page 41

1 Q.   What is that?
2 A.   I can't recall right now.  You'd have to check
3   the ACGME requirements.
4 Q.   But you're saying that during the three prior
5   weeks or four prior weeks you had significant
6   experience with him, with him reading ultrasounds?
7 A.   Along with the year prior to that.
8 Q.   And that's because, according to you, it
9   doesn't matter whether or not -- well, strike that.
10     Is there something that's funny?
11 A.   Well, I --
12     MR. SHUSTED: Don't answer that.
13   Mr. Jokelson, your tactic here is painfully
14   obvious.  You're trying to restate things
15   that are said and trying to annoy the Doctor
16   rather than asking questions straight up
17   questions.
18     MR. JOKELSON: I'm trying to get answers
19   to questions is what I'm trying to do.
20     MR. SHUSTED: You're trying to harass
21   the Doctor and get under his skin.  That's
22   what you're trying to do.
23     MR. JOKELSON: I think that's a
24   purposelessly ridiculous statement, Jack.  I

CHARLES CONCODORA, M.D.                    Page 42

1   think if you reflect on it, you'd know --
2   maybe you do, in fact, know it, but
3   whatever, we can go through that later.
4     BY MR. JOKELSON:
5 Q.   Doctor, did there come a time when you
6   reviewed the medical records in this case?
7 A.   Yes.
8 Q.   And when was that?
9 A.   That would have been when I cosigned Dr. Cho's
10   note.  And then --
11 Q.   When -- go on.
12 A.   And then that would have been after learning
13   of this lawsuit.
14 Q.   And when did you cosign Dr. Cho's note?
15 A.   I believe that was on July 28.
16 Q.   And so at no time prior to July 28 did you
17   review the medical records?
18 A.   Correct.
19 Q.   And the medical records were also including
20   the ultrasound images?
21 A.   Correct.
22 Q.   Is there any reason why you didn't review them
23   prior to the 28th?
24 A.   So the -- at the time of the emergency

CHARLES CONCODORA, M.D.                    Page 43

1   department consult, I had been given information
2   directly from Dr. Cho during a telephone
3   conversation and based on our conversation, the
4   standard of care was met and there was sufficient
5   information at that time.
6 Q.   Is the information that you were given by
7   Dr. Cho accurately and completely recorded in your
8   note, in your attending note that you signed?
9 A.   Are you talking about my addendum?
10 Q.   I'm talking about the attending note that you
11   cosigned.
12 A.   I don't -- Mr. Jokelson, I do not cosign an
13   attending note.  I cosign a resident's note.  I
14   would put down the attending addendum.  That would
15   be my portion of the note.
16 Q.   Actually, it's called an attending note, I
17   think, but I don't want to get into a dispute over
18   nomenclature.
19     MR. JOKELSON: Previously I had shown
20   the Doctor a document, the contract, and
21   that should be marked, so why don't we mark
22   that as Plaintiff's Exhibit P-16.
23       _ _ _
24     (Whereupon Exhibit P-16 was marked for

CHARLES CONCODORA, M.D.                    Page 44

1   identification.)
2       _ _ _
3     MR. JOKELSON: And then the same thing
4   goes for the next document that I showed the
5   Doctor, which was the on-call time log.
6   Let's call that P-17.
7       _ _ _
8     (Whereupon Exhibit P-17 was marked for
9   identification.)
10       _ _ _
11     BY MR. JOKELSON:
12 Q.   I'm going to share the consultation note.  Do
13   you see this, Doctor?
14 A.   Yes.
15 Q.   This is the consultation report?
16 A.   Yes.
17 Q.   And it says it was performed by Eric Cho.  Do
18   you see that?
19 A.   Yes.
20 Q.   At 6:07 a.m. Eastern Daylight Time?
21 A.   Yes.
22 Q.   And then it identifies that it was
23   authenticated by you at 2020 hours Eastern Daylight
24   Time on July 28.  That's consistent with what you

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

---

CHARLES CONCODORA, M.D.                              Page 45

1  told me before, which is when you looked at the
2  medical records for the first time?
3  A.   Correct.
4       MR. JOKELSON: And if you go to -- just
5  for everybody else's benefit this was
6  previously marked as Plaintiff's Exhibit
7  P-13, and it's document number SCHC 6
8  through 9.
9       BY MR. JOKELSON:
10 Q.   If you go to the last page, there's a portion
11 called the attending note.  I don't see anything in
12 here called attending addendum.  Is there a
13 separate attending addendum that I'm unaware of?
14 A.   So that is the addendum, so when this note is
15 created by the resident, Dr. Cho, and that's what
16 it states at the top, performed by Dr. Cho, that
17 note is then forwarded to me, to my inbox, and then
18 I place an addendum on the note.
19      So my addendum which is entitled
20 attending note is what you're looking at there.
21 Q.   So we were talking about the same thing?
22 A.   We were talking about the same thing, yes, but
23 so you know I'm not cosigning an attending note.
24 I'm cosigning a resident's note.

---

CHARLES CONCODORA, M.D.                              Page 46

1  Q.   You're cosigning a document that is four pages
2  long that's called at the very top consultation
3  report, and as part of the consultation report, as
4  I understand it, there's something at the bottom
5  called an attending note, and you're cosigning the
6  entirety of this document; is that correct?
7  A.   Correct.
8  Q.   So in terms of the attending note, which is
9  what you call the attending addendum, which no
10 matter what you call it are all part of the
11 consultation report, is that a complete and
12 accurate recitation of what you discussed with Dr.
13 Cho and what happened?
14 A.   Yes.
15 Q.   I take it it's true that you discussed the
16 care of the patient with the resident, right?
17 A.   Correct.
18 Q.   And you also -- you didn't personally examine
19 the patient, correct?
20 A.   Correct.
21 Q.   And you didn't review the ultrasound images;
22 is that correct?
23 A.   Correct.
24 Q.   Is there anything about this attending note

---

CHARLES CONCODORA, M.D.                              Page 47

1  that is inaccurate or incomplete?
2  A.   No, there's nothing inaccurate or incomplete.
3  Q.   And I take it that -- it says here, per the
4  resident the patient presented with scrotal
5  swelling that was waxing and waning in size.  Is
6  that your understanding?
7  A.   Yes.  And, Mr. Jokelson, I'd like to go back
8  to, you mentioned inaccurate or incomplete, I'd
9  like to mention that my last sentence there, per
10 the resident, the ultrasound was officially
11 reported as normal, my use of the word official is
12 to refer to the fact that the ultrasound was
13 officially read by a board certified radiologist
14 through tele-radiology services.  I am not
15 mentioning that this is a final report.  I'm
16 referring to that this was a report by a board
17 certified radiologist.
18 Q.   Do you understand there's a difference between
19 an official read and a preliminary read?
20 A.   I understand there's a difference between a
21 preliminary and a final.
22 Q.   A preliminary and a final, you don't
23 understand the word official to be the same as the
24 word final, an official report is the final report?

---

CHARLES CONCODORA, M.D.                              Page 48

1  A.   I think any report is official since it's
2  finding itself in an official electronic medical
3  record or medical record in general.  So let's make
4  a distinction between preliminary and final.
5       Like I mentioned, when I use the word
6  official, I'm stating that a report was generated
7  and is in the record.
8  Q.   Would that also go to statements of ultrasound
9  technicians?
10 A.   I never use the word of an ultrasound
11 technician.
12 Q.   Why is that?
13 A.   An ultrasound technician is not qualified to
14 read or interpret images.  An ultrasound technician
15 is specifically to perform the technical aspect of
16 the ultrasound.
17 Q.   And that means the ultrasound technician does
18 not have the qualifications to identify whether or
19 not there's blood flow to the testicles?
20      MS. ROBINSON: Objection.
21      BY MR. JOKELSON:
22 Q.   Is that correct?
23 A.   I'd like you to rephrase that.
24      MR. JOKELSON: Pat, why don't you read

---

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

---

CHARLES CONCODORA, M.D.                    Page 49

1  back my question so I can listen to it and
2  rephrase it.
3      (Whereupon the court reporter read back
4  as follows:  "Q.  And that means the
5  ultrasound technician does not have the
6  qualifications to identify whether or not
7  there's blood flow to the testicles?")
8      BY MR. JOKELSON:
9  Q.  Does the ultrasound technician have the
10  qualifications to determine whether an ultrasound
11  reliably demonstrates blood flow?
12      MS. ROBINSON: Objection.
13      MR. SHUSTED: You can answer.
14      THE WITNESS: I'm not familiar with what
15  the qualifications are for an ultrasound
16  tech. I'm not familiar with their
17  certification process.
18      I quite honestly don't know what an
19  ultrasound tech is supposed to be doing and
20  what they're supposed to be looking for.
21      BY MR. JOKELSON:
22  Q.  Doctor, was it ever reported to you that there
23  were any limitations to the ultrasound study that
24  was done?

---

CHARLES CONCODORA, M.D.                    Page 50

1  A.  No.
2  Q.  Do you understand whether the ultrasound study
3  was significantly limited?
4  A.  Are you asking if I understood at the time
5  back in July of '19?
6  Q.  Sure.
7  A.  No. No.
8  Q.  Did you understand at the time whether the
9  ultrasound was significantly limited?
10  A.  At the time, no.
11  Q.  Did you understand whether the ultrasound at
12  the time was of poor quality?
13  A.  No.
14  Q.  Did you understand at the time that the
15  ultrasound was a "extremely limited study?"
16  A.  No.
17  Q.  Did you understand at the time -- did you know
18  whether the ED -- whether the ultrasound technician
19  requested or discussed medicating the patient,
20  sedating the patient?
21  A.  No. Mr. Jokelson, can I have a moment to
22  speak with Mr. Shusted?
23  Q.  Sure you can.
24      MR. SHUSTED: How about a restroom break

---

CHARLES CONCODORA, M.D.                    Page 51

1  if now is a good time?
2      MR. JOKELSON: I missed what you said.
3      MR. SHUSTED: Let's take a five-minute
4  break, a restroom break for me and we'll be
5  back up.
6      MR. JOKELSON: Certainly.  Certainly.
7      _ _ _
8      (Whereupon a recess was held.)
9      _ _ _
10      BY MR. JOKELSON:
11  Q.  Let me show you, Doctor, another document.
12      You said before when you went back on on
13  the 28th and you logged on to sign your note, that
14  was the first time that you looked at the medical
15  records?
16  A.  Yes.
17  Q.  What records did you look at?
18  A.  Dr. Cho's note.
19  Q.  Nothing else?
20  A.  Not that I can recall.
21  Q.  Any reason you didn't look at any of the
22  records?
23  A.  Because the addendum note that I was putting
24  on Dr. Cho's note was based on the conversation

---

CHARLES CONCODORA, M.D.                    Page 52

1  that I had with Dr. Cho on the 24th, and based
2  solely on the information that I had at that time.
3  Q.  You weren't curious about anything else in the
4  chart?
5  A.  No.
6  Q.  Did you know anything about this case from Dr.
7  Balsara?
8  A.  I can't recall when I found out more
9  information about this case.
10  Q.  Do you know whether it would have been before
11  you wrote the note?
12  A.  I can't recall.
13  Q.  So it could have been before?
14  A.  It could have been after.
15  Q.  And it could have been before; is that
16  correct?
17  A.  Yes.
18  Q.  Dr. Balsara, she also works for Urology for
19  Children?
20  A.  Yes.
21  Q.  And she was the urologist who performed
22  surgery?
23  A.  Yes.
24  Q.  On the 24th -- and that was surgery to remove

---

Case 2:20-cv-01926-MMB   Document 223   Filed 12/01/22   Page 32 of 42

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

1  Andres Gardin, Jr.'s left testicle?
2 A.  Yes.
3 Q.  Let me show you -- this is the comments that
4  the ultrasound technician provided to the
5  tele-radiologist in this case.  Do you see this?
6 A.  I see your screen.
7 Q.  And do you see the tech comments extremely
8  limited study, patient inconsolable, screaming
9  inconsolable, screaming, constant motion?
10 A.  Yes, I can see that.
11 Q.  Right testis within normal limits with an
12  inguinal canal, flow imaging limited but
13  visualized, left testes limited but seen,
14  significant increase of flow visualized in the area
15  of the left, epididymitis, I guess that is.  Spoke
16  to ED about limited results, were comfortable and
17  choose not to medicate patient.
18      Did you ever become aware of any of this
19  information at the time?
20 A.  At the time of what?
21 Q.  On the 24th of July.
22 A.  No.
23 Q.  Did you become aware of it at any time prior
24  to when you signed your note?

1 A.  No.
2 Q.  Do you know whether motion has any impact on
3  an ultrasound evaluation, a scrotal ultrasound
4  evaluation?
5 A.  Yes.
6 Q.  And what kind of impact is that?
7 A.  Well, it depends on what you're looking for on
8  that scrotal evaluation.
9 Q.  When you're assessing for a differential
10  diagnosis that includes testicular torsion, does it
11  have any impact?
12 A.  It can have an impact.
13 Q.  What kind of impact can it have?
14 A.  Well, excessive motion, that can decrease --
15  sorry -- that can make it challenging for review of
16  the Doppler wave form.
17 Q.  Can it impact or compromise or does it
18  compromise the specificity of the test?
19 A.  It can.
20 Q.  Does it compromise the sensitivity of the
21  test?
22 A.  It can and, once again, it depends on what
23  you're looking for.
24 Q.  If you're looking for testicular torsion?

1 A.  Particularly about testicular torsion, then,
2  yes.
3 Q.  What does sensitivity mean to you?
4 A.  Sensitivity is how well a test can detect the
5  true diagnosis, so looking for the true positives.
6 Q.  What about specificity, what does that mean to
7  you?
8 A.  Specificity is how well a test can
9  specifically pick up on a specific diagnosis versus
10  other things on your differential.
11 Q.  And you never knew about any limitations
12  relating to inconsolable screaming -- inconsolable
13  screaming, constant motion, correct?
14 A.  Correct.  I was never informed of any of the
15  particulars on the study.
16 Q.  Let me show you another document.
17      MR. JOKELSON: For the record, that was
18  Plaintiff's Exhibit P-4 that I was referring
19  to.
20      BY MR. JOKELSON:
21 Q.  By the way, Doctor, do you understand there
22  can be a difference between a preliminary
23  ultrasound report and a final ultrasound report?
24 A.  I think we answered that before, but, yes,

1  there is a difference between a preliminary and a
2  final.
3 Q.  What is the difference?
4 A.  So a final report is the definitive
5  description of the ultrasound.  A preliminary
6  report is a report that is focusing in on specific
7  aspects of the report -- I'm sorry, of the exam,
8  and it's also focused on things that the ordering
9  physician has requested.
10      So, for example, in this case with a
11  testicular torsion on the differential and when the
12  radiologist is asked, requested to look for
13  testicular torsion, I expect, and it's been in my
14  experience that a preliminary finding, although
15  incomplete potentially, based on the definition of
16  preliminary should be very complete on answering
17  that specific question.
18 Q.  Let me show you the preliminary report in this
19  case.  Do you see this, Doctor?  This is the
20  preliminary report issued by Teleradiology
21  Solutions and electronically signed by Arjun
22  Kalyanpur, M.D.  This is previously identified for
23  the record as Plaintiff's Exhibit P-6.
24      This is the preliminary report we've

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

CHARLES CONCODORA, M.D.                                Page 57

1   been talking about?
2   A.  I don't know that we've been talking about
3   this preliminary report specifically.  I think this
4   is our first time bringing up this report.
5   Q.  Is there any other preliminary report that
6   you're aware of in this case?
7   A.  So when you mean aware of in this case, aware
8   of after the fact, but this is the only preliminary
9   report that I'm aware of.
10  Q.  At any point, is there any other preliminary
11  report?  I'm confused by your answer.
12      MR. SHUSTED:  Why are you confused by
13  that answer?
14      MR. JOKELSON:  It was suggesting that
15  there may be another preliminary report and
16  if there is, I'm not aware of any.
17      THE WITNESS:  Mr. Jokelson, my
18  interpretation of your question is that
19  you're asking if I was aware of a
20  preliminary report.  I'm just specifying
21  that I was not aware of a preliminary report
22  at the time of my note.
23      BY MR. JOKELSON:
24  Q.  Okay.  I understand.  You're aware that there

CHARLES CONCODORA, M.D.                                Page 58

1   was a report of whatever nature?
2   A.  I was aware that there was a report read by a
3   board certified radiologist and that is the report
4   that I referred to as official in my note.
5   Q.  And do you see here it talks about a
6   significantly limited evaluation due to a
7   noncooperative patient?
8   A.  I can read that on your screen, yes.
9   Q.  And again, you were never advised of that,
10  correct?
11  A.  Correct.
12  Q.  Now, it says under the impression that this
13  is, one, markedly limited evaluation as described.
14  Do you see that?
15  A.  I see that.
16  Q.  Again, you were never made aware of that
17  information, correct?
18  A.  Correct.
19  Q.  And then it says no evidence of testicular
20  torsion on this limited evaluation.  Were you made
21  aware of that finding?
22  A.  I was made aware of the finding that there was
23  no evidence of testicular torsion.
24  Q.  Was there a finding of no testicular torsion

CHARLES CONCODORA, M.D.                                Page 59

1   generally or was there a finding that there was no
2   testicular torsion within the limits of the study?
3       MS. ROBINSON:  Object to the form.
4       THE WITNESS:  Please rephrase that.
5       BY MR. JOKELSON:
6   Q.  Was there a finding that there was no
7   testicular torsion generally or was there a finding
8   that there was no testicular torsion within the
9   limits of the study which was noted to be
10  significantly and markedly limited?
11      MS. ROBINSON:  Object to the form.
12      MR. SHUSTED:  Objection.  You can
13  answer.
14      THE WITNESS:  Honestly I don't know how
15  to answer.  I'm not understanding this
16  question.
17      BY MR. JOKELSON:
18  Q.  I'll try it again.
19      Was -- did you understand that there was
20  no evidence of testicular torsion generally as
21  distinct from a finding of no testicular torsion
22  within the confines of this "limited evaluation?"
23      MS. ROBINSON:  Object to the form.
24      MR. SHUSTED:  Objection.  You can

CHARLES CONCODORA, M.D.                                Page 60

1   answer.
2       THE WITNESS:  I was notified that there
3   was no testicular torsion based on the
4   study.  I was never notified of limitations,
5   so --
6       BY MR. JOKELSON:
7   Q.  So you didn't know that there was a qualifier
8   to Dr. Kalyanpur's report?
9       MR. SHUSTED:  You just interrupted him.
10      MS. ROBINSON:  Objection.  Please note
11  my objection to the characterization of the
12  report.
13      MR. HOSMER:  Objection.
14      MR. SHUSTED:  I have the same objection.
15  Mr. Hosmer, do you also have an objection?
16      MR. HOSMER:  Yes, I made it.  Thank you.
17      MR. SHUSTED:  You can answer the
18  question if you remember it.
19      THE WITNESS:  Can you please read back
20  the question?
21      (Whereupon the court reporter read back
22  as follows:  "Q.  So you didn't know that
23  there was a qualifier to Dr. Kalyanpur's
24  report?")

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

CHARLES CONCODORA, M.D.                    Page 61

1    THE WITNESS: If you want to
2  characterize it as a qualifier, then I was
3  not aware of "qualifiers:
4    I was made aware of a report by the
5  radiologist stating no testicular torsion.
6    BY MR. JOKELSON:
7  Q.  In fact, it says no evidence of testicular
8  torsion on this limited evaluation; is that
9  correct?
10    MS. ROBINSON: I'm going to object in
11  that I think that mischaracterizes the
12  report and the entirety of the report.
13    MR. JOKELSON: I don't think it
14  mischaracterizes anything.  I think I just
15  read it verbatim.
16    THE WITNESS: So, Mr. Jokelson, if
17  you're asking can I read what is on your
18  screen, I can read what's on your screen.
19    If you're asking me what I knew and what
20  was referred to me, then there's a
21  discordance between that.
22    BY MR. JOKELSON:
23  Q.  A discordance between what?
24  A.  What is on your screen and what was told to me

CHARLES CONCODORA, M.D.                    Page 62

1  at the time of my phone conversation.
2  Q.  So what's on the screen marked as impression
3  number two is different than what you were told in
4  your telephone conversation by Dr. Cho, correct?
5    MR. SHUSTED: Objection.  You can
6  answer.
7    THE WITNESS: Correct.
8    BY MR. JOKELSON:
9  Q.  Does this indicate to you that perhaps you
10  should have been looking at the medical records
11  rather than relying upon Dr. Cho?
12  A.  No.  I'd like to say that even though this
13  states that this is a limited evaluation, it does
14  not state why this was limited or what caused -- it
15  does not state what the limit was.
16    If there was --
17  Q.  Does it --
18  A.  -- Mr. Jokelson, let me finish, please.
19    In my experience there's been reports
20  that say this is a limited study which prevented
21  the evaluation of vascular flow, or this was a
22  limited study in evaluating or identifying a
23  testicle.  This does not state what the limitation
24  was.  So if it lists no evidence of testicular

CHARLES CONCODORA, M.D.                    Page 63

1  torsion, even if there's a limitation, it appears
2  that that limitation did not prevent the
3  radiologist from coming up with this finding of no
4  testicular torsion.
5    MR. YOUNG: I'll object to the answer as
6  nonresponsive.
7    BY MR. JOKELSON:
8  Q.  That wasn't the finding, was it?  The finding
9  was no evidence of testicular torsion on this
10  limited evaluation.
11    He didn't make a general finding of no
12  testicular torsion, did he?
13    MS. ROBINSON: Object -- objection.
14  Asked and answered and we've been through
15  this before.
16    BY MR. JOKELSON:
17  Q.  Did he?
18    MR. SHUSTED: What's the question?
19    MR. JOKELSON: Why don't you read it
20  back, Pat.
21    THE WITNESS: Yes.
22    (Whereupon the court reporter read back
23  as follows:  "Q.  That wasn't the finding,
24  was it?  The finding was no evidence of

CHARLES CONCODORA, M.D.                    Page 64

1  testicular torsion on this limited
2  evaluation.
3    He didn't make a general finding of no
4  testicular torsion, did he?")
5    THE WITNESS: He wrote down on his
6  impression no evidence of testicular torsion
7  on this limited evaluation.
8    In the findings above the radiologist
9  notes that there is normal echogenicity and
10  Doppler flow signal.  That by definition
11  shows no testicular torsion.
12    BY MR. JOKELSON:
13  Q.  What is the impression?
14  A.  It's what you have on your screen there.
15  Q.  No, what is an impression?  Is that a
16  diagnosis or conclusion?
17  A.  I'm not sure what the use of the word
18  impression is on a radiology report.
19  Q.  Well, do you rely upon radiology reports in
20  your practice of medicine?
21  A.  Yes.
22  Q.  And you don't know what an impression means?
23    MR. SHUSTED: Objection.  It's a
24  mischaracterization of what he just

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concordora, MD
June 29, 2021

CHARLES CONCORDORA, M.D.                              Page 65

1  testified to.  Go ahead.
2      THE WITNESS: I rely on the entire
3  report which includes findings and which
4  includes impressions.  I'm not relying on
5  one specific aspect of the record.
6      BY MR. JOKELSON:
7  Q.  But you're not answering my question.  My
8  question is you just said you do not know what an
9  impression is?
10 A.  No.  No.
11     MR. SHUSTED: No, no.
12     BY MR. JOKELSON:
13 Q.  What is an impression?
14     MR. SHUSTED: No.  No.  It's incorrect,
15 and you're doing it again.  He gave you --
16 you're taking one word out of context.
17 Would you please just stop it?
18     He said what an impression was from a
19 radiological perspective and now you're
20 trying --
21     MR. JOKELSON: No, he didn't.
22     BY MR. JOKELSON:
23 Q.  What is an impression from a radiological
24 impression, Doctor, what is an impression?

CHARLES CONCORDORA, M.D.                              Page 66

1  A.  All right, so --
2      MR. SHUSTED: He's not a radiologist and
3  he was explaining that to you, and now
4  you're misstating what he said.  Go ahead.
5      BY MR. JOKELSON:
6  Q.  What is an impression?
7  A.  So an impression in general, not specifically
8  to a radiology report, an impression is the overall
9  picture, the overall, I guess findings.
10     I don't know what a radiologist uses the
11 term impression for specifically.
12 Q.  So the overall finding in this case was "no
13 evidence of testicular torsion on this limited
14 evaluation?"
15 A.  Once again --
16     MS. ROBINSON: Objection.
17     THE WITNESS: Once again, you just used
18 the word overall finding --
19     MR. JOKELSON: You just said --
20     MR. HOSMER: There is no question
21 pending.
22     MR. SHUSTED: Thank you.  What's the
23 next question then?
24     MR. JOKELSON: I think there was a

CHARLES CONCORDORA, M.D.                              Page 67

1  question pending.
2      BY MR. JOKELSON:
3  Q.  You said that the impression is the overall
4  finding, right?
5  A.  No, I didn't say that.
6  Q.  If I misheard you, explain it to me again.  I
7  may have misheard you.
8  A.  Can you read -- can you read what my answer
9  was?  I don't even remember at this point.
10     (Whereupon the court reporter read back
11 as follows: "A.  So an impression in
12 general, not specifically to a radiology
13 report, an impression is the overall
14 picture, the overall, I guess findings.
15     I don't know what a radiologist uses the
16 term impression for specifically.")
17     BY MR. JOKELSON:
18 Q.  So, Doctor, the overall finding in this case
19 was not that there was no testicular torsion, but
20 that there was no testicular torsion on this
21 limited evaluation?
22 A.  That's incorrect, and let me explain why to
23 you, Mr. Jokelson.  The overall finding is looking
24 at the entire report, okay, which is, part of that

CHARLES CONCORDORA, M.D.                              Page 68

1  report is the findings, which says normal
2  echogenicity and Doppler flow signal --
3  Q.  So how -- I apologize.  Go on.
4  A.  That is the overall picture here.  So what
5  you're reading and you're misstating the word, you
6  keep saying overall finding is, and then you read
7  line two.  No.  You're reading the impression.
8  You're reading line two of the impression.  That is
9  not the overall finding here.
10 Q.  You said to me before that your definition of
11 the impression is the overall finding, did you not?
12 A.  First of all, I said that my definition in
13 general, not specific to a radiology report, and I
14 also told you that I don't know what the use of the
15 word impression is in radiology terminology.
16 Q.  And yet you rely upon radiology reports in
17 your practice of medicine even though you do not
18 know what the doctor means by impression?
19     MR. SHUSTED: Objection.  Are you going
20 to engage in arguments and misstate things
21 Mr. Jokelson; is that what we're here for?
22     MR. JOKELSON: I think that's what he
23 said.  He can look at the record if he wants
24 to, but that's what I heard.

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

CHARLES CONCODORA, M.D.                                    Page 69

1     MR. SHUSTED: You heard what you heard.
2   The record is what it is.  Let's have the
3   next question.
4     BY MR. JOKELSON:
5   Q.  Doctor, were you aware, Doctor, that the study
6   was characterized as a poor study?
7     MS. ROBINSON: Objection.  Asked and
8   answered.
9     THE WITNESS: I believe I answered that,
10  but, no, I did not know.
11    BY MR. JOKELSON:
12  Q.  Let me show you -- this is from St.
13  Christopher's Hospital.  Do you see right here it's
14  the ED physician note?
15  A.  Yes.
16  Q.  This was previously marked as Plaintiffs
17  Exhibit P-10, which is SCHC pages 10 through 13.
18    This is a note, I believe it was
19  authored by Erin Hassel, M.D.  Do you know
20  Dr. Hassel?
21  A.  No.  I'm sure that I've had interactions over
22  the course of my time there, but I do not -- I
23  cannot put a face to the name and I did not know
24  her personally.

CHARLES CONCODORA, M.D.                                    Page 70

1   Q.  What about Pramath Nath?
2   A.  Same thing.
3   Q.  And you understood that Dr. Nath was the
4   attending physician, correct?
5   A.  I now understand.
6   Q.  Did you understand at the time?
7   A.  No.
8   Q.  It says right here ultrasound of poor quality,
9   however, ultrasound technician reports good blood
10  flow to both testicles during the examination.
11    Did you ever discover this information
12  in this report?
13    MS. ROBINSON: Object to the form.
14    THE WITNESS: Upon review of the records
15  in preparation of this deposition, I had
16  seen that.  At the time of my phone call
17  with Dr. Cho, I did not know of that
18  information.
19    BY MR. JOKELSON:
20  Q.  I take it Dr. Cho had access to these records?
21  A.  You'd have to ask Dr. Cho.
22  Q.  Well, do you know of any reason why he
23  wouldn't have access?
24  A.  Once again you'd have to ask Dr. Cho.

CHARLES CONCODORA, M.D.                                    Page 71

1   Q.  Well, since Dr. Cho was your source of
2   information for reviewing the medical records
3   wouldn't you have an expectation that Dr. Cho had
4   access to these records?
5   A.  Once again, I don't know the time that that
6   was written.  Many times these notes are written
7   after the fact, so I don't know when that would
8   have been in the record.
9     I don't know when that would have been
10  available to Dr. Cho.  I would expect a resident on
11  scene at St. Christopher's to have access to the
12  medical record.  I do not know when things have
13  been entered into the system there.
14  Q.  And then it says right here at 4:25 a.m. spoke
15  to -- this is the emergency room doctor, spoke to
16  ultrasound tech re patient, she said that while it
17  was difficult to exam the patient secondary to the
18  patient moving during the ultrasound, she's
19  confident there's good blood flow in both
20  testicles.  Do you see that?
21  A.  I see that on your screen.
22  Q.  And you were not made aware of that
23  information, were you?
24    MS. ROBINSON: Object to the form.

CHARLES CONCODORA, M.D.                                    Page 72

1     THE WITNESS: No.
2     BY MR. JOKELSON:
3   Q.  You are not aware if Dr. Cho was made aware of
4   that information or had access to that information?
5   A.  I'm not aware.
6   Q.  It says right here consulted urology regarding
7   the patient.  I'll represent to you that it's been
8   previously testified in this case that that refers
9   to a conversation with Dr. Cho.  Do you understand
10  that to be the case?
11  A.  Correct.  I had no discussions between myself
12  and the emergency room physicians.
13  Q.  So the only urology person that they could
14  have been speaking to would have been Dr. Cho?
15  A.  Correct.
16  Q.  It says relayed that ultrasound tech was not,
17  in all capital letters, concerned for torsion.
18  Were you ever made aware of that?
19    MS. ROBINSON: Object to the form.  I
20  don't know what "that" is.
21    BY MR. JOKELSON:
22  Q.  That which I just read?
23  A.  Say your question again.  Sorry.
24  Q.  Were you aware what it says here that they

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

---

CHARLES CONCODORA, M.D.                          Page 73

1    relayed to Dr. Cho that the ultrasound tech was
2    not, in all capital letters, concerned for torsion?
3    A.   I was not aware.
4    Q.   Do you know why that information would be of
5    any relevance to Dr. Cho?
6        MS. ROBINSON: Object to the form.
7        MR. SHUSTED: I object to that, too.  Go
8    ahead.  You can answer.
9        THE WITNESS: Please repeat that or
10   please rephrase that.
11       BY MR. JOKELSON:
12   Q.   Do you know whether -- why the statement that
13   the ultrasound -- why relaying that the ultrasound
14   tech was not concerned for torsion was of any
15   relevance to Dr. Cho?
16       MS. ROBINSON: Objection.  Lack of
17   foundation.
18       THE WITNESS: As I mentioned to you
19   before, I do not rely upon the comments of
20   an ultrasound tech, and that is also
21   construed upon our residents, that an
22   ultrasound tech has no -- there's no reason
23   an ultrasound tech should be giving an
24   interpretation, and we would never provide

---

CHARLES CONCODORA, M.D.                          Page 74

1    patient care based off of an ultrasound
2    tech's interpretation.
3        BY MR. JOKELSON:
4    Q.   And that's because an ultrasound tech is not
5    qualified to do so, is it not?
6        MS. ROBINSON: Objection.  Asked and
7    answered.
8        THE WITNESS: Once again, I had answered
9    that, but I don't know what the
10   qualifications are of an ultrasound tech.
11       BY MR. JOKELSON:
12   Q.   So it's possible that the ultrasound tech may
13   be qualified; is that what you're saying?
14       MS. ROBINSON: Objection.  Asked and
15   answered.
16       MR. HOSMER: Object to the form.
17       MR. SHUSTED: Objection.  Come on.  Come
18   on.
19       BY MR. JOKELSON:
20   Q.   Is that what you're saying, Doctor?
21       MS. ROBINSON: Objection.
22       THE WITNESS: Mr. Jokelson, I already
23   said to you I'm not sure what the
24   qualifications are of an ultrasound tech.

---

CHARLES CONCODORA, M.D.                          Page 75

1        MR. JOKELSON: Can you read back the
2    Doctor's answer from a couple answers ago?
3    I think he used the word confined.
4        (Whereupon the court reporter read back
5    as follows: "A.  As I mentioned to you
6    before, I do not rely upon the comments of
7    an ultrasound tech, and that is also
8    construed upon our residents, that an
9    ultrasound tech has no -- there's no reason
10   an ultrasound tech should be giving an
11   interpretation, and we would never provide
12   patient care based off of an ultrasound
13   tech's interpretation.")
14       BY MR. JOKELSON:
15   Q.   I don't know what the word construed means.
16   What do you mean by construed upon our residents?
17   A.   Meaning that in training a resident we tell
18   the resident that they are never to rely upon an
19   ultrasound tech's words.  That means nothing.  They
20   should be relying upon a radiologist.
21   Q.   So you actually teach them that?
22   A.   That's part of the residency, is learning how
23   to obtain information and where.
24   Q.   I'm saying you actually teach them

---

CHARLES CONCODORA, M.D.                          Page 76

1    specifically not to rely upon an ultrasound
2    technician, correct?
3        MR. SHUSTED: Objection.  Go ahead.  You
4    can answer.  Really?
5        MR. JOKELSON: Really.
6        MR. SHUSTED: What you're trying to
7    do --
8        MR. JOKELSON: I want to get an answer.
9        MR. SHUSTED: -- you take it out of one
10   context and give it another and it's a
11   sneaky think.  And I've said it.
12       That's sneaky and can we please have
13   another question.
14       BY MR. JOKELSON:
15   Q.   Why don't you answer the question, Doctor?
16   A.   So during their training a resident is
17   informed on the proper ways of obtaining
18   information, and if a resident were to gather
19   information from an ultrasound tech, that resident
20   would immediately be made aware that that's not the
21   appropriate information to obtain.  They would be
22   referred to a radiologist, a radiology read.
23   Q.   Did anybody ever tell Dr. Cho that there's no
24   reason for him to have -- there's no reason for

---

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

CHARLES CONCODORA, M.D.                                Page 77

1    information from an ultrasound technician to be
2    relayed to him?
3        MS. ROBINSON: I don't want to give a
4    speaking objection, but I think that's a
5    highly improper question that misstates the
6    record.
7        THE WITNESS: Also, Mr. Jokelson,
8    there's interference, so I cannot hear
9    what's going on.
10       BY MR. JOKELSON:
11   Q.  Is the echo coming from me?  Am I echoing now?
12   A.  No.
13   Q.  Can everybody else hear me?
14       MR. SHUSTED: Yes.
15       MR. JOKELSON: I lost my train of
16   thought, though.
17       THE WITNESS: It's terrible when you get
18   interrupted.
19       MR. JOKELSON: Pat, can you read back
20   where we were?
21       (Whereupon the court reporter read back
22   as follows: "Q.  Did anybody ever tell Dr.
23   Cho that there's no reason for him to
24   have -- there's no reason for information

CHARLES CONCODORA, M.D.                                Page 78

1    from an ultrasound technician to be relayed
2    to him?")
3        MR. SHUSTED: I object, and, Doctor, why
4    don't you leave the room for a second and
5    I'll put my objection on the record.
6        (Witness excused.)
7        MR. SHUSTED: Dr. Concodora has answered
8    very specific questions in context as to why
9    he -- what use is to be made from the data
10   from an ultrasound technician and it should
11   not be relied upon for certain reasons, and
12   now you're taking those words and misstating
13   something by saying no reliance whatsoever.
14       So obviously ultrasound technicians
15   provide data, and you're now trying to say
16   anything a ultrasound technician does is
17   useless and you're trying to get this Doctor
18   to say --
19       MR. JOKELSON: I'm not saying it's
20   useless.
21       MR. SHUSTED: You're trying to create
22   something, and you're misstating what he
23   said, and creating not only a misstatement
24   but you're arguing with the Doctor.  You

CHARLES CONCODORA, M.D.                                Page 79

1    could just ask specific factual questions,
2    he's answered your question and you don't
3    like the way he's answered it, so you want
4    to make him change his answer.
5        MR. HOSMER: David, Dr. Cho said he
6    didn't rely on the ultrasound tech, so why
7    are we even doing this.
8        MS. ROBINSON: I'm sorry, if I could add
9    to the objection, Dr. Hassel testified about
10   this conversation at length, so you're
11   asking this witness about a conversation
12   that may or may not have happened that he
13   wasn't privy to.  I just --
14       MR. JOKELSON: I'm asking about a
15   conversation that was reported to have
16   happened involving the person he was
17   supervising.  I think that's appropriate.
18       MS. ROBINSON: You've laid no foundation
19   that he was even aware of the conversation.
20   Again, it's so far in the abstract and
21   hypothetical, that it's just ridiculous.
22       MR. SHUSTED: Hearsay.
23       MR. JOKELSON: I'll remind everybody
24   that we're at a deposition, not trial.

CHARLES CONCODORA, M.D.                                Page 80

1        MR. SHUSTED: That goes to foundation.
2    The objection to the form is foundation.
3    You're asking him about someone else's
4    conversation with someone else, and you've
5    already questioned those people about that,
6    and saying what did they mean when they were
7    talking about that.  He wasn't there.
8        MR. JOKELSON: I didn't ask what they
9    meant.  That's exactly not what I asked him,
10   Jack.
11       MS. ROBINSON: By asking whether or not
12   it was proper, you're clearly asking what
13   they meant.  He can't give an opinion about
14   it.
15       MR. JOKELSON: Why don't we bring him
16   back.
17       BY MR. JOKELSON:
18   Q.  Did you ever review the final radiology report
19   done in this case in connection with the
20   preliminary report?
21   A.  During review for this deposition, yes.
22   Q.  But not at the time?
23   A.  Well, at the time there was no final report
24   because that wasn't provided for another seven

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

---

CHARLES CONCODORA, M.D.                                    Page 81

1   hours or so.
2   Q.   But you wrote your note four days later?
3   A.   Correct, and my note was written based off of
4     my phone conversation with Dr. Cho and nothing
5     else.
6   Q.   Did you take notes of that phone conversation?
7   A.   No.
8   Q.   And you remembered everything that happened in
9     that phone conversation, enough to write a note
10    about it four days later?
11  A.   Enough to write that note, yes.  What I wrote
12    in that note is factual and based on the
13    conversation.
14  Q.   How many patients have you seen in the
15    interim?
16  A.   I don't know.
17  Q.   Twenty or less?
18  A.   I don't know.
19  Q.   Did you see any?
20  A.   Yes.
21  Q.   Were you -- did you see patients after 8:00
22    a.m. on the 24th of July, on that day?
23  A.   Yes.
24  Q.   Did you perform surgery that day?

---

CHARLES CONCODORA, M.D.                                    Page 82

1   A.   I'd have to check my schedule.  I don't know.
2   Q.   Did you see patients on the 25th?
3   A.   I'd have to check my schedule.
4   Q.   Did you see them on the 26th?
5   A.   Same answer.  I'd have to check my schedule.
6   Q.   And the same answer would be for the 27th or
7     the 28th?
8   A.   That would be correct.
9   Q.   But you're certain you made no notes of your
10    conversation with Dr. Concodora?
11  A.   You mean Dr. Cho?
12  Q.   I meant Dr. Cho.  Thank you for correcting my
13    mistake.
14  A.   Correct.
15  Q.   And you just wrote your note from your memory
16    entirely?
17  A.   Correct.
18  Q.   And I think you said before, unless I'm
19    misunderstanding, that you don't recall having any
20    conversations with Dr. Balsara?
21  A.   Correct.
22  Q.   And you never spoke to the patient in this
23    case or his parents?
24  A.   Correct.

---

CHARLES CONCODORA, M.D.                                    Page 83

1   Q.   Do you have any recollection today what your
2     conversation was with Dr. Cho, actual recollection
3     as distinct from what's on the record?
4   A.   Minimal.
5   Q.   What's the minimal part?
6   A.   I remember speaking with Dr. Cho about that
7     there was waxing and waning of the scrotum, meaning
8     there was a size difference in the scrotum that was
9     coming and going to put it in a different term, and
10    I remember the ultrasound was read as normal with
11    no evidence of testicular torsion.
12  Q.   Was the waxing and waning over the course of
13    the child's lifetime?
14  A.   I don't recall the duration of time.
15  Q.   Did there come a time when Urology for
16    Children was not being paid by St. Christopher's
17    Hospital?
18  A.   I'm not privy to that information.
19  Q.   I'm going to show you a document.  This is a
20    filing in the United States District Court by
21    Urology for Children.  Let me show you here on page
22    2 of this filing, there is a footnote, too, that
23    refers to agreements that are with St.
24    Christopher's Hospital and one of them is a service

---

CHARLES CONCODORA, M.D.                                    Page 84

1     agreement.
2         I think I raised that before when we
3     were off the record in the beginning of the
4     deposition.
5         Do you have any knowledge about that
6     service agreement?
7   A.   No, I do not.
8   Q.   And I had asked your counsel, Mr. Shusted,
9     again, to produce that.
10        MR. SHUSTED: I'll look into it if you
11    send me a follow-up e-mail, too.
12        MR. JOKELSON: Off the record.
13        _ _ _
14        (Whereupon a discussion was held off the
15    record.)
16        _ _ _
17        BY MR. JOKELSON:
18  Q.   It identifies in here that the debtors, which
19    is the entity that own St. Christopher's Hospital
20    were obligated to make payments to Urology for
21    Children for services rendered and that the debtors
22    defaulted on their obligation to make all required
23    payments, and in that regard it identifies that the
24    debtors owe Urology for Children $37,200 for

---

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

CHARLES CONCODORA, M.D.     Page 85

1   on-call coverage during May of 2019; $36,000 for
2   June of 2019; $37,200 for July of 2019. Were you
3   ever made aware of any of that?
4   A. No.
5      MS. ROBINSON: Objection.
6      MR. JOKELSON: Why don't we take two
7   minutes. I just want to look through my
8   notes.
9      _ _ _
10   (Whereupon a recess was held.)
11      _ _ _
12      BY MR. JOKELSON:
13   Q. Do you understand, Doctor, that acute scrotal
14   pain is a urological emergency requiring prompt
15   attention?
16   A. Yes.
17   Q. Why is that?
18   A. Well, acute scrotal pain has a very large
19   differential diagnosis which includes potential
20   surgical emergencies, medical treatments, and so it
21   requires prompt assessment.
22   Q. Do you understand that a spermatic cord
23   torsion is a true urological emergency and must be
24   differentiated from other complaints of testicular

CHARLES CONCODORA, M.D.     Page 86

1   torsion because a delay in diagnosis can lead to a
2   loss of the testicle?
3   A. Yes.
4   Q. And do you understand that in making that
5   assessment it's necessary to urgently have an
6   ultrasound performed?
7   A. That is part of the assessment.
8   Q. Well, is there any criticality to having that
9   done sooner rather than later?
10      MS. ROBINSON: Object to the form.
11   Vague.
12      BY MR. JOKELSON:
13   Q. Is that a yes?
14   A. Yes.
15   Q. I couldn't hear you, Doctor.
16   A. Yes.
17   Q. And that's a Doppler ultrasound?
18   A. Correct, that would be ultrasound that has
19   Doppler flow, yes.
20   Q. In these sorts of situations time is of the
21   essence for salvaging the testicle?
22      MS. ROBINSON: Object to the form.
23      BY MR. JOKELSON:
24   Q. Taking these prompt actions?

CHARLES CONCODORA, M.D.     Page 87

1      MS. ROBINSON: Objection. Vague.
2      MR. HOSMER: Join.
3      BY MR. JOKELSON:
4   Q. Is that correct?
5   A. I didn't hear that. Please state the entire
6   question without interruptions.
7   Q. In order to preserve testicular viability,
8   it's essential, is it not, that in the presence of
9   acute scrotal pain, that the patient be assessed,
10   you know, emergently, emergently; is that correct?
11      MR. SHUSTED: Object to the form.
12      THE WITNESS: So first of all, the
13   assessment of acute scrotal pain requires
14   prompt intervention. You're lumping in
15   viability of the testicle into this, where
16   acute scrotal pain, that's a long
17   differential which includes testicular
18   torsion, so maybe your real question is, I
19   don't know if you're asking, is it necessary
20   in the setting of testicular torsion to act
21   appropriately to save the testicle.
22      BY MR. JOKELSON:
23   Q. In a situation where there's acute scrotal
24   pain the differential includes testicular torsion,

CHARLES CONCODORA, M.D.     Page 88

1   right?
2   A. Correct. We went over there, yes.
3   Q. So in order to insure that the testicle
4   remains viable, the various items on the
5   differential have to be excluded in an urgent
6   fashion, an emergent fashion?
7   A. Correct.
8      MS. ROBINSON: Objection.
9      MR. SHUSTED: Object to the form.
10      MS. ROBINSON: I join in the objection
11   I'm sorry, Doctor, and, Mr. Jokelson, I'm
12   not trying to interrupt anyone, but
13   Dr. Concodora you're not my witness and
14   sometimes there's no time between
15   Mr. Jokelson finishing and you starting, so
16   that leads me to interrupting one of you, so
17   if I could respectfully ask for maybe a
18   brief pause in between the finishing of the
19   question and you answering, I think that
20   would stop me from interrupting.
21      BY MR. JOKELSON:
22   Q. Part of that emergent evaluation to rule out
23   testicular torsion in the presence of an acute --
24   of acute scrotal pain would be the performance

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021

CHARLES CONCODORA, M.D.                          Page 89

1  urgently of a scrotal ultrasound?
2     MS. ROBINSON: Object to the form.
3     THE WITNESS: If testicular torsion is
4  on the differential diagnosis, then, yes,
5  ultrasound is appropriate, yes.
6     BY MR. JOKELSON:
7  Q.   And testicular torsion should be on the
8  differential diagnosis when a patient has acute
9  scrotal pain?
10  A.   Correct.
11  Q.   Is that correct?
12  A.   Yes.
13     MR. JOKELSON: I don't have any further
14  questions, I don't think.  Thank you,
15  though.
16     MR. YOUNG: I have just a few.  David,
17  would you please put up SCHC 12?
18     MR. JOKELSON: Mr. Young, do you know
19  what plaintiff exhibit that was?
20     MR. YOUNG: It's the emergency urgent
21  care notes.
22     MR. JOKELSON: I believe it's
23  Plaintiff's Exhibit 10.  You want page 12?
24     MR. YOUNG: Yes, please.

CHARLES CONCODORA, M.D.                          Page 90

1     BY MR. YOUNG:
2  Q.   Doctor, my name is George Young.  I represent
3  Dr. Kalyanpur and I would like, please, if we could
4  highlight Dr. Hassel's note of 5:32 a.m.  Can you
5  do that, David?
6     MR. JOKELSON: Sure.
7     BY MR. YOUNG:
8  Q.   Doctor, do you see that?
9  A.   Yes.
10  Q.   Dr. Hassel wrote spoke to urologist, reported
11  that he was not confident in the results of the
12  ultrasound.  He is coming in to evaluate the
13  patient.
14     Was that ever communicated to you that
15  the urologist was not confident in the results of
16  the ultrasound?
17  A.   So that line from the medical record was not
18  relayed to me.
19  Q.   Did Dr. Cho ever indicate to you why he
20  decided to come in to evaluate the patient?
21  A.   Because that's standard for the residents
22  covering the emergency room.  Every scrotal pain is
23  to be seen by the resident in person.  So that is
24  standard for that resident to come in.

CHARLES CONCODORA, M.D.                          Page 91

1  Q.   So it was not related in a lack of confidence
2  in the results of the ultrasound?
3     MS. ROBINSON: Object to the form.
4     THE WITNESS: I can't answer for
5  Dr. Cho, but like I mentioned, Dr. Cho would
6  have been coming in regardless.
7     MR. YOUNG: Thank you.  That's all I
8  have.  Thank you.
9     MR. HOSMER: I have nothing.
10     MS. ROBINSON: I don't have anything.
11     MR. FOWLER: No questions from me.
12     MR. JOKELSON: Thank you, everyone.
13     _ _ _
14     (Deposition concluded at 6:05 p.m.)
15     _ _ _
16
17
18
19
20
21
22
23
24

CHARLES CONCODORA, M.D.                          Page 92

1          C E R T I F I C A T I O N
2
3          I, PATRICIA A. LIPSKI, hereby
4  certify that the testimony and the proceedings in
5  the foregoing matter, are contained fully and
6  accurately in the stenographic notes taken by me,
7  and that pages 1 through 91 of this testimony are a
8  true and correct transcript of the same.
9
10
11          *Patricia A. Lipski*
12
13          PATRICIA A. LIPSKI
             RPR, CCR, New Jersey,
             Notary Public
14
15          The foregoing certification of this
16  transcript does not apply to any reproduction of
17  the same by any means unless under the direct
18  control and/or direction of the certifying
19  shorthand reporter.
20          _ _ _
21
22
23
24

LaSheena Sipp-Lipscomb, et al. vs.
Einstein Physicians Pennypack Pediatrics, et al.

Charles Concodora, MD
June 29, 2021



CHARLES CONCODORA, M.D.                              Page 93

 1
 2                   CERTIFICATE OF DEPONENT
 3
 4            I, CHARLES CONCODORA, M.D., have read
 5   the foregoing transcript of my testimony taken on
 6   June 29, 2021, contained within pages 1 to 92, and
 7   it is true, correct and complete to the best of my
 8   knowledge, recollection and belief, except for the
 9   list of corrections, if any, attached on a separate
10   sheet herewith.
11
12
13   DATE                  CHARLES CONCODORA, M.D.
14
15
16
17
18
19
20
21
22
23
24